**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re ASML Holding N.V. Securities Litigation* | Case No. 24-cv-8664-NRB-JW |
| | <u>CLASS ACTION</u> |
| | **CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| | <u>JURY TRIAL DEMANDED</u> |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................ 2

II.   JURISDICTION AND VENUE ..................................................................... 9

III.  PARTIES ......................................................................................................... 9

IV.   SUMMARY OF THE FRAUD ..................................................................... 13

    A.    Background .......................................................................................... 13

    B.    Tighter Export Restrictions For China Implemented Before The Start Of The Class Period Threaten The Company's Promised Growth ........................... 14

    C.    The Class Period Begins ..................................................................... 19

    D.    As The Class Period Continues, Public Reporting Suggests Adverse Developments For ASML—But Defendants Steadfastly Assure Otherwise ....... 24

    E.    Unknown To Investors, Defendants Knew And Concealed Adverse Facts ......... 39

        1.    Defendants Knew—But Concealed From Investors—Adverse Facts Indicating That Leading-Edge Customers Would Cancel Or Postpone Orders ........................................................................ 39

        2.    Defendants Knew—But Concealed From Investors—That The Company's China-Based Performance Was Unsustainable And Would Normalize Rapidly ...................................................... 45

    F.    Knowing That 2025 Results Will Miss Guidance, Defendants Engage In Insider Sales And Selectively Disclose Information ............................................. 49

    G.    The Relevant Truth Is Revealed ......................................................... 53

    H.    Post-Class Period Events Further Confirm The Fraud ......................... 58

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ............................................................. 61

    A.    Defendants' False And Misleading Statements And Omissions Concerning Adverse Facts Related To The Company's Leading-Edge Customers ................ 61

    B.    Defendants' False And Misleading Statements And Omissions Concerning China Performance ............................................................................... 67

C.    Defendants' False And Misleading Statements And Omissions Concerning The Strength Of The Company's Backlog ............................................. 75

D.    Defendants' False And Misleading Statements And Omissions Concerning The Company's Order Intake ..................................................... 76

E.    Defendants' False And Misleading Statements And Omissions Concerning The State Of The Industry Recovery ...................................... 77

F.    Defendants' False And Misleading Statements And Omissions As To 2025 Performance ............................................................. 80

VI.    LOSS CAUSATION .................................................................. 83

VII.    ADDITIONAL SCIENTER ALLEGATIONS ............................................ 89

A.    Defendants' Insider Sales Support A Strong Inference Of Scienter .................... 89

B.    Defendants' Unique And Nonpublic Insight Into Their Customers And The Industry Support A Strong Inference Of Scienter ..................................... 94

C.    Defendants' Admission That There Was A "Factual Absence" Of Industry Recovery Supports A Strong Inference Of Scienter ............................... 98

D.    Defendants' Admission That Order Intake Does Not "Accurately" Reflect Business Momentum Supports A Strong Inference Of Scienter ...................... 99

E.    The Close Proximity Between Defendants' False And Misleading Statements And The Revelation Of The Truth Supports A Strong Inference Of Scienter ........................................................................ 99

F.    The False And Misleading Statements And Omissions Concerned Matters Critical To ASML's Performance, Which Supports A Strong Inference Of Scienter ........................................................................ 100

G.    That Defendants' False And Misleading Statements Concerned Subjects About Which Defendants Frequently And Authoritatively Spoke Supports A Strong Inference Of Scienter ...................................................... 101

H.    Defendants' Involvement In Discussions Around Export Restrictions Supports A Strong Inference Of Scienter ............................................. 102

I.    The Suspicious Circumstances Of Defendant Miller's Departure Supports A Strong Inference Of Scienter ...................................................... 103

J.    Defendants Possessed The Motive And Opportunity To Artificially And Unsustainably Accelerate The Company's China Sales Given Political Pressure And Global Downturn ...................................................... 104

K.     Defendants' Selective Disclosure Of Material Non-Public Information Supports A Strong Inference of Scienter ........................................................... 105

VIII.   CLASS ACTION ALLEGATIONS ................................................................. 107

IX.     APPLICABILITY OF THE PRESUMPTION OF RELIANCE ................................... 108

X.      NO SAFE HARBOR ..................................................................................... 109

XI.     CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT........................................ 110

XII.    PRAYER FOR RELIEF ................................................................................. 113

XIII.   JURY TRIAL DEMANDED ............................................................................ 114

Court-appointed Lead Plaintiffs City of Hollywood Firefighters' Pension Fund, City of Hollywood Police Officers' Retirement System, City Pension Fund for Firefighters and Police Officers in the City of Miami Beach, City Pension Fund for Firefighters and Police Officers in the City of Pembroke Pines, and Police and Fire Retirement System of the City of Detroit (together, "Lead Plaintiffs"), by and through their undersigned counsel, bring this action for violations of Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1, and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against ASML Holding N.V. ("ASML" or the "Company"), Peter Wennink, Christophe Fouquet, Skip Miller, and Roger Dassen. Lead Plaintiffs bring these claims on behalf of themselves and a class of investors who purchased or otherwise acquired ASML ordinary shares, as well as those who purchased or otherwise acquired call options and/or sold put options on ASML ordinary shares, between January 24, 2024 and October 15, 2024, inclusive (the "Class Period"), in domestic transactions or on U.S. exchanges, and were damaged thereby.

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based on, among other things, the ongoing independent investigation of their undersigned counsel. This investigation includes reviewing, analyzing, and conducting: (i) ASML public filings with the SEC and the Dutch Authority for Financial Markets ("AFM"); (ii) research reports by securities and financial analysts; (iii) records and transcripts of investor conference calls; (iv) publicly available presentations by ASML and its clients; (v) press releases, media reports, and industry publications; (vi) securities pricing data; (vii) interviews with former ASML employees and other individuals; (viii) consultations with experts; and (ix) other material and data

identified herein. Lead Counsel's investigation is continuing, and many of the relevant facts are known only by Defendants and are exclusively within their custody or control.

I.    **INTRODUCTION**

1.    This action arises from Defendants' false and misleading statements and omissions during the Class Period concerning the sustainability of revenue from sales to China and orders from the Company's leading-edge customers that undergirded critical performance expectations that Defendants repeatedly reaffirmed to investors. In fact, Defendants knew of—but misled investors as to—adverse facts that indicated significant risks to both ASML's China and critical non-China leading-edge customers, and thereby artificially inflated and/or maintained artificial inflation in the price of ASML ordinary shares. When the truth concerning Defendants' misrepresentations and omissions was revealed, the Company's stock price declined precipitously, erasing billions of dollars in shareholder value.

2.    ASML is a Dutch corporation with its principal executive offices in Veldhoven, the Netherlands. ASML is a leading supplier to the semiconductor industry, providing chipmakers with hardware, software, and services to mass produce integrated circuits (i.e., microchips). ASML generates substantially all of its revenue through the sale and maintenance of photolithography machines and related equipment used by its customers in the semiconductor fabrication process.

3.    Broadly speaking, ASML's photolithography equipment falls into one of two categories: (i) Deep Ultraviolet ("DUV"), an older and less expensive technology that uses higher wavelength light, and (ii) Extreme Ultraviolet ("EUV"), a newer method that uses lower wavelength light. DUV and EUV allow "fabs," the factories which manufacture semiconductors and other microelectronics (also known as "foundries"), to "etch" or print increasingly small and efficient semiconductors used in advanced applications.

2

4.     ASML enjoys a near-monopolistic stranglehold over the global chip industry through its advanced lithography technology and equipment, which are necessary to build advanced semiconductors. These machines can take the Company up to 18 months (or even longer) to manufacture and qualify, and thus customer orders are initially recorded by the Company as backlog, and only later recognized as revenue once the orders are completed and transferred to customers. Given the expense and lengthy lead time required, the market understands that ASML has deep and accurate forecasting insights, and guidance provided by the Company is highly material to investors. Thus, over a year before the start of the Class Period (in November 2022), ASML had provided the market with revenue and gross margin guidance for 2025, telling investors that the Company would achieve remarkable growth, increasing revenue from €22.3 billion in 2022 to €30-40 billion in 2025—i.e., an increase of 35%-79%—and increasing its gross margin from 50.5% in 2022 to 54%-56% in 2025, i.e., an increase of 7%-11%.

5.     Defendants continued to reaffirm, before and throughout the Class Period, that the Company would achieve this performance, and this guidance was—as one analyst wrote—investors' "anchor" in valuing the Company. Defendants also told investors that the guidance was "conservative" and—even as late as September 2024, just weeks before the end of the Class Period—that they "don't see a way" that the Company would achieve only the ***low*** end of the guidance. Indeed, for more than 12 years, without fail, ASML had reported revenues above the mid-point of its guidance, bolstering investors credit of Defendants' assurances about their 2025 performance. In other words, Defendants affirmatively and consistently led investors to believe that the Company was on track to achieve in 2025 the ***upper range*** of the revenue and gross margin guidance they had provided.

6.      As noted, the Company's performance (and thus its ability to achieve the guidance) primarily turned on its delivery of orders from its existing backlog as well as imminent orders from customers. While EUV was the cutting edge of ASML's products and widely understood to be the Company's and industry's future, before and continuing throughout the Class Period, Defendants drove outsized revenue and bookings related to the Company's DUV machines, which were generally used to support the manufacture of "trailing edge" and older microelectronics.

7.      In particular, starting in the second quarter of 2023 and continuing into 2024, ASML reported significant sales growth in China. Since 2019, ASML had been prohibited through export control regulations implemented by the United States and the Hague from selling EUV machines to China, and through 2022, the country had represented just 15-20% of the Company's revenue, according to Defendants. However, in the periods just prior to and continuing throughout the Class Period, the proportion of the Company's net system sales[1] to China skyrocketed from 2022 levels:

**Percentage of ASML Net System Sales to China**

| 4Q22 | 1Q23 | 2Q23 | 3Q23 | 4Q23 | 1Q24 | 2Q24 | 3Q24 |
|------|------|------|------|------|------|------|------|
| 9% | 8% | 24% | 46% | 39% | 49% | 49% | 47% |

Similarly, before the start of the Class Period, Defendants reported growth in the share of new bookings (i.e. orders that the market expected ASML would convert into revenue in the near-term) that was unrelated to EUV; given that, as noted, ASML had been prohibited from exporting EUV to China for years, the market understood that these new orders were a bellwether of China demand:

---

[1] Throughout the Class Period, net system sales drove 75% or more of the Company's total net sales, its reported revenue metric.

**ASML Non-EUV Bookings as a Percentage of Total Bookings**

| 4Q22 | 1Q23 | 2Q23 | 3Q23 |
|------|------|------|------|
| 46%  | 58%  | 64%  | 81%  |

8.    These outsized increases in bookings and revenue began at the same times as the Company's business to China came under increasing international pressure. As was later revealed, prior to the surge in China performance, ASML had been operating under a then-secret agreement with the U.S. government to delay deliveries of its DUV lithography systems to China, under which Defendants had taken orders from China but nonetheless prioritized fulfillment of orders to clients outside China. However, according to subsequent public reporting, that deal "stumbled [in 2023] as ASML turned to Beijing to compensate for weak demand elsewhere," causing ASML "to successfully lobby The Hague for export licenses to China . . . ." As a result, "[t]he Dutch government permitted more shipments, allowing China to stock up on the gear before new US-brokered export restrictions came into force."

9.    This development "dash[ed] U.S. officials' expectations that the [secret] deal would limit deliveries," and the United States government pressed for formal export restrictions on ASML. By March 2023, the Dutch government announced plans to implement new export controls on certain DUV technology, which would further limit the number and types of machines that ASML could ship to customers in China. At the end of June 2023, the Dutch government published its new regulations, which became effective on January 1, 2024.

10.    As these forthcoming restrictions were announced, ASML claimed that it did "not expect these measures to have a material effect on our financial outlook . . . for 2023 or for our longer-term scenarios." However, given the now-outsized contribution from China to the Company's performance, the market scrutinized the question of "China sustainability," i.e., if (and

when) the Company's China-related performance would normalize to historical levels. However, prior to and throughout the Class Period, Defendants repeatedly dismissed such concerns, reassuring investors that China demand was and would remain "***strong***" "***going forward***"[2] as China prioritized building the fabs necessary to support its domestic industrial demand for microelectronics. Indeed, Defendants even told investors that "DUV demand [is] higher than we can deliver, particularly in China." Further, even as news of potential further restrictions emerged throughout the Class Period—which posed potentially existential risks to the Company's business in China, i.e. the driver of nearly half of the Company's performance at this time—Defendants did not waver from their guidance and reassured investors that they appropriately accounted for export restrictions.

11.     Even as China drove an increasingly large share of the Company's orders and revenue by the start of the Class Period, ASML still depended significantly on (and needed to drive material contributions from) the Company's largest leading-edge customers, including Intel, TSMC, and Samsung, which were not based in China and which analysts estimated had historically provided as much as 80% of the Company's revenue. Indeed, Defendants had acknowledged publicly the critical importance of ASML's leading-edge customers to the Company's performance and growth. For example, in response to an analyst question in December 2022 as to how important Intel was for ASML's growth rates and whether moderated Intel spending would impact the Company's growth rate, Defendant Miller admitted that Intel was "clearly an important customer" and further that it was "critical going forward" that Intel and other customers "drive innovation"; in other words by continued spending for ASML's pricey tools, each of which could cost hundreds of millions of euros. Among other things, expected construction of new fabs by

---

[2] Unless otherwise noted, all emphasis herein is added.

these leading-edge customers (as required to manufacture the next generation of semiconductors) portended significant expenditures by those customers to ASML, as each EUV machine would cost up to €350 million, construction of these fabs portended massive expenditures by ASML customers.

12.    Thus, in addition to assuring investors about the Company's "strong" and "robust" demand from China, Defendants also consistently reassured investors throughout the Class Period about the orders and revenue from these leading-edge customers, even in response to emerging reporting of difficulties at those customers. For example, Defendants told investors the positions "***that customers have taken are pretty rock solid***," that Defendants had seen no "***indication or any customer messaging to us that those things won't happen***," and that "***in the foreseeable future you will see the translation of what we know is firm demand into orders***." Even when directly asked about public reporting detailing massive spending cuts by Intel—which would seemingly have a direct impact on that key customer's orders with ASML—Defendants again reaffirmed ASML's long-touted guidance and suggested that the Company knew of and considered that development in its guidance, stating that "***many times some of the communications around CapEx and other things have already been reflected and adjustments that have been made in the different forecast***." Indeed, Defendant frequently touted client interactions "from CEO-to-CEO . . . right through to on-the-ground support at individual fabs" as providing them with detailed knowledge of their clients' roadmaps and future needs. Thus, Defendants' repeated and specific assurances gave the market the impression that the leading-edge customer backlog was "intact" and that, "as a strategic supplier, [ASML] have been aware of changes at [their leading-edge customers] ahead of . . . public announcement[s]" and those changes were incorporated into Defendants' conservative performance guidance.

13.     Ultimately, in an abrupt about-face over a series of disclosures on October 15 and 16, 2024, Defendants revealed that their assurances to investors over the Class Period—as to both China and the Company's leading-edge customers—had been false. In fact, the Company's leading-edge customers had postponed orders, delaying substantial revenue from the Company's backlog until after 2025—if not longer. Further, contrary to their assurances to investors that the Company's outsized China performance was "robust" and demand was "strong," in fact the Company's outsized China performance would imminently normalize to much lower levels, far faster than investors had been led to believe. Defendants also admitted that the supposedly "conservative" 2025 performance guidance that they repeatedly touted was, in fact, unachievable as a result of these very issues (i.e. abrupt China normalization and leading-edge customer pushouts).

14.     Investors were stunned. Analysts at Wolfe Research wrote that, "[g]iven the long lead times and strong visibility that ASML typically has with customers, *it's rare for ASML to surprise investors as they just did*," elaborating that "*[p]art of the surprise here is that many of these potential issues (China, INTC)*"—i.e., the very issues Defendants repeatedly reassured investors about, discussed above—"*were known 90 days ago, yet management continued to reiterate their €35-40bn guide through the quarter*," referring to the high end of the 2025 guidance, consistent with Defendants' assurances. Likewise, Cantor Fitzgerald exclaimed that "*there is no doubt there is a loss of credibility here*."

15.     All told, this new information caused the price of ASML ordinary shares to fall from a close of $872.27 per share on October 14, 2024 to close at $683.52 per share on October 16, 2024, a decline of nearly 22%.

16.     While investors suffered damages from the revelation of the truth, Defendants made millions in proceeds from insider sales before revealing it. These insider sales included approximately €13 million in proceeds to Defendant Dassen alone, who liquidated his *entire* personal holdings of ASML ordinary shares just weeks before the Company disclosed the truth.

## II.    <u>JURISDICTION AND VENUE</u>

17.     Plaintiffs' claims arise under Sections 10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1, and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

18.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

19.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because ASML's shares are traded on the Nasdaq and many of the acts that constitute the violations of law complained of herein, including the dissemination to the public of materially false and misleading information, occurred in this District.

20.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    <u>PARTIES</u>

21.     Lead Plaintiff City of Hollywood Firefighters' Pension Fund ("Hollywood Firefighters") is a pension fund established for the benefit of current and retired firefighters of the City of Hollywood, Florida. As of January 10, 2025, Hollywood Firefighters managed over $300 million in net assets on behalf of approximately 500 members and their beneficiaries. As set forth in its previously filed certification, *see* ECF No. 33-1, incorporated by reference herein, Hollywood

Firefighters purchased ASML securities on U.S. exchanges and in domestic transactions at artificially inflated prices during the Class Period and was damaged thereby.

22.    Lead Plaintiff City of Hollywood Police Officers' Retirement System ("Hollywood Police") is a pension fund established for the benefit of current and retired police officers of the City of Hollywood, Florida. As of January 10, 2025, Hollywood Police managed approximately $390 million in net assets on behalf of approximately 990 members and their beneficiaries. As set forth in its previously filed certification, *see* ECF No. 33-1, incorporated by reference herein, Hollywood Police purchased ASML securities on U.S. exchanges and in domestic transactions at artificially inflated prices during the Class Period and was damaged thereby.

23.    Lead Plaintiff City Pension Fund for Firefighters and Police Officers in the City of Miami Beach ("Miami F&P") is a pension fund established for the benefit of current and retired firefighters and police officers of the City of Miami Beach, Florida. As of January 10, 2025, Miami F&P managed approximately $1.2 billion in net assets on behalf of over 1,300 members and their beneficiaries. As set forth in its previously filed certification, *see* ECF No. 33-1, incorporated by reference herein, Miami F&P purchased ASML securities on U.S. exchanges and in domestic transactions at artificially inflated prices during the Class Period and was damaged thereby.

24.    Lead Plaintiff City Pension Fund for Firefighters and Police Officers in the City of Pembroke Pines ("Pembroke Pines F&P") is a pension fund established for the benefit of current and retired firefighters and police officers of the City of Pembroke Pines, Florida. As of January 10, 2025, Pembroke Pines F&P managed approximately $840 million in net assets on behalf of approximately 840 members and their beneficiaries. As set forth in its previously filed certification, *see* ECF No. 33-1, incorporated by reference herein, Pembroke Pines F&P purchased

ASML securities on U.S. exchanges and in domestic transactions at artificially inflated prices during the Class Period and was damaged thereby.

25.     Lead Plaintiff Police and Fire Retirement System of the City of Detroit ("Detroit F&P") is a pension fund established for the benefit of current and retired firefighters of the City of Detroit, Michigan. As of January 10, 2025, Detroit F&P managed approximately $2.8 billion in net assets on behalf of over 11,000 members and their beneficiaries. As set forth in its previously filed certification, *see* ECF No. 33-1, incorporated by reference herein, Detroit F&P purchased ASML securities on U.S. exchanges and in domestic transactions at artificially inflated prices during the Class Period and was damaged thereby.

26.     Defendant ASML is a Dutch corporation headquartered at De Run 6501, 5504 DR Veldhoven, the Netherlands. ASML's ordinary shares are listed on the Nasdaq under the ticker symbol "ASML."

27.     Defendant Christophe Fouquet was the Company's Chief Business Officer from July 2022 through April 24, 2024, and has served on the Company's Board of Management since April 2018. He has served as the Company's President and Chief Executive Officer since April 25, 2024. Defendant Fouquet personally profited from at least €2.9 million in proceeds from insider sales of ASML ordinary shares during the Class Period.

28.     Defendant Roger Dassen is the Company's Executive Vice President and Chief Financial Officer, and has served in that role since June 2018. Defendant Dassen personally profited from at least €12,291,556 in proceeds from insider sales of ASML ordinary shares during the Class Period.

29.     Defendant Peter Wennink served as the Company's President and Chief Executive Officer from 2013 until April 24, 2024. Defendant Wennink had previously served as the

Company's CFO since 1999. Because Defendant Wennink is no longer employed by ASML, his Class Period transactions in ASML ordinary shares cannot be determined at this time.

30.    Defendant Skip Miller served as the Company's VP of Investor Relations and Head of Worldwide Investment Relations during the Class Period, having held that role since January 2018. Prior to that, Defendant Miller had served as Director of Strategic Marketing since December 2002. Having spent over 21 years with ASML, Defendant Miller abruptly left the Company just after the Class Period with no explanation.

31.    Defendants Fouquet, Dassen, Wennink, and Miller are collectively referred to herein as the "Individual Defendants." ASML and the Individual Defendants are collectively referred to herein as "Defendants."

32.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of ASML's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Each Individual Defendant was provided with copies of the Company's reports alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions, day-to-day management of ASML, and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations being made were materially false and/or misleading at the time they were made, and/or omitted material facts necessary to prevent their public statements from being misleading.

IV.    **SUMMARY OF THE FRAUD**

    A.    **Background**

33.    ASML is a Dutch corporation with its principal executive offices in Veldhoven, the Netherlands. ASML designs, develops, integrates, markets, and services photolithography machines and other equipment for use in the semiconductor fabrication process. It is the largest supplier for the semiconductor industry and the sole supplier in the world of the EUV ultraviolet lithography machines that are required to manufacture the most advanced semiconductors. Photolithography is a microfabrication technique that uses light to create intricate patterns on a substrate, like a silicon wafer, by transferring a pattern from a photomask to a light-sensitive material called photoresist. This process is a crucial step in manufacturing semiconductor devices and other micro-scale components. In 2013, the Company acquired lithography light source supplier Cymer, which is now the division of the company that manufactures the light sources that power the Company's lithography equipment. As described by analyst firm Morningstar on July 20, 2022, the "hefty" price tag paid by ASML to acquire Cymer was warranted because Cymer is "critical to the success of EUV." Thus, throughout the Class Period, the Company's performance was impacted by Cymer's own performance, as Cymer's lasers are critical components of the Company's lithography machines and its performance correlates to the Company's sales of that equipment.

34.    Generally speaking, the Company sells two categories of lithography machines: (i) DUV systems, which were first introduced in the late 1990s; and (ii) EUV systems, the Company's "leading-edge" product that is currently being tested and used to build the next generation of semiconductors, and which comes in both low-NA and high-NA (numerical aperture) varieties. DUV, low-NA EUV, and high-NA EUV allow ASML's clients to print ever smaller circuits.

35.     ASML spearheaded the development and industrialization of EUV lithography, collaborating with other industry players to bring the technology from the lab to production around 2010. EUV systems can etch significantly smaller features onto a semiconductor, increasing the number of transistors (tiny electrical switches controlling the flow of electricity) on the surface, which increases the number of functions a microchip can perform. By contrast, DUV systems print the basic layers of a microchip, but are highly productive and cost effective.

36.     EUV systems are required to produce the most advanced microchips in both Logic and Memory. A Logic chip is the "brain" of a smart device and is used to process information to complete a task. Logic chips are used in central processing units and graphics processing units, such as those in computers, smart phones, and advanced gaming devices. Memory chips are used to store information.

37.     Both types of machines, DUV and EUV, are extremely expensive and carry long lead times between order and delivery. DUV machines generally cost tens of millions of euros and require lead times of approximately six months, and EUV machines cost approximately €220-350 million and require lead times of approximately 12 to 18 months.

**B.     Tighter Export Restrictions For China Implemented Before The Start Of The Class P**eriod Threaten The Company's Promised Growth

38.     Beginning in November 2022, and reaffirmed throughout 2023 and the Class Period, Defendants told investors that the Company would achieve remarkable growth, increasing revenue from €21.2 billion in 2022 to €30-40 billion in 2025—i.e., an increase of 40%-88%—and increasing its gross margin from 50.5% in 2022 to 54%-56% in 2025, i.e., an increase of 7%-11%. Defendants told investors that ASML would achieve this rapid growth based in part on an ongoing push for "technological sovereignty," which included onshoring of semiconductor manufacturing

across several nations and involved billions of dollars of investments in the United States, Europe, and China.

39.    At the same time, the United States was also undertaking efforts to hamper China's semiconductor manufacturing efforts, including by putting renewed pressure on the Dutch government to restrict shipments of ASML's lithography technology into China. Even though the Netherlands had previously agreed in 2019 to ban the sale of EUV systems into China, China still represented approximately 14% of the Company's revenues in 2022, making it the Company's third largest market.

40.    In 2022, however, the United States began to push to expand this restriction even further, to less advanced but extremely productive DUV equipment, which ASML has described as "the workhorses of the industry."

41.    In late 2022, ASML's then CEO, Defendant Wennink, publicly acknowledged that the United States was pressuring the Netherlands to implement stricter export controls on advanced chipmaking equipment, particularly regarding sales to China. These political pressures threatened to strangle ASML's China sales, and the United States and ASML entered into a secret deal, intended as a stopgap before new restrictions were actually imposed on ASML, which gave priority to shipments of the Company's immersion DUV machines to markets outside of China.

42.    However, a global downturn in the semiconductor industry in 2023 impaired ASML's financial performance and further threatened ASML's ability to achieve the 2025 performance that Defendants had provided to investors. Accordingly, ASML successfully lobbied The Hague for licenses to export critical semiconductor manufacturing equipment to China, dashing U.S. officials' expectations that the secret deal would limit deliveries.

43.     By March 2023, the Dutch government announced plans to implement new export controls on certain DUV technology. These restrictions would further limit the number and types of machines that ASML could ship to customers in China. At the time these forthcoming controls were announced, ASML claimed that it did "not expect these measures to have a material effect on our financial outlook . . . for 2023 or for our longer-term scenarios." Ultimately, new export restrictions were published at the end of June 2023, and became effective on January 1, 2024.

44.     At the same times as these restrictions progressed throughout 2023, having abandoned its secret deal to restrict the supply of lithography equipment to its China clients—and facing flagging global demand—ASML began aggressively delivering on its China backlog, and the Company's China revenues skyrocketed. Indeed, in Q3 2023 alone, ASML exported a record €2.44 billion worth of lithography-related equipment to China, almost as much as *all* of ASML's China related revenues in 2022.

45.     The possibility of still further, potentially existential export restrictions in the future, however, caused some investors to wonder whether the astronomical growth in China sales for the Company reflected organic and sustainable growth, and was not, e.g. Chinese purchasers front-loading their orders to get ahead of the impending restrictions. For example, an article published by FT on August 25, 2023, entitled "China Imports Record Amount of Chipmaking Equipment," stated:

> While it is not clear how much of the increase in imports relates to tools that will be covered by restrictions, the purchases suggest China wants to avoid any disruption to its plans to expand chip production. "This is one of China's responses to the . . . export restrictions in the Netherlands and Japan," said Lucy Chen, vice-president of Taiwan-based research firm Isaiah Research. "China increased its inventory of semiconductor equipment through *advance stockpiling* to alleviate potential supply chain bottlenecks."

46.     As another example, a September 20, 2023 report by Société Generale, stated that the new export restrictions "*led the surge in DUV revenue this year*." The report elaborated that

"*[m]ainland China customers [are] rushing to place orders before tougher restrictions are implemented in full as of 1 January 2024*," but that investors "will inevitably discount such strength as temporary and potentially unsustainable, especially if major leading-edge customer spending pushouts" continue in light of the global semiconductor downturn. Likewise, a report Mizuho published on September 11, 2023 stated that the most frequently asked ASML investor question concerned "China demand outlook and sustainability."

47.    However, ASML and its executives mollified any investor concern as to the nature and sustainability of China demand, assuring that elevated China demand was sustainable and based on organic domestic demand in China. For example, on September 6, 2023, Defendant Miller stated that "[i]n terms of sustainability, our view is that *China will continue to be sustainable* as they work to build out the capability. . . . *And it really is in support of the different industrial activities going on in China*. . . . So we see that piece of it being *a sustainable story and not something just a one-time pull forward and it's over*."

48.    Likewise, in a press release issued on October 17, 2023, responding to updated export restrictions adopted by the United States (which are traditionally refreshed each October), ASML downplayed any impact from continuing developments around export restrictions, stating that the updated restrictions applied only "to a limited number of fabs in China" and that ASML "[does] not expect these measures to have a material impact on our financial outlook for 2023 and for our longer-term scenarios for 2025 and 2030." Further, during the Company's earnings call the following day, Defendants again denied that the Company's 2023 China sales reflected pull-forward stockpiling, stating: "For systems shipment this year to Chinese customers, the majority of the orders were booked in 2022. The demand fill rate for our Chinese customers over the last two years was significantly less than 50 percent. So the Chinese customers were in fact receiving

a much lower number of systems than they ordered. This was due to the fact that demand for our systems worldwide significantly exceeded supply."

49.    Analysts credited Defendants' representations concerning the sustainability of China demand. For example, J.P. Morgan identified China sales as "keep[ing] ASML's sales from collapsing as they did in year 3 of previous downturns," explaining on October 11, 2023, that "ASML has indicated that China remains a key bright spot in its '24 outlook and expects continued strength in that segment of the market. *We take this to mean that their sales to this market will not decline in '24 despite the ongoing semi downturn given that this investment is strategic rather than capacity driven.*" As another example, Evercore reported on anticipated China demand in 2024, stating, "sizing China demand next year (mgmt confident it sustains)." Degroof Petercam similarly reported on October 19, 2023 that, "*Management sees continued strong demand from China for the foreseeable future for mature and mid-critical equipment. Hence, they see no big threat that demand from China could suddenly fall from a cliff*. Shipments to China have been very strong this year, following large orders last year, and the fact that these customers had to wait their turn in line re shipment."

50.    Ultimately, as the year came to an end, the market continued to credit Defendants' explanation that improved order fulfillment was the principal cause of the increase in China sales. Equity research firm CrispIdea, for example, stated in a December 5, 2023 report:

> The demand for ASML's products in China remains strong, particularly for its Deep Ultraviolet (DPV) systems. Despite delays in order fulfilment over the past two years, ASML reports a high demand fill rate from Chinese customers, with most orders for the current year having been placed in 2022. Changes in demand timing from other customers have allowed ASML to catch up on fulfilling orders to China. The company is actively shipping lithography systems, focusing on mature and mid-critical nodes, to China while complying with export control regulations. ASML expects a higher sales percentage from China in the current circumstances compared to previous years. *Overall, the company anticipates continued positive*

***demand for its products in China***, especially for DPV systems, contributing to its overall growth and performance.

51.    While China drove an increasingly large share of the Company's revenue by this time, ASML still depended significantly on its largest leading-edge customers, including Intel, TSMC, and Samsung, which analysts estimated had historically provided as much as 80% of the Company's annual revenue. Indeed, Defendants acknowledged publicly the critical importance of its leading-edge customers to the Company's performance and growth. For example, in response to an analyst question in December 2022 as to how important Intel was for ASML's growth rates and whether moderated Intel spending would impact the Company's growth rate, Defendant Miller admitted that Intel was "clearly an important customer" and further that it was "critical going forward" that Intel and other customers "drive innovation"; in other words, by continuing spending.

52.    Given the importance of these customers to ASML prospects, the market carefully monitored news around those customers for any developments that could potentially impact the Company. In fact, as 2023 came to a close, public reporting bolstered hopes that the Company's customers could fuel ASML. For example, near the end of 2023, Intel—one of the Company's three largest customers—began a well-publicized effort to regain its industry leadership and significantly expand its manufacturing capacity, which would require significant investment in ASML's lithography equipment and services.

### C.    The Class Period Begins

53.    The Class Period begins on January 24, 2024. That day, Defendants announced the Company's Q4 2023 and full-year 2023 results, disclosing that ASML generated €27.6 billion in revenue and gross margins of 51.3%. Defendants disclosed that they had secured the Company's 2023 performance through a 250% increase of its high-margin China revenues, with China-based

sales reaching €7.2 billion (compared to 2022 revenues of €2.916 billion). Defendants further guided investors to expect still greater China-based sales, stating that a "***strong order intake [of €9.186 billion] in the fourth quarter clearly supports future demand***" and "significant growth . . . for 2025," with 39% of those orders related to DUV, a bellwether for China demand.

54.    Consistent with Defendants' prior representations, Defendant Wennink touted this China-based performance while at the same time assuring investors that China was sustainable and not meaningfully vulnerable to export restrictions, explaining that "[w]hile the export regulations had remaining impact on our business, ***we continue to see strong demand for mid-critical and mature nodes in China***."

55.    During the same day earnings call, an analyst probed Defendants' assessment of China demand asking, "So you've said you're expecting strong demand from China to continue in 2024. Is that expected to be sort of at the same level we've seen for the last few quarters where it's been exceptionally strong? Or is there some rebalancing you're expecting across global demand expected for later in the year ***as we get towards that growth expectation for 2025***?" In response, Defendant Dassen stated, "***we do see the demand from China being very robust***," and that while "there is an impact, obviously, coming out of the export controls . . . ***fundamentally, it's pretty clear that the China demand remains very strong***. . . ." At most, Dassen acknowledged that "how the China demand is going to pan out" was only "dependent on how the demand from the rest of the world is going to pan out" because of "allocation questions" around "supply-constrain[ts]," — but emphasizing again that, "one thing is for sure, China will remain very strong in our numbers also in 2024."

56.    Defendants bolstered their assurances by reaffirming that day ASML's 2025 guidance, telling investors that, "[b]ased on discussions with our customers and supported by our

strong backlog, we currently expect 2025 to be a strong year driven by a number of factors," including "***new fabs*** [i.e., new foundries, or semiconductor manufacturing plants] ***that are being built across the globe,*** in some instances clearly supported by several government incentive plans," and further stating that "we clearly remain confident in our long-term growth opportunity" as "***we are seeing the first signs, the positive signs of a recovery, which is basically the data we get on inventory levels, but also we see our utilization rates going up again***." The fabs referred to by Defendants were dependent on ASML's cutting-edge EUV machines; as each EUV machine would cost up to €350 million, construction of these fabs portended massive expenditures by ASML customers.

57.    In response to these remarks, an analyst noted that "consensus has come down really to the lower end of the guidance for 2025," and asked Defendant Wennink whether the Company was "still targeting the middle of the range." In response, Wennink said that Defendants "feel a bit more comfortable on 2025 ***after having received €9.2 billion of orders***," and further stated, "***I thought the low end of the range was too conservative***. That's what I said. ***Now you can make it in the middle of the range or the high end of the range***." Wennink added, "***I said the low end, I thought it was too conservative, because we do believe that 2025 is going to be a very strong year***," referring to a similar statement by Defendant Wennink on October 18, 2023, that "2025 is a very strong year and a very strong year doesn't jibe with [hitting the] low end of the [2025] guidance." Wennink added that "the order intake actually gives us at least some level of confidence that that statement at that time was actually quite good."

58.    Defendant Wennink continued his response by touting the Company's progress toward the 2025 guidance, recalling "what I also said last time, if we're right on 2025, we need to see orders coming in, in the first half of 2024. Now ***we've seen a significant batch of those orders***

*already coming in, in Q4 2023. So that just supports our assumptions*." Wennink elaborated that the Company's "exceptionally high" orders in Q4 2023 included a significant portion of EUV orders for 2025, explaining that the orders "that we're now getting is not for 2024, it's for 2025. So, that will have to continue and, in my mind, will continue in the first half of 2024. . . . [I]n the first half, we need to see a healthy further order intake . . . to support our 2025 view."

59.     Reflecting the fact that—as the market understood—achieving the touted 2025 performance depended on filling orders for expensive EUV machines from the Company's leading-edge customers, a Citi analyst asked, "if you can give us an update in terms of your – from your point of view in speaking with the customers. Have things been moving around at all in terms of the key customers and their plans for these new fabs and the tooling stores? Or is it pretty rock solid from your point of view and therefore, and evident perhaps in that €9 billion order number?" Wennink responded that, in the Company's view, orders would be filled as promised, without delay:

> I think the longer-term, let's say, *positions that customers have taken are pretty rock solid*. I think they will happen. . . . *I think the intentions are very clear. We don't see any delay there*. . . . [G]enerally, those fabs are there, those fabs are there in the US. They're in Japan, they're in Taiwan, they're in Korea, they're in China, they're in Europe. *I mean, we don't see any indication or any customer messaging to us that those things won't happen.*

60.     As to leading-edge customers purchasing EUV lithography equipment to manufacture the next generation of logic semiconductors, when asked whether "those orders will be signed up in the next few quarters for 2025 and 2026?," Wennink responded, "Yes. I think – *certainly for 2025*. I think when we look at our large Logic customers, *there are still some large customers that still need to order*, so for 2025. It still has to come. Now of course, we're in discussions, this is clear. But I mean, you could also say that *some are not in the order book that definitely need to be there if they want to have tools in 2025*. So yeah, this is – yeah, this is

22

something that *you will see* over the next couple of quarters." In other words, Defendant Wennink acknowledged that orders to meet 2025 timelines were still lacking from large Logic customers, but he asserted that investors would "see" those orders in 2024 which would, in turn, translate into revenue in 2025.

61.    Defendants' assurances worked. For example, Citi reported on January 24, 2024 that "ASML's 4Q results were punctuated by record orders of EUR9.2bn, driven broadly across customers and with significant contribution from both low and high NA EUV. We view this as ***clear indication of customers planning for structural growth, a cyclical upturn and new fab installations, the combination of which supports ASML's 2025 revenue in the top half of its EUR30-40bn range*** and ahead of consensus. The market had been anticipating an order upturn in 1H24, but it arrived sooner in 4Q23, which we take as a sign of customers' confidence in the medium-to-long term outlook." BofA similarly reported, "***ASML is feeling increasingly confident on its ability to deliver on its FY25 guide*** (€30-40bn), but with €40bn being contingent on timing of new fabs (i.e Intel EUV)."

62.    Numerous analysts also upgraded their price targets for ASML based on Defendants' positive representations during the January 24, 2024 earnings call. For instance, Raymond James upgraded ASML to a price target of $1,000 from $850 stating, "Looking ahead, we believe the worst is behind from a cyclical standpoint and expect ASML to benefit from broadening EUV adoption as well as ASP tailwinds. We are raising our FY25 estimates on strong bookings . . . ." UBS reiterated its "Buy" rating, and increased its price target to €880 from €785. Jefferies reported, "The company remains committed to strong revenue growth in 2025 at a 54-46% gross margin, ***which is well supported by the surge in Q4 orders***. We remain strong buyers of ASML." Mizuho similarly reported, "We expect strong recovery for ASML's business from

2H24 into 2025 due to spending recovery for both logic and memory. We forecast ASML's EPS to grow 64% YoY in 2025, driven by 1) N5/N3/N2 capacity expansion in logic, 2) geometry upgrade to 1b and 1c in DRAM, 3) equipment spending in new fabs, and 4) High-NA EUV sales recognition. Thus, we increase our EPS forecast by 3% for 2025. We maintain our Buy rating and raise price objective to EUR860 from EUR740." Société Generale added, "The main event of the report was ASML's return to ***record-high order intake*** of €9.2bn (3.5x the level of the previous quarter), with strong low-NA EUV orders that support ASML's bold 2025 targets (27% sales growth with a gross margin of 55% at midpoint, up by more than 400bp yoy). Against the backdrop of strong order intake, ASML's weak 1Q guidance (revenue 15% below cons., with gross margins 230bp below) was a non-event. Given our renewed confidence in ASML's strong mid-term growth prospects, we hike our estimates."

63.    Analysts also responded positively to Defendants' assurances of continued strength in China demand. For instance, UBS reported that "***investors have been overly concerned about China demand***" in light of "management comments of sustained demand into 2024," and further noted that "we believe the risk is skewed to the upside" of the 2025 guidance. Citi similarly reported on February 7, 2024 that "***Chinese demand is viewed as real, not stockpiling of equipment, and supported by the aim of captive domestic supply of chips***."

**D.    As The Class Period Continues, Public Reporting Suggests Adverse Developments For ASML—But Defendants Steadfastly Assure Otherwise**

64.    Immediately after the start of the Class Period, however, public reporting emerged suggesting potential threats to the Company's performance, including its ability to achieve its much-touted 2025 guidance. Indeed, the day after Defendants' January 24, 2024, earnings call, *Bloomberg* reported on the expiration of a secret deal between ASML and the United States to starve China of critical semiconductor technology, reporting:

A secret agreement between the U.S. and the Netherlands last year to limit ASML Holding NV's deliveries to China didn't stop a surge in sales of its sensitive chipmaking equipment.

The deal, which hasn't been reported before, stumbled as ASML turned to Beijing to compensate for weak demand elsewhere. The Dutch government permitted more shipments, allowing China to stock up on the gear before new U.S.-brokered export restrictions came into force this month.

Originally intended as a stopgap before those restrictions took effect, the agreement was meant to give priority to shipments of the company's immersion deep ultraviolet lithography machines to markets outside of China, according to people familiar with the deal who spoke on condition of anonymity.

But the global downturn pushed ASML to successfully lobby The Hague for export licenses to China of critical semiconductor manufacturing kit, dashing U.S. officials' expectations that the deal would limit deliveries, they said.

Instead, China became ASML's biggest market last year, as companies there rushed to buy equipment before the impending export ban.

65.     Then, shortly thereafter, on February 2, 2024, one of the Company's major customers—Intel—publicly announced the pushout to 2026 of two fabs in Ohio and further forewarned of cuts to its capital expenditures "in 2024 and beyond." This followed on the heels of news on January 18, 2024—just before the start of the Class Period—that TSMC, another major ASML customer, had announced a delay to 2027 or later in the projected start of production at its Arizona fab.

66.     While these public developments potentially implicated the Company's performance—and its ability to achieve its 2025 guidance—Defendants quickly assured investors to the contrary. JP Morgan reported on March 5, 2024, based on a meeting with Defendant Dassen and European IR Marcel Kemp, "the company continues to see positive trends." Elaborating, JP Morgan reported that "[t]he company has seen improving utilization in January at their customers. *The indication from the company was that* though 4Q orders were incredibly strong and cannot really improve from that very high level, *they expect good orders in the next three quarters*. We

take the latter statement to mean that the company is bullish about '25 given that strong orders in next three quarters would mean company achieving sales towards upper end of the €30-40bn '25 guidance." On China, JP Morgan relayed, "***The company sees very healthy demand in China and believes that the revenue from China will not fall off a cliff, with China in the early innings of its capacity build plans***. . . . ASML expects that China's share of mature technology nodes will increase significantly over the next few years. ASML also believes that the lion's share of the shipments to China is going ***to viable customers who will be in the market for the long term***, i.e. most of the tools are going to customers with viable technology."

67.    Defendants' continued, positive representations had their intended effect. On March 6, 2024, Jefferies increased its price target from €1,050 to €1,260, based on its view of "ASML's 2025 revenues to the high end of its guidance range of €30-40bn. We now forecast sales of €38.2bn for 2025." Similarly, on March 8, 2024, ABN-Amro raised its price target from €990 to €1,110 based on its view that "***[t]he middle of the 2025 revenue range of € 30-40bn is now easily achievable*** and the top end of the range could be as well if order intake is strong (with a level of around € 7bn in Q1 and Q2 on our reckoning). We are now forecasting € 37.5bn" for 2025. On April 2, 2024, Haitong raised its price target to $1,212 based on its "forecast [of] ASML's revenue to be EUR38.8bn in 2025."

68.    However, in March and April 2024, additional news emerged that again implicated the Company's China performance as well as its orders with leading-edge clients. First, on March 14, 2024, *Reuters* reported that Intel had "given up or postponed" a planned fab in Italy. Then, on April 2, 2024, Intel revealed an operating loss of $7 billion in 2023 for its foundry business (i.e. the "fabs" that manufacture semiconductors). On April 4, 2024, *Reuters* reported that "US President Joe Biden plans to press the Netherlands next week to stop its top chipmaking equipment

maker ASML from servicing some tools in China . . . as the U.S. leans on its allies in its bid to hobble Beijing's tech sector. [T]he U.S. export policy chief is scheduled to meet in the Netherlands next Monday with officials from the Dutch government and ASML Holding NV to discuss the servicing contracts." Finally, on April 16, 2024, reporting from *The Register* revealed that Intel's planned fabs in Arizona and Ohio had skyrocketed in costs by roughly $20 billion. This news foreshadowed further capital expenditure cuts, pushouts, and even cancellations by Intel, any of which could have material consequences for ASML.

69.    This news was front and center for investors when, on April 17, 2024, ASML reported its first quarter 2024 results, which revealed that ASML's net bookings had ***fallen*** to €3.611 billion—down from €9.186 billion in the fourth quarter of 2023. Analysts pressed Defendants about these developments during the earnings call that same day, and in turn Defendants again assured the market that the Company was on track to achieve its touted 2025 performance.

70.    For example, an analyst asked Defendants, "Can you talk about the China business trend over the recent quarter, please, because China has been really strong and there has been always concern that China may actually go to capacity by adjusting period in this year or later this year? Do you have any comment on China trends, please?" In response, Defendant Dassen stated that China was "***still strong***," "both in absolute terms and in relative terms." Dassen further elaborated, "So in terms of trends in China, strong first quarter for sure but not a record quarter, but a strong quarter. We expect China to continue to be strong this year. . . . We've also said on previous calls, and I just want to reiterate that, if you look at the demand for China, the demand in China continues to be strong . . . China is strong because they're adding capacity that we believe the world needs. And, yes, as a result of this, China's share and global market share over the years

27

become larger than it is today. . . . [W]e believe that [the capacity] China is adding today in terms of mature capacity is rational and is in line with our expectation of what capacity and mature needs to be added in order to get to what the world needs in the second half of this decade." Dassen thereby assured investors that China growth resulted from organic addition of mature capacity, and not from inorganic stockpiling.

71.    Further, Defendant Dassen also specifically emphasized that EUV orders were imminent and in place based on Defendants' own review of customer plans, which were provided to Defendants as part of ASML's close relationship with its customers. Dassen said, "if we look at the plans of some of our large customers, . . . ***it's pretty clear that in the next couple of quarters, significant orders need to come in***." Dassen further explained that he knew the orders would come because the "market being in recovery means that customers are first driving up the utilization of their tools, ***which is exactly what they're doing***." In response to an analyst question on the same topic, Defendant Fouquet touted imminent sales to the Company's leading-edge clients of ASML equipment capable of printing sub-2nm chips, which was among the Company's most advanced, stating: "So we're going to now focus when it comes to EUV and logic foundry mostly to 2-nanometer order intake which, ***as Roger [Dassen] said, should come in the next few months***." Dassen elaborated that Defendants' knowledge that "firm demand" would translate into orders and that any delays related to those orders were due to the generic complexities of negotiating large commercial transactions:

> Of course, with customers we have an ongoing dialogue on what they need. And then Peter said it, then there is a bureaucratic process and there is some negotiation going on that will ultimately lead to the order being made and being translated into a PO that, as you also know these days, comes with the obligation to pay money. And that's probably part of the reason why some customers are postponing the placement of the order a little bit as well. ***But the reality is that we know quite well what customers want, and customers know it as well, so it's just a matter of those two worlds coming together and then ultimately leading into a PO. Is it a***

*dangerous game on their side? Is it a dangerous game on our side? I don't think so.* I mean, as long as we have a very open dialogue with one another*, I'm pretty sure that in the foreseeable future you will see the translation of what we know is firm demand into orders. I'm quite confident with that.*

72.     Defendant Dassen also waved away any concerns around the decline in orders from the prior quarter, stating that ASML's "order flow can be lumpy and may not be evenly distributed over the year." Thus, Dassen downplayed any potential importance of the quarterly orders decline and instead claimed that ASML remained strongly positioned to achieve the €35 billion midpoint of its 2025 revenue guidance. Mathematically, Dassen reported that the Company needed an average of €4 billion in orders per quarter in the remaining three quarters of 2024 to do so, indicating that first quarter bookings of €3.6 billion were not far below that range. Dassen further represented that ASML would benefit from a "significant uptick" in orders in 2025. As a result, Dassen stated that the Company was "*not looking at the low end of the scenarios that we provided back in 2022*"—i.e., €30-35 billion in revenue—and even further "not saying now you need to look at the midpoint of the guidance"— in other words, indicating to investors to look above €35 billion in revenue, citing "*a very strong recovery into 2025*."

73.     Defendant Fouquet also touted scheduled orders from leading-edge customers such as Intel and Samsung as supporting a strong 2025, stating that "[b]ased on the discussions with our customers and *supported by our strong backlog*, we expect 2025 to be a strong year. . . . [W]e need to prepare for the significant number of new fabs that are being built across the globe . . . [which] are strategic for our customers, *and are scheduled to take our tool[s]*." Defendant Dassen likewise proclaimed that "*our expectation of a very strong recovery into 2025 has by no means changed*." Defendant Wennink likewise stated that "[o]ur outlook for the full year 2024 is unchanged, with the second half of the year expected to be stronger than the first half, in line with the industry's continued recovery from the downturn."

74.     Defendants' statements reassured analysts and investors as to market demand, imminent orders from leading-edge clients, and the continued validity of Defendants' conservative financial guidance. For example, Berenberg reported on April 17, 2024:

> [R]ecovery path remains clear: In our view, ***there is no indication in these results that ASML's 2025 revenue consensus needs to be revised down at this point***. We believe that the group's 2025 growth path remains clear because of: 1) memory spending remaining solid due to technology node migration in DRAM, and EUV will be used to print more layers in advanced DRAM, although we do not expect memory orders similar to the Q4 2023 level; 2) 2nm tech migration driving EUV demand after a weak 2023 and early part of 2024, with TSMC ramping up its Arizona fab facility in 2025; 3) Samsung's Taylor facility in Texas also ramping up capacity in the coming year, especially for leading-edge nodes such as 3nm, which will need EUV; 4) ***China spending continuing until at least 2025, even after strong levels in 2023 and 2024,*** due to domestic capability being a part of the government's strategic focus.

75.     Further, echoing Defendants' assurances, Berenberg wrote that "weak [quarterly] orders are not a concern to us" and specifically called out its belief that additional orders from critical leading-edge customers TSCM and Intel were imminent, stating "we think ASML's orders will vary by quarter, so the lower-than-expected level in Q1 is not an indication that the group will not be able to achieve 2025 revenue guidance of EUR35bn (***we believe investors expect EUR37bn***). In our view, given that TSMC has not ordered significant volumes of EUV for a few quarters now due to the weak end-market recovery, ASML can expect this in the coming quarters as TSMC prepares for its 2nm migration. At the same time, we expect Intel to continue its order momentum as it looks to compete with TSMC with the launch of its 18A process technology on time."

76.     Jefferies similarly reported on April 18, 2024, "ASML's order weakness is primarily because of an ongoing order drought from TSMC, due to delays in concluding commercial discussions between the two companies. However, we do not see any delays in TSMC's 2nm ramp at its Hsinchu and Kaoshiung fabs in 2025-26. Hence, orders are expected in

Q2/Q3, and we expect TSMC to be the largest buyer of EUV machines in 2025, ahead of the DRAM companies and Intel."

77.    Analysts such as Raymond James again increased price targets based on Defendants' positive representations, stating "We continue to see upward bias to management's FY25 outlook, and are raising our estimates closer to the midpoint. We are also raising our PT from $1,000 to $1,100." ABN-Amro similarly reported that "TSMC has yet to place orders for 2nm technology in 2025 (but it cannot stay on the sidelines for long), Samsung and Intel are set to order more and we still see a marked upturn in the memory segment. We still believe the top end of this 2025 guidance range is achievable." UBS reported, "With the cycle improving in H2'24 and TSMC orders likely to come through, we see > €5bn orders per quarter as more likely for the next three quarters vs >€4bn required to reach the mid point of 2025 guidance (ie €35bn). This would imply €40bn revenues in 2025E, which sits at the high end of guidance range of €30-40bn." Citi dismissed the quarter's low bookings, stating "*management clearly reiterating their aim of revenue in the top half of the €30-40bn range.*" And, buoyed by Defendants' positive representations, JP Morgan reported that "though the 1Q order intake is disappointing in the short term, we do not believe it derails a *very strong '25 for ASML*."

78.    Deutsche Bank reported "Coming into Q1 results, there was high expectation amongst investors that ASML would see a big boost from TSMC in Q1 bookings. That didn't materiali[ze], but we do not see any cause for alarm. TSMC will likely land as expected before the summer with 2nm orders (likely a ~25 EUV order dollop, worth €5bn), so the Q1 report should have no impact on consensus expectations for 2025 sales (€36-37bn). Put another way, we don't see any reason to revert back to the mid-point of 2025 sales with just over €4bn/quarter of bookings on average required in Q2-Q4 to meet that mid-point. *That is a low bar and should be met easily*."

BofA similarly reported, "***Growing confidence in a 'boom' year in 2025***. Whilst we maintain our CY24E revenue/EPS estimates largely unchanged, we raise our CY25E revenue estimate to €37.7bn (vs €36.3bn prior) and our EPS estimate to €31.9 (vs €30.3 prior). . . . Our higher 2025 estimates reflect (A) our confidence in ASML's ability to book more than €4bn/quarter through year-end, (B) limited contribution from Foundries (2nm build) in the backlog . . . ."—i.e., bolstering confidence that billions of dollars in bookings were still to come this year, as Defendants had assured investors.

79.    Nevertheless, in the next quarter (i.e. the second quarter of 2024), still more news emerged that implicated these same concerns. On its April 30, 2024, first quarter earnings call, major ASML customer Samsung announced that production at its planned Texas fab, previously slated to begin in 2025, would not start until 2026 at the earliest. By June 3, 2024, *TrendForce* reported that "[m]ajor companies such as Intel, TSMC, and Samsung"—ASML's three largest customers—"while continuing to advance their expansion projects, have been constantly adjusting and slowing down the pace and schedule of their fab construction . . . . It's found that seven fabs worldwide are projected to delay construction." Indeed, on June 10, 2024, *The Register* reported that Intel had paused construction on a fab in Israel, and then just over a week later, on June 18, 2024, Samsung announced that it had further delayed equipment orders for its Texas fab.

80.    Then, on July 17, 2024, at 12:41 a.m. ET, *Reuters* published an article titled, "US Considers Tougher Trade Rules in China Crackdown," which reported:

> The U.S. is weighing whether to impose a measure called the foreign direct product rule, or FDPR, the report said. The provision, called the Foreign Direct Product Rule, or FDPR, was first introduced in 1959 to control trading of U.S. technologies. It essentially says that if a product was made using American technology, the U.S. government has the power to stop it from being sold - including products made in a foreign country. The U.S. is presenting the idea to officials in Tokyo and the Hague as an increasingly likely outcome if the countries don't tighten their own China measures, the Bloomberg report added.

81.     That same day, ASML announced its Q2 2024 financial results, reporting quarterly net sales of €5.6 billion, which Defendants stated were in line with expectations and well above the amount needed to achieve, at minimum, the midpoint of Defendants' 2025 guidance. Defendants further stated that the Company "continues to expect 2024 total net sales to be similar to 2023, supported by a strong second half year."

82.     During the earnings call, in response to analysts' questions about "how big domestic Chinese demand is as a part of your backlog today, *just to get a sense for the level to which it may contribute to revenues next year*," Defendants downplayed any specific risk from China, with Dassen stating that, "the way we look at the demand for our tools is not from a specific geography in this case, China," but rather "[i]t is the global demand for [chips] that drives our modeling," and represented that "the Chinese share in our backlog" is "a little bit north of 20%." Pressed by an analyst directly about the "implication for ASML" of the potential new export restrictions revealed by *Reuters*, given "that you do have a pretty high exposure to China," Defendant Fouquet stated: "[T]he point Roger and I have made in the last few quarters, which is still valid, is before you look at China, I think *you have to look at the opportunity we see on the mature semiconductor market*. . . . *In 2023, 2024, China has been investing a large part of this market. And this is why I think our revenue on China has been high*."

83.     Defendants also assured investors about the public reporting around the Company's leading-edge customers, with Defendant Fouquet stating the Company's leading-edge clients had placed orders for their advanced nodes, stating: "So, on the bookings, as you would have seen in the bookings mix, 73% of the bookings is related to – was related to Logic. So, I think that gives you pretty strong indication who the buyers are and who is in the mix. So, *I think it is reasonable to assume that the foundry business at 2-nanometer is in the book*"; meaning, in other words,

that the Company's leading-edge customers had purchased some of the Company's most expensive equipment necessary to build the next generation of semiconductors. Defendant Dassen similarly touted that the Company's leading-edge clients, such as Intel, "are all scheduled to take our tool" elaborating that "this customer is going to ramp. And there, you will see a gradual build-up and that will – you will also see – at some stage, you will see additional orders coming in for that ramp."

84.     An analyst with Cantor Fitzgerald asked Defendants about any changes in customer sentiment during the last quarter, asking whether there were "any changes in customer conversations over the last three months, whether foundry, logic and particularly as it relates to your more robust immersion shipment outlook for the second half of this year?" In response, Defendant Fouquet stated, "Well, the short answer is *no big change*. *I think the discussion[s] we have with our customer are very consistent* . . . we don't see any major change. I think, in fact, *I will say our view of the market this quarter is very much the same as the one we had last quarter*. I think the big difference, as you have seen, is that *we have made progress with booking on some of the segments* answering maybe one of the big questions we got from all of you last quarter. But the *view of the market* for Roger, for me, *is not changing*."

85.     Ultimately, citing the Company's purportedly strong order intake, Defendants again reassured investors as to the Company's 2025 guidance, with Dassen explaining, "As it relates to 2025, . . . very consistent, I think, in our messaging. And that's why *we say we confirm what we said in November of 2022, which is we expect 2025 to be between €30 billion and €40 billion. We've also said it's not the low point of that guidance*. . . . I think you can conclude with the bookings number that we've reported that *we're nicely on track [to achieve the midpoint of guidance]*." In response to an analyst question on the same topic, Dassen further explained, "*I*

think we're well on track to achieve the objectives there . . . *we're nicely on the way to achieve the objectives and the bandwidth that we've discussed before*." Dassen concluded by "reiterating, between €30 billion and €40 billion [in 2025], *and it will not be the low point*"—i.e., 2025 revenues were still set to fall into the higher end of the €30-40 billion range. As Dassen again noted: "[T]hat's the expectation that we've articulated before, and *that's where we still are*."

86.    Defendants' reassurances again assuaged analysts. For example, on July 18, 2024, Morgan Stanley wrote that "[f]ears of further Chinese restrictions have seen multiples contract on expectation of lower earnings" but noted that the "[o]rder book recovery however is confirmed." While the report found it "[n]otable" that there "was an absence of orders from Intel this quarter," it also pointed out that "*the company does think Intel will come back into the order book soon* – perhaps for EUV and DUV tools" given Defendants' comments touting the ongoing ramp and expected orders from major customers.

87.    On July 30, 2024, Barclays similarly reported that "China normalisation seems increasingly likely (though on record comps)[,] . . . China has no local alternative for ASML's tools, *so we expect ASML to see demand hold up. . . . [T]he vast majority of China's expansion looks to be clustered far away from the risk of any further export controls*." The report also expressly stated the market's continued "assum[ptions]" around leading-edge customers, including that "Intel's . . . EUV capacity almost doubles in 2025E . . . given new fabs in Arizona, Ohio, Magdeburg and a general transition to EUV nodes . . . as per Intel's roadmap. We assume the same EUV layers counts as Samsung, i.e., slightly above TSMC's, and a transition to high-NA starting at 14A." On August 5, 2024, Jefferies forecasted "*no material change in ASML's China business*" stemming from new export restrictions, noting that the U.S. had in 2023 "directly engaged with ASML."

88.    However, public reporting continued to emerge about challenges at ASML's top leading-edge customers. On July 30, 2024, ASML's second largest client reported further delays in its ramp at a leading-edge fab. Specifically, Samsung's Head of Investor Relations Daniel Oh announced that the company's "second quarter CapEx [had] decreased compared to the previous quarter due to adjustments to facilities and infrastructure investments based on market conditions." The reduced capital expenditures, according to reporting, followed a series of delays in the startup timeline for Samsung's Taylor, Texas plant. Though the plant was initially slated to begin mass production in 2025, Samsung announced in April 2024 that due to "changing market conditions in foundry . . . [and] our approach of gradual investment in line with customer orders," the company now expected "mass production to begin maybe 2026."

89.    Two days later, on August 1, 2024, Intel revealed during its Q2 2024 earnings call an expected reduction in capital expenditure for 2024 and 2025, explaining that the company was taking "aggressive actions to significantly reduce spending," from between $25 and $27 billion for 2024 and between $20 and $23 billion for 2025, major cuts that would logically and invariably impact Intel's demand for ASML's equipment.

90.    Just days later, on August 5, 2024, Defendant Miller spoke at the Keybanc Technology Leadership Forum, and expressly rejected concerns surrounding Intel's ability to take ASML's equipment given Intel's disclosed cuts in capital expenditures. Specifically, Keybanc analyst Steve Barger asked, "And the second big topic that's out there is one of your customers had a highly publicized kind of change to their outlook. And how are you thinking about that? And what does that do to your thoughts about CapEx for the broad group?" Miller responded that based on "very routine and very comprehensive at all levels of the – within the company, discussions with our customers in terms of their technology needs, capacity needs. And because of the long

lead times of our machines, *many times some of the communications around CapEx and other things have already been reflected and adjustments that have been made in the different forecast*."

91.     Defendant Miller reaffirmed that "we still see a range between €30 billion and €40 billion. We see a challenge to get to the low end of that range, I don't see how to get there"—i.e., how ASML would not achieve the higher end of the range. He continued, "we start seeing the second half of this year for us being stronger. . . . [T]he second half strength this year clearly gives you some indications that we're starting in that direction." Miller specifically based his statements on ASML's non-public data on utilization rates, stating, "we're seeing them trending up for both logic and memory. And so, I think that piece of it, I think, will continue, or at least our view is that that will continue. And then you'll eventually get to a point where you'll hit utilization levels high enough where you trigger additional demand."

92.     During the conference, Defendant Miller also again reassured investors about ASML's sales to China, stating that "there's nothing been published to date that's new since we've communicated that at the end of last year" and reporting that "if you look at our – percentage of our revenue to China, historically, were 15% to 20%. These past two quarters, Q1, Q2, we were up around 49%. *That's more of a reflection of the non-China space [not] recovering yet*. As that recovers, obviously, we get into the second half of the year, *we see a stronger second half, and into 2025, obviously, the non-China coming back*, you should expect China as a percentage of revenue would come back towards more in line with what our backlog is, which we said is a bit over 20%." In other words, Defendant Miller communicated that China revenues were expected to normalize "a bit over 20%" on a relative basis—as other parts of ASML's business grew.

93.     A week later, in a report dated August 12, 2024, Barclays stated that "Intel and China concerns have been the main debates since our [July 30, 2024] upgrade." On Intel, the report stated: "[W]e had already taken a cautious view on 2025 due to concerns of slips/the cycle taking longer to recover." The report also noted that ASML could "get towards the upper end of its guidance range" with support from "additional DUV strength, given that *the backlog remains elevated and orders remain strong*." On China, the report said that "[d]ebate on the strength of China spending continues" and that "export restrictions represent the biggest risk to China business for ASML" even though "[d]emand remains strong," highlighting that "China has been the significant majority of DUV orders for a number of quarters, *which would point to no slowdown for ASML in 2025, despite what peers are signaling, assuming no change in export controls*."

94.     In a subsequent report dated August 20, 2024, Barclays noted that "China semicap imports have stepped up materially since June 2023, which we partly attributed to Chinese players trying to buy as much advanced equipment as they can before updated export controls came into effect, *but also better order fulfillment*. . . . [T]he debate on China normalisation will continue but *July provides some reassurance of continued China strength*."

95.     In the coming weeks, Defendants continued to speak with investors and analysts, reaffirming the same messages despite reporting of additional pushouts from the Company's largest clients. For instance, on or about August 20, 2024, according to a report from South Korean media outlet BusinessKorea, Samsung announced plans to reduce its procurement of ASML machines, stating that while the company had "initially planned to purchase more than three units of the next versions [of ASML's cutting edge high-NA EUV systems] over the next ten years," it had "decided to introduce only [the second generation ASML model] and will reconsider the introduction of subsequent versions in the future."

38

96.     On August 23, 2024, TD Cowen published a report titled "On The Road With ASML," recounting "a number of meetings" with the Company's American and European heads of investor relations, Peter Convertito ([ASML] Director of Investor Relations, N. America) and Jim Kavanaugh ([ASML] Director of Investor Relations, Europe, and stated based on those meetings that "there was no explicit commentary on Intel capex impact [but] ***it appears that Intel backlog is intact.***"

97.     The analyst further relayed that "China – Is just above 20% of backlog today and are expected to moderate to 20% in CY25," consistent with Defendant Miller's August 5, 2024, statement that non-China revenues would grow and therefore minimize the relative contribution from China to ASML's total revenues. On these bases, TD Cowen reaffirmed its €36 billion estimate of 2025 revenues, i.e. above the midpoint of €30-40 billion in revenue, consistent with Defendants' Class Period guidance that 2025 performance would not be on the low end of that range.

### E.     Unknown To Investors, Defendants Knew And Concealed Adverse Facts

#### 1.     Defendants Knew—But Concealed From Investors—Adverse Facts Indicating That Leading-Edge Customers Would Cancel Or Postpone Orders

98.     Throughout the Class Period, Defendants concealed adverse facts from investors indicating that the Company's leading-edge customers would postpone or cancel outright their orders with ASML, which were critical for the Company's near-term financial performance. Specifically—and contrary to Defendants' claims that, e.g., customers were "driving up the utilization of their tools," which would drive market recovery (¶71)— former ASML employees, including former employees who worked directly with (and at) ASML's major customers, have revealed slowdowns, pushouts, delayed fab construction and completion, and "cold bagging" of

equipment at ASML's major customers beginning before the Class Period and continuing throughout, which contradicted Defendants' Class Period assurances.

99.    FE 1 was a customer support engineer for ASML from January 2022 to September 2024. FE 1 worked on the machinery in a fab that was already open in Chandler, Arizona for Intel. FE 1 noted that his[3] position was in the field and his role was to keep the customer up and running, which included planned maintenance. FE 1 recounted that existing fabs were only operating at 50% capacity in early 2024. FE 1 also reported on numerous delays at Intel's Ohio fab, where FE 1 was initially scheduled to work.

100.    Specifically, FE 1 relayed that when he started with the Company in 2022, Intel was supposed to open a fab within five months in Ohio. While Intel broke ground, three years later, nothing was started there, and no tools were installed because Intel postponed anything to do with that fab.

101.    FE 1 also explained that Intel started to ramp down or "cold bag" the machines he was servicing around November 2022 for the December, January and February period and was supposed to bring the machines back up. But, during his time servicing Intel with the Company, until September 2024, he never saw Intel ramp those machines back up. FE 1 also visited other Intel fabs in California and Oregon. Based on what he saw there, he believed that they were operating similarly to Chandler and not anywhere near their full production capacity.

102.    FE 2 worked for Cymer from March of 2019 to December 2024, first as a Field Services Engineer and then, starting in mid-2021, as a Shift Supervisor. FE 2 explained that Cymer, a division of ASML, manufactures the lasers and other components for ASML's DUV machines.

---

[3] For confidentiality, the allegations use masculine gender pronouns with respect to all former employee information.

Cymer sold pulses of the laser, and clients were billed monthly based on the utilization rate or pulses of the laser. FE 2 confirmed that the laser hits were tracked by a software program, and that he received a report each month for those numbers. He clarified that the software program used was a Cymer in-house program called "Smart pulse" and that someone in finance would send them the report. Corroborating FE 1's allegations, FE 2 recounted that he observed a significant decline in the utilization of the equipment at Intel which started in 2022. In Oregon, the utilization tapered off in 2024. FE 2 explained that in 2021, Intel was doing really well, and that it was "gangbusters." He estimated Intel had between 120 to 130 lasers being utilized in Oregon alone.

103.    By the start of 2024, however, that number was down to 60 lasers and by the end of 2024, it declined even further to 40 lasers. FE 2 reported that the number is scheduled to be further reduced to 30 lasers by the end of 2025. This was a huge reduction in utilization and use of the machines, with a corresponding impact on Cymer's revenues. Intel's Arizona facility was reporting a similar reduction in utilization and use of the machines, along with a similar number of machines being fully turned off or "cold bagged."

104.    FE 2 stated that things started to slow down towards the end of 2022, when Intel stopped installing new DUV equipment and, instead, started de-installing. During 2024, FE 2 and his colleagues were concerned about the decrease in numbers and the de-installations because they didn't know if it would result in layoffs. FE 2 stated that he and his colleagues were not busy at all during 2024, and as a result they dubbed the year "operation thumb twiddle" because they did nothing at all. This was one of the reasons he left the Company.

105.    FE 2 further explained that the installation of EUV machines had no impact on reducing the DUV machines as there will always be a need for DUV machines. EUV only produces 20% of the chip, with the remaining 80% coming from DUV. For every laser turned off, an ASML

scanner was turned off or moved. They go hand in hand. Any impact to Cymer's business affects ASML.

106.    FE 2 was asked if ASML was aware of these pulse hit numbers, and he indicated that ASML ran the [quarterly] townhalls where the Cymer numbers were presented. The decrease in pulse numbers resulted in a great reduction in revenue. FE 2 recalled that Patrick O'Keeffe, who is Cymer's CEO, spoke for Cymer during those meetings, and he reported on those numbers.

107.    According to FE 2, Intel gave Cymer and ASML the guidelines to de-install equipment on certain dates, with 6 to 9 months of lead time on average. FE 2 stated that, because of the decrease in work, the Company did not fill positions as people left.

108.    FE 3 worked as a field services engineer at Cymer from August 2022 to October 2023. Corroborating FE 2, FE 3 confirmed that Cymer's revenue was dependent on production and laser shots. FE 3 observed a decrease in laser shots and cold bagging of equipment during his time at Intel. During his last six months at ASML (i.e. just prior to the start of the Class Period), there was a decrease in active lasers at Intel every month and large parts of the lasers at four Intel fabs in Arizona were in the process of being shut down. Intel was shutting down entire rows of lasers, in many cases due to not enough wafers being processed.

109.    FE 3 reported that part of his responsibilities included monitoring shot counts through a software platform and, in case of a communication issue, from the actual lasers themselves. FE 3 related that those reports went all the way up to the top of ASML.

110.    Echoing FE 2's account, FE 3 reported that since so many lasers were shut down, he spent his last four months sitting in a cubicle for 12 hours a day, doing absolutely nothing more than 60% of the time. This was the reason he left the Company.

111.    FE 4, who worked as an engineer from August 2022 through July 2024 at ASML's Hillsboro, Oregon facility, reported on discussions with his team leadership in Oregon before he departed ASML in July 2024. FE 4 reported that it was conveyed during those discussions that 2025 was going to be a lean year for ASML—contradicting Defendants' public assurances to investors otherwise.

112.    FE 5 worked as a project manager at the Company from February 2023 to April 2024. As a project manager, he oversaw the installation of EUV tools, which according to Defendants were the Company's most expensive and highest margin equipment, and managed timelines and the budget for the tools scheduled to be installed, such as the personnel allotment and timeline.

113.    FE 5 was hired by the Company in 2023 to go to the Samsung fab in Texas, which was supposed to be his home station, and the biggest factory in the U.S. for chip making. The Texas fab was supposed to be online by February or March 2023, but was initially pushed out to August 2023. According to FE 5, Samsung had a 100-acre plot and was supposed to have nine fabs built on that land. Throughout 2023, FE 5 and other field employees asked for the status of the Texas fabs because from the ground they could physically see that progress had stalled, but did not get an immediate answer.

114.    At the start of the Class period, in January 2024, in a Teams online meeting, FE 5's team in Austin was finally told by their leaders that the Samsung fabs weren't going to happen anytime soon. During the call, no timeline for when the project would move forward was provided. FE 5 explained that Samsung delayed their Texas fabs because Samsung did not have the subscribers (demand) needed to justify the fabs. Further, FE 5 had been to Samsung's Korea fabs, and they were also running at 70% (less-than-full utilization), and still meeting all orders.

115.    FE 5 relayed that, to this day, there is only one fab standing at the Texas campus. Critically, when asked if other customers were not moving forward with fabs scheduled to take EUV equipment like Samsung, FE 5 noted that it was ***across the board***, as of his departure in April of 2024.

116.    These severe reductions in fab construction by Samsung (one of ASML's three largest and most critical leading-edge customers), as communicated to FE 5 at the start of the Class Period, are corroborated by subsequent reporting during the Class Period. For instance, between July and September 2024, Samsung announced reductions in its capital expenditures and scaled back plans for plant construction. In a July 30, 2024 earnings call, Samsung's Head of Investor Relations, Daniel Oh, announced that the company's "second quarter CapEx [had] decreased compared to the previous quarter due to adjustments to facilities and infrastructure investments based on market conditions." The reduced capital expenditures, according to reporting, followed a series of delays in the startup timeline for Samsung's Taylor, Texas plant. Though the plant was initially slated to begin mass production in 2025, Samsung announced in April 2024 that due to "changing market conditions in foundry . . . [and] our approach of gradual investment in line with customer orders," the company now expected "mass production to begin maybe 2026." Then, on October 18, 2024, Reuters published an article reporting that, according to sources within Samsung, the company had postponed taking delivery of ASML's EUV equipment destined for Samsung's Taylor fab amid continued failure to find customers for the plant's products. As noted above, postponing delivery of orders meant that the Company could not recognize as revenue most (if not all) of the amount of that order.

117.    Similarly, FE 6 worked at ASML as an Engineer for more than one year before the Class Period through Q2 of 2024. Between January 2024 and July 2024, FE 6 coordinated EUV

upgrades and reported to Upgrade and Install Relocation Department Section Manager, Ian Wang, who reported to Operations Manager, Wayne Lan. FE 6 worked in customer service for TSMC, one of the leading chipmakers and another of ASML's largest customers, purchasing significant amounts of both EUV and DUV systems from ASML. Given his responsibility for coordinating EUV upgrades in 2024, FE 6 maintained the schedule for EUV upgrades and installations, and was in regular contact with 10 engineers from TSMC.

118.    FE 6 revealed that TSMC either postponed or cancelled virtually 100% of scheduled upgrades on a nearly *weekly basis*—approximately 20 upgrades in total—throughout his 2024 tenure, which spanned the first six months of 2024. FE 6 explained that approximately half of these upgrades, each costing approximately $100 million, were outright cancelled. In other words, by the time of FE 6's departure from ASML just halfway through the year, TSMC had *already* cancelled *$1 billion* in upgrades from ASML and postponed another *$1 billion* in upgrades.

### 2. Defendants Knew—But Concealed From Investors—That The Company's China-Based Performance Was Unsustainable And Would Normalize Rapidly

119.    During the Class Period, Defendants repeatedly touted that restrictions on the sale of equipment to China were appropriately reflected in the Company's guidance and that demand from China was "strong," sustainable, and a function of industrial needs within China, and in fact that "demand [was] higher than we can deliver, particularly in China." In truth, as known to Defendants—but concealed from investors—ASML's China performance was not driven by organic and sustainable demand, but instead by pull-forward demand from stockpiling customers *as well as* ASML overdelivering on its China backlog.

120.    Indeed, on December 4, 2024, at the UBS Global Technology & AI Conference (i.e. after the end of the Class Period), Defendant Miller admitted that the Company's China

customers had ordered not based on organic demand but instead on export restriction-induced advance ordering, stating that "***some of those [Chinese customers had ordered] a bit earlier than they originally planned*** . . . .", which had pulled forward revenues from later years. Miller's admission of ***any*** earlier export restriction-related ordering by Chinese customers contradicted Defendants' repeated insistence throughout the Class Period that orders from China reflected "strong" organic demand tethered to China's domestic industrial needs, and not pre-restriction stockpiling.

121.    Further, contrary to Defendants' statement during the Class Period that "demand [was] higher than we can deliver, particularly in China," Defendants admitted at the end of the Class Period that, in fact, ASML had been "***overdelivering***" on its China backlog, i.e. filling China orders faster than demand would sustain.

122.    These admissions also contradicted Defendants' Class Period representations concerning the Company's 2025 guidance, including statements as late as August and September 2024 about the purported rate and levels at which China revenues would normalize. Indeed, as Defendants continued to reaffirm their guidance in August and September of 2024, they knew by that time of an abrupt falloff in non-EUV orders, which amounted to just €1.2 billion in Q3 2024, a bellwether of China demand. This decline was more than 60% from Q2 2024 and the lowest level since at least 2022.

123.    Defendants' knowledge (or recklessness in not knowing) the true nature of their China sales and demand is further bolstered given their unique and nonpublic visibility into the Company's customers. Among other things, Defendants had nonpublic insight into whether their China customers were utilizing their available lithography capacity based on data collected by ASML in real time from its tools; indeed, Defendant Miller relied on this utilization data in

admitting on December 4, 2024 to the pull-forward by customers, stating that while a "handful" of China clients were utilizing their imported lithography equipment efficiently, many were not. In other words, Defendant Miller conceded that many of the Company's China clients were ***still*** struggling to digest the capacity they had already installed.

124.    Moreover, as they repeatedly touted, Defendants communicated frequently with all the Company's customers to understand their roadmap, business strategies, and operational activities. For example, Defendants told investors that they "are working closely with our customers and suppliers" specifically given that (purportedly) "DUV demand [is] higher than we can deliver, particularly in China." Then, as Defendant Dassen stated during the Company's April 17, 2024 first quarter earnings call: "I like to think of the relationship that we have with our customers as much more one of partnership than one of transactional behaviors . . . ***we have a pretty good understanding based on our interactions with customers what they really need***, so that's I think – it's the interaction with the customers." Defendant Wennink similarly admitted to his close familiarity with ASML's China clients when, in a radio interview on July 5, 2024, he stated that he went to China to visit customers "four or five times a year," and that China "customers came here too."[4]

125.    Similarly, on August 5, 2024, Defendant Miller boasted about the depth of ASML's interactions with its customers stating, "we have very routine and very comprehensive at all levels of the – within the company, ***discussions with our customers in terms of*** their technology needs, ***capacity needs.***" Indeed, as Defendants described in the Company's 2024 annual report, "***We collaborate with customers at all levels of the organization – from CEO-to-CEO interaction***

---

[4] BNR Nieuwsradio, *Voormalig ASML-baas: ik werd gepolst voor een kabinetsfunctie* (July 5, 2024), *available at* https://www.bnr.nl/nieuws/nieuws-politiek/10551951/voormalig-amsl-baas-ik-werd-gepolst-voor-een-kabinetsfunctie.

**right through to on-the-ground support at individual fabs**," including through periodic recurring meetings with ASML's clients which allowed Defendants to understand the "current and future needs" of their clients and "to adjust our demand plans" accordingly, including (1) technology review meetings, where senior technology experts and ASML's CEO and CCO discuss technology roadmaps and requirements with customers; (2) executive review meetings, where members of ASML's senior management and the Board of Management, which includes the Individual Defendants, discuss business and strategies with customers; and (3) operational review meetings, where ASML reviews topics related to customers' operational activities.

126.    Defendants' knowledge of nonpublic information revealing the truth about their China sales and demand is further confirmed by the extremely long lead times required for the lithography machines ASML shipped to its customers (both in China and generally), as many months or even years may pass after the customer makes the order before ASML manufactures, tests, ships, installs, and qualifies the final product. Given this long lead time, ASML's clients must and do communicate their detailed needs (and changes to those needs) to ASML many months if not years in advance of actual production. Reflecting this, as Defendant Miller stated on August 5, 2024, "many times some of the communications around CapEx and other things [from our clients] have already been reflected and adjustments that have been made in the different forecast."

127.    Finally, as Defendants admitted on October 15, 2024, additional China export restrictions required a "more cautious" expectation of future China performance, below 2025 guidance. While Defendants waited until the end of the Class Period to reveal this adverse truth to investors—and in fact had falsely suggested otherwise throughout the Class Period—Defendants knew (or were reckless in not knowing) this adverse information given their active role in, and

awareness of, nonpublic discussions concerning China export restrictions. For example, as revealed at the very start of the Class Period, Defendants had in 2023 entered into—and then terminated—a secret deal with the United States concerning the Company's exports to China. Moreover, Defendants themselves acknowledged their involvement in continued discussions around export restrictions both before and throughout the Class Period. ¶¶273-74.

F. **Knowing That 2025 Results Will Miss Guidance, Defendants Engage In Insider Sales And Selectively Disclose Information**

128.    While the above information was unknown to investors, Defendants knew the full truth.

129.    On August 29, 2024, reporting from *Bloomberg* confirmed the persistent rumors during the Class Period, long known to Defendants, that the Netherlands would impose additional restrictions on ASML's ability to repair and maintain equipment and China. Specifically, *Bloomberg* reported:

> The government of Prime Minister Dick Schoof will likely not renew certain ASML licenses to service and provide spare parts in China when they expire at the end of this year, according to people familiar with the matter. The decision is expected to cover the company's top-of-the-line deep ultraviolet lithography, or DUV, machines. . . . The Hague's move is also likely to impact ASML's sales, about half of which comes from China. . . . The inability to fix broken machines, particularly ASML's lithography systems, means the company would likely to be forced to reduce its output.

130.    On September 2, 2024, Defendant Dassen abruptly sold ***all his remaining holdings of ASML ordinary shares***, 4,370 shares, raking in proceeds of €3,515,184.30.

131.    After Defendant Dassen made millions of euros in highly unusual and suspiciously timed insider sales that liquidated his entire holdings, he and the other Individual Defendants, as well as other ASML executives, thereafter began an "extensive communications campaign" to gradually mitigate the expected fallout from the impending emergence of the truth, while nevertheless falsely reaffirming their 2025 guidance and continuing to conceal the true facts from

investors as to the normalization of China demand and the commitment from leading-edge customers.

132.    On September 4, 2024, at the Citi Global TMT Conference, Defendant Fouquet reaffirmed Defendants' "confiden[ce] we will be in the [guidance] range . . . [and] *we will not be in the lower end of the range*," but nevertheless soft-pedaled other statements regarding subjects that Defendants had touted throughout the Class Period. When asked about China, and the strength in that market, Defendant Fouquet touted that there was "a huge need for legacy semiconductors" that only China could fill but admitted—for the first time—that current China sales were "a peak" driven by ASML's initial inability to meet China demand in 2022 and 2023. Defendant Fouquet then suggested that the China revenues would "*go back progressively over the next 12 to 18 months*" to typical levels "*in the 20-30% area,*" implying a gradual normalization to a range of €7.5 to €11.5 billion in China revenues, or €9.5 at the midpoint. Further, speaking about ongoing discussions concerning additional export restrictions, Defendant Fouquet stated that "[i]f you look at the dynamic today, there is a strong will in the US to get more restrictions. That is very clear. That is well understood. . . . Most probably there will be more pressure for further restrictions."

133.    While Defendants mitigated expectations, these comments nevertheless kept investors in the dark. For example, Haitong reported on September 8, 2024, that "[d]emand wise, we expect China demand to remain strong in 2025. Our checks suggests that *China order is stable* at ~€8bn run rate (*consistent with mgmt. comment* of 20% backlog). . . . *We believe China won't be a risk for ASML in 2025*." Mizuho similarly reported on September 9, 2024, following its Mizuho EU Corporate day for ASML in Tokyo, that "[m]anagement remains bullish on its 2025 growth outlook" and "demand from China should continue to be high and strong in the near term

future, based on ASML's current backlog with 30-40 China customers. . . . ***Management thinks the probability of the low end of its target range (EUR30bn-40bn) for 2025 sales is low***."

134.    Similarly, on September 11, 2024, ABN-Amro reported  "[f]ollowing a roadshow with Marcel Kemp (Head of IR Europe)" that ASML privately "highlighted three factors to justify ***its clearly more conservative stance on 2025***: 1/ ***the factual absence of clear upturn in the semiconductor market*** in H2 24, contrary to expectations just three to six months ago, which we think could impact orders in H2 and thus revenue levels in 2025, 2/ the announcement of the reduction in capex from Intel of a little over 20% for 2024 and 2025 (this is not set to have an impact on 2024 but could in 2025), 3/ the uncertainties over potential additional US restrictions on immersion DUV systems shipments to China. In the absence of precise guidance, but out of caution, we have cut our 2025 revenue forecast from € 36.3bn to € 34.7bn." This new messaging concerning the "factual absence of clear upturn in the semiconductor industry"—which was only communicated privately—directly contradicted statements made by Defendants throughout the Class Period, including by Defendant Miller just weeks earlier, claiming on August 5, 2024 that "we start seeing the second half of this year for us being stronger. That ***clearly is a sign of you're starting into this industry recovery*** . . . ." In its September 11 report, ABN-Amro also reported based on its private meeting with ASML executives, "We understand that ***the group does not anticipate a collapse in the Chinese market*** which, if it wants to carry on down the road towards self-sufficiency, will have to continue to invest for several more years (although a one-off slowdown can never be completely ruled out)."

135.    On September 18, 2024, a Citi report recounted recent statements from Defendant Fouquet: "Despite the potential pressure on Intel's spending, at Citi's Global TMT Conference earlier this month, ASML's CEO Christophe Fouquet reiterated the company's EUR30-40bn

revenue range for 2025 and stated again that the 'low end' of the range was too conservative." The report continued, stating, "It is clear to us that, as a strategic supplier, [ASML] have been aware of changes at Intel ahead of the public announcement."

136.    Indeed, as reflected in Citi's report, Defendants' statements had led investors to believe throughout the Class Period that ASML was aware of customer changes ahead of public reporting, and that the Company's advance knowledge was considered and reflected in the Company's assurances and reaffirmations throughout the Class Period. Thus, the market took comfort in Defendants' continued reassurances after the negative public reporting around the Company's leading-edge customers emerged throughout the Class Period, as discussed above.

137.    Moreover, Defendants' statements continued to mislead the market as to the truth about China demand, as reflected in a Barclays report dated October 8, 2024, which stated that "ASML's China exposure has been elevated, prompting concerns on the impact of China's elevated spend normalising; 49% of system sales were from China in 1H24. ASML has communicated that it expects its China exposure to fall towards the 20-30% level over the next 12-18 months, reflecting the geographic mix of its backlog, with non-China spend expected to recover in 2H24 and into 2025, following a weak 1H24. We flex ASML's China exposure to explore the growth rate required outside of China in order to meet our estimates, and find little risk if China were to normalise to 20% of system sales by 2026, but demanding growth would be needed outside China if normalisation were to happen faster than expected." The report added: "If China sales were to normalise faster than ASML has indicated, and make up 20% of system sales by 2025 (i.e. faster than the 12-18 month period implied by its backlog), then RoW ex-EUV business would have to more than double in 2025E, reaching cE6bn, or just below peak 2022/23 levels, and €5.5bn

in 2026E due to EUV revenue growth. Thus, there would be more risk to 2025E than 2026E if China normalisation were to happen faster than expected."

### G.    The Relevant Truth Is Revealed

138.    Investors learned the relevant truth beginning on October 15, 2024, when the Company announced its third quarter 2024 earnings a day earlier than previously scheduled due to an unexplained "technical error." The release revealed quarterly bookings of just €2.63 billion, a 54% decline from the prior quarter, missing analysts' estimates by €3 billion. What's more, ASML also reversed years of reaffirmations, and finally admitted that full year 2025 total net sales would be between €30 billion and €35 billion, i.e., billions of euros below the topline of the prior guidance range, and instead, at most, in the low end of the prior range – exactly the portion of that range about which Defendants had assured investors, as recently as weeks earlier, "*we don't see how to get to the low end*."

139.    The Company further lowered its 2025 gross margin to between 51% and 53%— entirely short of the 54% to 56% range Defendants had repeatedly touted as guidance for 2025.

140.    In the earnings release, Defendants admitted that this reduced performance related in part to "competitive foundry dynamics [that] have resulted in a slower ramp of new nodes at certain customers, leading to several fab push outs and resulting changes in litho demand timing, in particular EUV."

141.    Analysts were "surprised" and "disappointed" at Defendants' admissions and the truth about 2025 revenues and margins, particularly given the fact that this marked the first time in 12 years that ASML had signaled that it would not "beat" expectations by exceeding the midpoint of its public guidance. UBS reported on October 15, 2024 that "we continue to expect downside in 2025E . . . . The 2025 guidance cut primarily came from lower EUV than expected, with shipments now guided to be 50 tools vs 60-85 previously. . . . In our estimates, this reduction

is due to weakness at Samsung/Intel . . . ." UBS also explicitly called out China demand weakness, lowering its own 2025 guidance estimate to €29.5 billion "primarily driven by China declining." Given Defendants' positive Class Period representations, Barclays reported on the 2025 cut being "bigger than feared." In its "autopsy of a disappointment," BofA attributed ASML's revenue guidance reduction to pushouts from Intel, Samsung, and TSMC, and a "sharp decline" in China revenues. BofA attributed the more severe margin revision to fewer low-NA EUV tools and a lower proportion of (high margin) China sales.

142.    Wolfe Research wrote in a report on October 15, 2024, that "our math suggests that flat q/q 4Q bookings would drive CY25 revenue of €33.8bn, thus driving the change in guidance." Another Wolfe Research report also dated October 15, 2024 noted "areas of weakness potentially behind ASML's [guidance] cuts: INTC, Samsung, memory, China and TSMC." Wolfe stated, "*We believe that [ASML] management was aware of the INTC cuts when they reported in July (and management reiterated the 35-40bn CY25 guide at that point).*" The report also said that "ASML is now saying China revenue will be down to ~20% of revenue next year," and that "the bear case on ASML has been about China restrictions"—but, reflecting the market still being misled by Defendants, the report continued, "based on the company's commentary thus far, that doesn't appear to have anything to do with this miss."

143.    An October 15, 2024 report from Citi explained that "[n]ewsflow over the summer has been negative, with Intel's capex cuts and commodity memory price softness, but *as recently as early September, [ASML] management had [still] reiterated that the low-end of the 2025 range was still 'conservative.' . . . Having said that the low end of the range was 'conservative' as recently as last month, customer push outs are now driving them to guide from EUR30-40bn to the new 30-35bn range*. The reduction is clearly disappointing even relative to our recently

reduced EUR36bn estimate." In its October 15, 2024 report, Jefferies stated: "We have clearly got this call wrong, as our forecast for 2025 revenues were at the high end of the range. *We find the level of order weakness puzzling*."

144.    In response to these surprising revelations, the price of ASML ordinary shares fell $141.84 per share, or approximately 16.3%, from a close of $872.27 per share on October 14, 2024, to close at $730.43 per share on October 15, 2024.

145.    The following day, during the accompanying earnings call held before the U.S. markets opened on October 16, 2024, Defendants provided additional information revealing the previously misrepresented and concealed truth. Defendant Fouquet claimed that the same "competitive dynamics" that had been "expressed at length in the press *in the last three months*" were to blame for reduced demand and the corresponding reduction the Company's 2025 guidance—even though Defendants had assured investors against any such result at those times. Skeptical, an analyst pressed:

> "I'd like to dig into a little bit more of what more specifically may have changed over the last 90 days because some of the things you referred to in China, some memory spending, some logic spending, some of it I think was sort of known 90 days ago and some may be incremental. If I take each of those three and some of the fab push-outs that have come about that, how would you characterize the change in your calendar 2025 guidance among those three areas? *Basically, what was new to you as compared to when we had the last earnings call?*

146.    In response, Defendant Dassen admitted that decreased customer demand had become "a question mark" for Defendants "*a number of quarters ago,*" contradicting Defendants' statements throughout the Class Period that they had not seen *any* indication from *any* client of pushout or cancellations. *See, e.g.*, ¶¶165-166.

147.    In a follow-up question, the same analyst also probed Defendants' rationale for lower China sales in light of the fact that "there haven't been new export restrictions announced." Defendant Dassen, contrary to the Company's prior stance on refusing to credit speculation in

evaluating China demand, now claimed that the Company's "more cautious view" was attributable, in part, to potential further export restrictions. Another analyst pressed further, asking what portion of the reduction in guidance was attributable to Defendants' purported regulatory caution around China, as opposed to "not over-delivering on their backlog," i.e. cannibalizing 2025 revenues in 2024. Defendant Dassen **refused to answer the question**, explaining that "you can not dissect that and I will not dissect that."

148.    Defendant Dassen further admitted that "[w]e also now expect our China sales to be around 20% of our total revenue next year, trending back towards our historical China percentage and in line with its share of the backlog." Dassen's admission marked a **radical** departure from Defendants' Class Period claims, including Defendant Fouquet's representations, made just one month prior, that China demand would **gradually** normalize over the course of the next 12 to 18 months to 20% to 30% of revenues. Now, however, Defendants effectively slashed this figure to €6.5 billion, or 20% of the Company's forecasted 2025 revenues at the midpoint. And while Dassen claimed that the leading-edge issues were known "**a number of quarters ago**," and that the factors that had caused Defendants to revise guidance were "risks and uncertainties that we talked about before," neither Dassen nor the other Defendants explained their several recent reaffirmations of guidance in August and in September. *See* ¶¶128-137.

149.    Analysts continued to express shock. Wolfe Research wrote in an October 16, 2024 report, "**Management noted that, while they were aware of various risks 90 days ago (when they reiterated €35-€40bn CY25 guidance)** [i.e., the performance Defendants now admitted was impossible]**, some of those risks finally materialized over the last 90 days.**"

150.    The report also noted that ASML management had expressed "a cautious view on China shipments for CY25 based on 'what they read in the newspapers' regarding further export

controls. . . . We're a bit surprised that would have a material impact . . . [b]ut perhaps those customers still had DUV orders in ASML backlog." The report went on: "Also clear from the call is that the reduction in guidance was due to push outs of orders already in the backlog." The report expressed surprise, noting, "It's rare that ASML surprises investors in this manner. ***Part of the surprise here is that many of these potential issues (China, INTC) were known 90 days ago, yet management continued to reiterate their €35-40bn guide through the quarter***, and the strength of their CY25 backlog appeared to support that. ***Given the long lead times and strong visibility that ASML typically has with customers, it's rare for ASML to surprise investors as they just did***."

151.    Likewise, given Defendants' admissions that these facts had been known for "a number of quarters," Cantor Fitzgerald reported that "***there is no doubt there is a loss of credibility here***," explaining that the "CY25 China revenue guide of €6.5 billion seems very low (mgmt. had been suggesting flattish at €9.0B vs 2024)."

152.    BofA likewise reported on October 16, 2024 on the "sobering update," writing, "ASML reported a weak order intake and cut drastically their CY25E revenue/GM guide, which had so far anchored investors." BofA also wrote that "ASML expect China to decline to 20% of sales next year, implying a 48% revenue decline yoy (but also a 69% yoy increase in non-China sales) . . . more severe than the 3% revenue decline we had anticipated," and attributed the cut in part to "pushouts for Intel [and] Samsung Foundry."

153.    On October 16, 2024, Mizuho released a report stating that "ASML's orders dropped sharply in 3Q24 owing to China order drop and muted order [*sic*] from Samsung and Intel," and attributing ASML's lowered "2025 sales and margins guidance" in part to "sharp China business decline." The report noted: "We had the lowest EUV forecast in the Street of only 59

systems (incl. 54 systems of Low NA EUV and 5 systems of High NA EUV) for 2025, but the new guidance of below 50 systems of Low NA EUV is even below our expectations."

154.    An ING report dated October 16, 2024 stated that, "[f]or FY25, ***ASML expects net sales to be between €30bn and €35bn, which is materially lower than earlier guidance (between €30bn and €40bn)***. It has also lowered the FY25 gross margin guidance to 51-53%. . . . Sales to China are now expected to be c.20% of sales, while they were above 40% more recently."

155.    On October 17, 2024, Citi published a report stating: "The material guidance cut is a setback for ASML as it represents the first time since it began its biennial CMDs in 2012 that it expects to not beat or be at the high-end of its targeted ranges."

156.    On this news, the price of ASML ordinary shares fell an additional $46.91 per share, or approximately 6.4%, from a close of $730.43 per share on October 15, 2024, to close at $683.52 per share on October 16, 2024. All told, over the two days from market close on October 14, 2024 to market close on October 16, 2024, the price of ASML ordinary shares fell $188.75 per share, or approximately 21.6%.

**H.    Post-Class Period Events Further Confirm The Fraud**

157.    Additional reporting and admissions by Defendants after the Class Period further confirm Defendants' fraud.

158.    ***First***, Defendant Miller (and thus ASML) have admitted that China customers engaged in export restriction induced pull-forwards. Specifically, on December 4, 2024, Defendants presented at the UBS Global Technology & AI Conference. During the conference, with respect to China demand, Defendant Miller admitted that Defendants' prior statements on "strong" China demand were attributable to backlog cannibalization, stating in response to an analyst question about whether Defendants had, in fact, factored in Chinese customers installing equipment not to meet current demand but to avoid future export restrictions, that "***some of those***

*[Chinese customers had ordered] a bit earlier than they originally planned* . . . ." Miller's admission of *any* earlier export restriction-related ordering by Chinese customers contradicted Defendants' insistence throughout the Class Period that orders from China reflected "strong" organic demand and not pre-restriction stockpiling.

159.    *Second*, consistent with Defendant Miller's admission above, reporting after the Class Period continues to show that export restrictions induced stockpiling by ASML's Chinese customers, which both helped drive the Company's outsized China performance and then contributed to the subsequent rapid normalization of that China contribution. For example, on October 16, 2024, CNBC reported that "ASML's China-based customers had *stockpiled less advanced ASML machines to get ahead of the U.S. exports* — now, demand in the country is expected to dry up significantly." Nomad Semi similarly reported that "*there had been quite a bit of demand pull-in for fear of further export restriction by the US governmen*t." A report on the Motley Fool from October 18, 2024 similarly stated that "*part of the problem for [ASML] appears to be that Chinese companies rushed to buy its older deep ultraviolet lithography (DUV) machines ahead of expected export restrictions*. . . . For 2025, sales to China are also expected to move back to around 20%. *ASML saw a pull-forward demand in China this year due to trade restrictions, and that business will go back to a more normal level*." A Mizuho report published on November 14, 2024 explained the fact that ASML "[m]anagement expected sales contribution from China to be normalized to 20% of its system sales in 2025," attributing it "to China customers' *aggressive stock-up and pull-in* during 2023-24."

160.    Likewise, the Semiconductor Deep Dive Newsletter by Robert Castellano published on October 21, 2024, elaborated:

> **Surge in DUV Imports to China: Temporary Stockpiling.** ASML's revenue growth in China has been largely driven by accelerated purchases of Deep

Ultraviolet (DUV) lithography equipment, as Chinese semiconductor manufacturers stockpile machines ahead of potential U.S. sanctions. While imports of DUV tools to China include contributions from Canon and Nikon, ASML remains the dominant supplier, particularly in the high-resolution DUV segment.

Lithography equipment imports into China surged to €3.4 billion in Q3 2024, reflecting an ***urgent push by Chinese firms to secure critical tools before export controls*** potentially expand to cover more advanced DUV systems. However, ASML projects a steep decline in Chinese demand by 2025, with revenue expected to normalize to 20% of total sales, down from nearly 50% in Q3 2023. ***This normalization aligns with expectations of saturated inventories*** and tighter U.S. export controls, which could restrict ASML's ability to sell and service these systems in China. . . . ***The sharp ramp-up in DUV sales to China is not sustainable***. The anticipated downturn in 2025 is driven by the combination of tighter export regulations, inventory saturation, and the broader geopolitical environment.

161.    ***Third***, Defendants admitted that their order intake is not a reliable indicator of the Company's performance. Specifically, on January 29, 2025, Defendant Dassen admitted that the Company's prior reporting on customer orders on a quarterly basis created an inaccurate impression of the ASML's "business momentum," explaining "our order flow on a quarterly basis can be lumpy and does not necessarily reflect our business momentum accurately." Despite this, during the Class Period, Defendants had repeatedly tied quarterly orders to their "strong" performance and increased confidence in 2025 guidance. What's more, in response to lower than expected orders during the Class Period, Defendants had cited exactly the same "lumpy" nature of their order intake to ***downplay*** concerns and ***assure*** investors that they would achieve the 2025 guidance. Now, however, Defendants admitted that their "lumpy" orders did the opposite, giving a misleading impression of the company's momentum.

162.    Dassen's admission that quarterly orders were a misleading indicator of the Company's prospects was used to justify ASML's decision to entirely cease reporting quarterly booking, starting in 2026. This admission contradicted Defendants' Class Period representations

concerning how quarterly orders reported during the Class Period provided Defendants with confidence in their 2025 performance. *See* ¶¶201-04.

163.    *Fourth*, Defendants' admission at the end of the Class Period that the possibility of further China export restrictions warranted "more cautious" performance expectations in fact bore out when, on December 2, 2024, ASML announced additional restrictions on China sales that included both additional restriction on lithography equipment and precluded sales to additional fab locations, mainly in China.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

164.    Throughout the Class Period, Defendants made a series of materially false and misleading statements and omissions.

### A.    Defendants' False And Misleading Statements And Omissions Concerning Adverse Facts Related To The Company's Leading-Edge Customers

165.    On January 24, 2024, on the Company's Q4 2023 and full year 2023 earnings call, as to leading-edge logic customers, when asked whether "those orders will be signed up in the next few quarters for 2025 and 2026?," Defendant Wennink responded, "Yes. I think – *certainly for 2025*." Wennink continued elsewhere, "I think the longer-term, let's say, *positions that customers have taken are pretty rock solid*. I think they will happen. . . . *I think the intentions are very clear. We don't see any delay there*. . . . [G]enerally, those fabs are there, those fabs are there in the US. They're in Japan, they're in Taiwan, they're in Korea, they're in China, they're in Europe. *I mean, we don't see any indication or any customer messaging to us that those things won't happen. . . .*"

166.    Also on January 24, 2024, in a pre-recorded earnings video and transcript for the first quarter of 2024, both published on ASML's website, Defendant Dassen stated, *[I]t's clear that many fab openings are scheduled that will require the intake of quite some tools in the 2025*

*time frame. So we look at 2025 as a strong year of growth* and we are making the investments as I also mentioned before in 2024 in order to be able to create *the capacity that will be needed in 2025*."

167.    Defendant Wennink's and Dassen's statements above (¶¶165-66) were materially false and misleading, omitted material facts, and lacked any reasonable basis. It was materially misleading for Defendants to tout leading-edge orders as "certainly [signed up] for 2025," to portray customers' positions on fabs and orders as "pretty rock solid," and to assert that "[w]e don't see any delay . . . any indication or any customer messaging to us that those things won't happen," when, in truth, adverse facts known and/or available only to Defendants (as alleged above in ¶¶98-118) indicated that leading-edge customers such as Intel and Samsung had low utilization, were "cold-bagging" equipment, were pushing out fabs, and suffering from other severe issues, all of which indicated a "factual absence of clear upturn" (¶134) and that as a result those customers would likely and/or already had postponed projects that implicated demand for ASML's tools.

168.    On April 17, 2024, on the Company's Q1 2024 earnings call—and in the pre-recorded earnings video and transcript for the first quarter of 2024, both published on ASML's website—Defendant Dassen stated: "But the reality is that we know quite well what customers want, and customers know it as well, so it's just a matter of those two worlds coming together and then ultimately leading into a PO. Is it a dangerous game on their side? . . . *I'm pretty sure that in the foreseeable future you will see the translation of what we know is firm demand into orders*. I'm quite confident with that." Defendant Dassen further predicted that, under "the plans and the announced plans of some of our larger customers, it's pretty clear that in the next couple of quarters, significant orders need to come in." On that call Defendant Fouquet also stated, "we expect 2025 to be a strong year, driven by a number of factors," including "the significant number

of new fabs that are being built across the globe . . . These fabs are spread geographically, are strategic for our customers and ***are scheduled to take our tool[s]***."

169.    Also on April 17 2024, in a pre-recorded earnings video and transcript for the first quarter of 2024, both published on ASML's website, Defendant Dassen stated that "all the fab openings that have been indicated by our customers" were "[l]eading up to ***what we think is going to be a very strong 2025***."

170.    Defendant Dassen's and Fouquet's statements above (¶¶168-69) were materially false and misleading, omitted material facts, and lacked any reasonable basis. It was materially misleading for Defendants to state "quite confident[ly]" that "the translation of what we know is firm demand into orders" would happen "in the foreseeable future," and to premise that assertion on "the reality . . . that we know quite well what customers want," when, in truth, adverse facts known and/or available only to Defendants (as alleged above in ¶¶98-118) indicated that leading-edge customers such as Intel and Samsung had low utilization, were "cold-bagging" equipment, were pushing out fabs, and suffering from other severe issues, all of which indicated a "factual absence of clear upturn" (¶134) and that as a result those customers would likely and/or already had postponed projects that implicated demand for ASML's tools.

171.    On the Company's April 17, 2024 pre-recorded earnings video and on the associated transcript, both published on ASML's website, Defendant Dassen cited "all the fab openings that have been indicated by our customers" as a reason for "why we're doing what we're doing. Which is really preparing for that ramp, for ***that momentum that we see being built up***."

172.    Defendant Dassen's statements above (¶171) were materially false and misleading, omitted material facts, and lacked any reasonable basis. It was materially misleading for Defendant Dassen to tout the "momentum that we see being built up" as "indicated by our customers," when,

in truth, adverse facts known and/or available only to Defendants (as alleged above in ¶¶98-118) indicated that leading-edge customers such as Intel and Samsung had low utilization, were "cold-bagging" equipment, were pushing out fabs, and suffering from other severe issues, all of which indicated a "factual absence of clear upturn" (¶134) and that as a result those customers would likely and/or already had postponed projects that implicated demand for ASML's tools.

173.    On the Company's July 17, 2024 earnings call—and in the pre-recorded earnings video and transcript for the second quarter of 2024, both published on ASML's website—Defendant Fouquet specifically cited "a number of new fabs that are being built today across the globe" that "*are all scheduled to take*" ASML's lithography machines as support for Defendants' "expect[ing] 2025 to be a strong year."

174.    Defendant Fouquet's statements above (¶173) were materially false and misleading, omitted material facts, and lacked any reasonable basis. It was materially misleading for Defendant Fouquet to tout leading-edge customers' "fabs . . . . being built today across the globe" and state that 2025 would be a "strong year" because those fabs "are all scheduled to take" the Company's tools, when, in truth, adverse facts known and/or available only to Defendants (as alleged above in ¶¶98-118) indicated that leading-edge customers such as Intel and Samsung had low utilization, were "cold-bagging" equipment, were pushing out fabs, and suffering from other severe issues, all of which indicated a "factual absence of clear upturn" (¶134) and that as a result those customers would likely and/or already had postponed projects that implicated demand for ASML's tools.

175.    On August 5, 2024, at the KeyBanc Technology Leadership Forum, an analyst asked Defendant Miller, "And the second big topic that's out there is one of your customers [Intel] had a highly publicized kind of change to their outlook. And how are you thinking about that? And

what does that do to your thoughts about CapEx for the broad group?" In response, Defendant Miller stated, "So, we don't, obviously, comment on customer specific revenue. I think if you look at our customers, we have very routine and very comprehensive at all levels of the – within the company, discussions with our customers in terms of their technology needs, capacity needs. And because of the long lead times of our machines, ***many times some of the communications around CapEx and other things have already been reflected and adjustments that have been made in the different forecast***. So, that's one thing."

176.    Defendant Miller's statements above (¶175) were materially false and misleading, omitted material facts, and lacked any reasonable basis. It was materially misleading for Defendant Miller to suggest that "communications" with customers "around CapEx and other things have already been reflected in adjustments that have been made in" ASML's "forecast" when, in truth, adverse facts known and/or available only to Defendants (as alleged above in ¶¶98-118) indicated that leading-edge customers such as Intel and Samsung had low utilization, were "cold-bagging" equipment, were pushing out fabs, and suffering from other severe issues, all of which indicated a "factual absence of clear upturn" (¶134) and that as a result those customers would likely and/or already had postponed projects that implicated demand for ASML's tools. Moreover, contrary to Defendant Millers' statements, Defendants' 2025 guidance publicly provided to investors did not take these adverse facts into consideration, as Defendants admitted when they were forced to reveal that they could not achieve their 2025 guidance.

177.    On August 5, 2024, at the Keybanc Technology Leadership Forum, Defendant Miller stated that there was "continued orders going forward in support of th[e] strong demand" from "expected strength in an upcycle," "future demand both in logic and memory," customer "fabs that . . . are currently going to be ready to take machines," and that, "[a]s [the non-China

space] recovers, obviously, we get into the second half of the year, we see a stronger second half, and into 2025, obviously, the non-China coming back."

178.    Defendant Miller's statements above (¶177) were materially false and misleading, omitted material facts, and lacked any reasonable basis. It was materially misleading for Defendant Miller to project that "the non-China space" would recover through "a stronger second half" of 2024 and "into 2025," resulting in a greater "percentage of revenue" for those sales, when, in truth, adverse facts known and/or available only to Defendants (as alleged above in ¶¶98-118) indicated that leading-edge (non-China) customers such as Intel and Samsung had low utilization, were "cold-bagging" equipment, were pushing out fabs, and suffering from other severe issues, all of which indicated a "factual absence of clear upturn" (¶134) and that as a result those customers would likely and/or already had postponed projects that implicated demand for ASML's tools.

179.    On September 10, 2024, Defendant Miller presented at the Goldman Sachs Communacopia + Technology Conference, and was again asked about the effect of Intel's recent cuts to capital expenditures. In response, he stated, "We do have very routine conversations with our customers many times across the quarter in the form of technology and capacity and so on and so forth," and that "*fabs available to take our systems*" were "*very much on track*," and that "*there are many pedestals that will be available to take our machines*."

180.    Defendant Miller's statements above (¶179) were materially false and misleading, omitted material facts, and lacked any reasonable basis. It was materially misleading for Defendant Miller to tout that there were "fabs available to take our systems" and they were "very much on track" when, in truth, adverse facts known and/or available only to Defendants (as alleged above in ¶¶98-118) indicated that leading-edge customers such as Intel and Samsung had low utilization, were "cold-bagging" equipment, were pushing out fabs, and suffering from other severe issues, all

of which indicated a "factual absence of clear upturn" (¶134) and that as a result those customers would likely and/or already had postponed projects that implicated demand for ASML's tools.

**B.**    **Defendants' False And Misleading Statements And Omissions Concerning China Performance**

181.    On January 24, 2024, on the Company's Q4 2023 and full year 2023 earnings call, Defendant Wennink stated: "While the export regulations had an impact on our business, *we continue to see strong demand for mid-critical and mature nodes in China*." Likewise, also during that call, Defendant Dassen stated, "*we do see the demand from China being very robust*. . . . *fundamentally, it's pretty clear that the China demand remains very strong*. . . . [I]t's primarily driven towards mature and mid critical nodes. I mean that's what it's all for."

182.    Defendants' statements above (¶181) were materially false and misleading, omitted material facts, and lacked a reasonable basis. It was materially misleading for Defendant Wennink to tout "strong demand for mid-critical and mature nodes in China" and for Defendant Dassen to state that "China demand very strong" and "robust," when, in truth and as Defendants later admitted (as alleged above in ¶¶119-127) (i) Defendants were at this time "overdelivering" on the Company's China backlog, i.e. delivering beyond demand; and (ii) the Company's China customers were ordering "earlier than they originally planned . . ."; in other words, had engaged in inorganic pull-forward stockpiling beyond actual capacity needs. As a result of these inorganic orders and shipments that were untethered to true demand, the Company's China performance was not "robust" but instead would imminently normalize, much quicker than Defendants had misled investors to believe, such that—as Defendants ultimately admitted—the Company could not achieve the performance in 2025 they touted throughout the Class Period.

183.    Also on January 24, 2024, in a pre-recorded video posted to the Company's website to accompany the earnings report—and in the transcript to that video, also posted to the Company

website—Defendant Dassen made a number of statements regarding "[s]ales to China." Dassen said that "China sales went up so significantly in this year" because "we were able to execute on the demand that was clearly there in China" after a "couple of years" of "fairly low" "order fill rate" for China. Thus, Dassen explained, "the majority of the sales that we had with China was actually executing on orders that were already there by the end of 2022." Dassen added, "those sales are really for mid-critical and mature manufacturing," and stressed that China "***demand remains very, very solid***. It was solid last year. ***We expect it to be solid this year and also on a go forward basis*** because of all the dynamics that are going on in China. ***We believe that that will remain solid.***"

184.    Defendant Dassen's statements above (¶183) were materially false and misleading, omitted material facts, and lacked a reasonable basis. It was materially misleading for Defendant Dassen to tout that China demand was "very, very solid" and his expectation that sales to China would be "solid" on a "go forward basis," when, in truth and as Defendants later admitted (as alleged above in ¶¶119-127) (i) Defendants were at this time "overdelivering" on the Company's China backlog, i.e. delivering beyond demand; and (ii) the Company's China customers were ordering "earlier than they originally planned . . ."; in other words, had engaged in inorganic pull-forward stockpiling beyond actual capacity needs. As a result of these inorganic orders and shipments that were untethered to true demand, the Company's China performance was not "very, very solid" but instead would imminently normalize, much quicker than Defendants had misled investors to believe, such that—as Defendants ultimately admitted—the Company could not achieve the performance in 2025 they touted throughout the Class Period.

185.    The Company's 2023 Annual Report, published on February 14, 2024 and filed with the SEC on Form 20-F that same day, highlighted "***DUV demand higher than we can deliver,***

*particularly in China*." Also in the report, Defendant Wennink was quoted as saying that, "In 2023, demand for our DUV systems continued to be strong, particularly in China," and stated that the Company "had the opportunity to backfill these [existing] orders for mature and mid-critical nodes to China." The report also quoted Defendant Dassen as stating that the Company "step[ped] up our China order fill rate this year."

186.    Defendants' statements above (¶185) were materially false and misleading, omitted material facts, and lacked a reasonable basis. It was materially misleading for Defendants to tout that China demand was "higher than we can deliver" and that demand "continued to be strong" when, in truth and as Defendants later admitted (as alleged above in ¶¶119-127) (i) Defendants were at this time "overdelivering" on the Company's China backlog, i.e. delivering beyond demand; and (ii) the Company's China customers were ordering "earlier than they originally planned . . ."; in other words, had engaged in inorganic pull-forward stockpiling beyond actual capacity needs. As a result of these inorganic orders and shipments that were untethered to true demand, the Company's China performance was not "strong" but instead would imminently normalize, much quicker than Defendants had misled investors to believe, such that—as Defendants ultimately admitted—the Company could not achieve the performance in 2025 they touted throughout the Class Period.

187.    On April 17, 2024, on the Company's Q1 2024 earnings call, Defendant Dassen was asked for "any comment on China trends," given that "China has been really strong, and there has been always concern that China may actually go to capacity by adjusting period in this year or later this year." In response, Defendant Dassen stated that China was "*still strong*," "both in absolute terms and in relative terms," and further, "We expect China to continue to be strong this year. . . . We've also said on previous calls, and I just want to reiterate that, if *you look at the*

*demand for China, the demand in China continues to be strong*. . . . *China is strong because they're adding capacity that we believe the world needs*. And, yes, as a result of this, China's share and global market share over the years become larger than it is today. . . . *[W]e believe that [the capacity] China is adding today in terms of mature capacity is rational* and is in line with our expectation of what capacity and mature needs to be added in order to get to what the world needs in the second half of this decade."

188.    Defendant Dassen's statements above (¶187) were materially false and misleading, omitted material facts, and lacked a reasonable basis. It was materially misleading for Defendant Dassen to tout that China demand was "still strong" and "adding capacity" that "is rational" when, in truth and as Defendants later admitted (as alleged above in ¶¶119-127) (i) Defendants were at this time "overdelivering" on the Company's China backlog, i.e. delivering beyond demand; and (ii) the Company's China customers were ordering "earlier than they originally planned . . ."; in other words, had engaged in inorganic pull-forward stockpiling beyond actual capacity needs. As a result of these inorganic orders and shipments that were untethered to true demand, the Company's China performance was not "still strong" but instead would imminently normalize, much quicker than Defendants had misled investors to believe, such that—as Defendants ultimately admitted—the Company could not achieve the performance in 2025 they touted throughout the Class Period.

189.    On the company's July 17, 2024 second quarter earnings call, an analyst asked Defendants about "the implication for ASML" of "the U.S. administration looking to impose some severe trade restrictions . . . given the fact that you do have a pretty high exposure to China." In response, Defendant Fouquet stated, "I think you have to look at the opportunity we see on the mature semiconductor market. . . . *In 2023, 2024, China has been investing a large part of this*

*market. And this is why, I think, our revenue on China has been high*. Moving forward, we still believe that this market is needed."

190.    Defendant Fouquet's statements above (¶189) were materially false and misleading, omitted material facts, and lacked a reasonable basis. It was materially misleading for Defendant Fouquet to tout that historical China demand was the result of "investing in a large part of this market" when, in truth and as Defendants later admitted (as alleged above in ¶¶119-127) (i) Defendants were at this time "overdelivering" on the Company's China backlog, i.e. delivering beyond demand; and (ii) the Company's China customers were ordering "earlier than they originally planned . . ."; in other words, had engaged in inorganic pull-forward stockpiling beyond actual capacity needs. As a result of these inorganic orders and shipments that were untethered to true demand, the Company's China performance would imminently normalize, much quicker than Defendants had misled investors to believe, such that—as Defendants ultimately admitted—the Company could not achieve the performance in 2025 they touted throughout the Class Period.

191.    On August 5, 2024, at the Keybanc Technology Leadership Forum, Defendant Miller stated that "***there's nothing been published to date that's new*** [in terms of export restrictions to China] since we've communicated that at the end of last year," and stated further, "if you look at our – percentage of our revenue to China, historically, were 15% to 20%. These past two quarters, Q1, Q2, we were up around 49%. ***That's more of a reflection of the non-China space [not] recovering yet***. As that recovers, obviously, ***we get into the second half of the year, we see a stronger second half***, and into 2025, ***obviously, the non-China coming back***, you should expect China as a percentage of revenue would come back towards more in line with what our backlog is, which we said is a bit over 20%."

192.    Defendant Miller's statements above (¶191) were materially false and misleading, omitted material facts, and lacked a reasonable basis. It was materially misleading for Defendant Miller to state the increase in China revenue was "more a reflection of the non-China space" not recovering yet, when, in truth and as Defendants later admitted (as alleged above in ¶¶119-127) Defendants' China performance was driven by the facts that (i) Defendants were at this time "overdelivering" on the Company's China backlog, i.e. delivering beyond demand; and (ii) the Company's China customers were ordering "earlier than they originally planned . . ."; in other words, had engaged in inorganic pull-forward stockpiling beyond actual capacity needs. As a result of these inorganic orders and shipments that were untethered to true demand, the Company's China performance would imminently normalize, much quicker than Defendants had misled investors to believe, such that—as Defendants ultimately admitted—the Company could not achieve the performance in 2025 they touted throughout the Class Period. Further, for the same reasons, it was misleading to state that China would begin to "come back towards more in line with what our backlog is" purely as a function of "the non-China coming back," when in fact, as a result of the inorganic orders and shipments that were untethered to true demand described above, the Company's China performance would normalize imminently. What's more, at the time Defendant Miller made these statements, the Company was well into its third quarter, and thus knew by that time of an abrupt falloff in non-EUV orders (which were a bellwether of China demand), amounting to just €1.2 billion in Q3 2024. This decline was more than 60% from Q2 2024 and the lowest level since at least 2022, and marked the end of Defendants secretly driving China sales from pull-forward stockpiling and overdelivering beyond demand. Finally, it was misleading for Defendant Miller to state that "***there's nothing been published to date that's new*** [in terms of export restrictions to China]" when, in fact (as described above in ¶127), Defendants knew and/or

were reckless in not knowing of further export restrictions that, as they later admitted, required a "more cautious" reduction in their performance guidance.

193.    On September 4, 2024, at the Citi Global TMT Conference, Defendant Fouquet stated with respect to elevated China sales, that "we had demand in China in 2022, we couldn't meet because the demand was extremely high on the entire market and we didn't have the tools China was asking for. We could meet about 40% of the demand then. So we started to recover this backlog in '23 and also in '24. And the other reason is of course the rest of the market has been down. So whatever tool we had last year, this year could go basically to address the backlog. If we look at a normal business, if we look at a backlog in China, that's more in the 20 to 30% area. ***And that's also where we expect the business to go back progressively in the course of the next let's say 12 to 18 months***."

194.    Defendant Fouquet's statements above (¶193) were materially false and misleading, omitted material facts, and lacked a reasonable basis. It was materially misleading for Defendant Fouquet to tout that Defendants "expect [China] business to go back progressively in the . . . next . . . 12 to 18 months" when, in truth and as Defendants later admitted (as alleged above in ¶¶119-127) (i) Defendants were at this time "overdelivering" on the Company's China backlog, i.e. delivering beyond demand; and (ii) the Company's China customers were ordering "earlier than they originally planned . . ."; in other words, had engaged in inorganic pull-forward stockpiling beyond actual capacity needs. As a result of these inorganic orders and shipments that were untethered to true demand, the Company's China performance would imminently normalize, much quicker than Defendants had misled investors to believe, such that—as Defendants ultimately admitted—the Company could not achieve the performance in 2025 they touted throughout the Class Period. What's more, at the time Defendant Fouquet made these statements,

the Company was well into its third quarter, and thus knew by that time of an abrupt falloff in non-EUV orders (which were a bellwether of China demand), amounting to just €1.2 billion in Q3 2024. This decline was more than 60% from Q2 2024 and the lowest level since at least 2022, and marked the end of Defendants secretly driving China sales from pull-forward stockpiling and overdelivering beyond demand.

195.    On September 10, 2024, Defendant Miller presented at the Goldman Sachs Communacopia + Technology Conference, and stated that "*we see [China demand] continuing to be strong*," and that, "*[o]n a go-forward basis* . . . *the expectation is that as the non-China business recovers*, that will more evenly distribute the revenue across the regions. *And therefore, that percentage would likely come down to more something aligned with what we have in our backlog*, which today is a bit over 20% of our backlog."

196.    Defendant Miller's statements above (¶195) were materially false and misleading, omitted material facts, and lacked a reasonable basis. It was materially misleading for Defendant Miller to tout that Defendant' China business "continu[ed] to be strong" and that performance would be impacted only by the recovery of the non-China business when, in truth and as Defendants later admitted (as alleged above in ¶¶119-127) (i) Defendants were at this time "overdelivering" on the Company's China backlog, i.e. delivering beyond demand; and (ii) the Company's China customers were ordering "earlier than they originally planned . . ."; in other words, had engaged in inorganic pull-forward stockpiling beyond actual capacity needs. As a result of these inorganic orders and shipments that were untethered to true demand, the Company's China performance would imminently normalize, much quicker than Defendants had misled investors to believe, such that—as Defendants ultimately admitted—the Company could not achieve the performance in 2025 they touted throughout the Class Period. What's more, at the time Defendant

Miller made these statements, the Company was well into its third quarter, and thus knew by that time of an abrupt falloff in non-EUV orders (which were a bellwether of China demand), amounting to just €1.2 billion in Q3 2024. This decline was more than 60% from Q2 2024 and the lowest level since at least 2022, and marked the end of Defendants secretly driving China sales from pull-forward stockpiling and overdelivering beyond demand.

### C. Defendants' False And Misleading Statements And Omissions Concerning The Strength Of The Company's Backlog

197.    On January 24, 2024, on the Company's Q4 2023 and full year 2023 earnings call, Wennink stated that "[b]ased on discussions with our customers and *supported by our strong backlog*, we currently expect 2025 to be a strong year . . ."

198.    Likewise, on April 17, 2024, on the Company's Q1 2024 earnings call, Defendant Fouquet stated, "[b]ased on the discussions with our customers and *support[ed] by our strong backlog*, we expect 2025 to be a strong year."

199.    Further, on July 17, 2024, on the Company's Q2 2024 earnings call and in the Company's pre-recorded earnings video and transcript that same day, Defendants touted, among other things, "the expected strong demand in 2025," stating that, "[b]ased on discussion with our customers and *supported by our strong backlog*, we currently expect 2025 to be a strong year," and specifically citing "a number of new fabs that are being built today across the globe" that "are all scheduled to take our systems."

200.    Defendants' statements above (¶¶197-99) were materially false and misleading, omitted material facts, and lacked a reasonable basis. It was materially misleading for Defendants to tout the Company's "strong" backlog and to claim that that backlog supported a "strong" 2025, when, when, in truth, adverse facts known and/or available only to Defendants (as alleged above in ¶¶98-118) indicated that leading-edge customers such as Intel and Samsung had low utilization,

were "cold-bagging" equipment, were pushing out fabs, and suffering from other severe issues, all of which indicated a "factual absence of clear upturn" (¶134) and that as a result those customers would likely and/or already had postponed projects that implicated demand for ASML's tools. Further, in truth and as Defendants later admitted (as alleged above in ¶¶119-127) (i) Defendants were at this time "overdelivering" on the Company's China backlog, i.e. delivering beyond demand; and (ii) the Company's China customers were ordering "earlier than they originally planned . . ."; in other words, had engaged in inorganic pull-forward stockpiling beyond actual capacity needs. As a result of these inorganic orders and shipments that were untethered to true demand, the Company's China performance would imminently normalize, much quicker than Defendants had misled investors to believe, such that—as Defendants ultimately admitted—the Company could not achieve the performance in 2025 they touted throughout the Class Period.

### D.    Defendants' False And Misleading Statements And Omissions Concerning The Company's Order Intake

201.    On January 24, 2024, on the Company's Q4 2023 and full year 2023 earnings call, as well as in the associated press release and pre-recorded earnings video and transcript posted to the ASML website, Defendants touted €9.2 billion in quarterly bookings. On the earnings call, Defendant Wennink told an analyst that "***the order intake actually gives us at least some level of confidence***" that "***2025 is going to be a very strong year***." In the earnings press release that day filed with the SEC under Form 6-K, Defendant Wennink was quoted as saying that the Company's "***strong order intake in the fourth quarter clearly supports future demand***," including "significant growth . . . for 2025."

202.    The same day, January 24, 2024, Defendant Dassen stated in the Company's earnings press conference webcast that "order intake is strong," calling this a "***very positive development[]***."

203.    On the Company's second quarter 2024 earnings call held on July 17, 2024 and in pre-recorded earnings video and transcript posted to the ASML website, Defendants touted €5.6 billion in quarterly bookings and told investors based on this bookings number that "we're nicely on track" for "the midpoint of the [2025 guidance] range," i.e. €35 billion, and again "still confirm[ing] that our expectation is between the €30 billion and €40 billion" for 2025.

204.    Defendants' statements above (¶¶201-03) about their "order intake" and claims that the orders "clearly support[] future demand" and "significant growth" are false and misleading. To the contrary (as alleged above in ¶¶161-62), Defendants have since admitted that their quarterly order intake disclosures (as in the above paragraphs) do not "necessarily reflect the business momentum *accurately*."

**E.    Defendants' False And Misleading Statements And Omissions Concerning The State Of The Industry Recovery**

205.    On January 24, 2024, during the Company's Q4 2023 and full year 2023 earnings call, Defendant Wennink said that while the "semiconductor industry is currently working through the bottom of the cycle," "there are some positive signs" as "[i]ndustry end-market inventory levels continue to improve." Wennink further assured that "*we are seeing the first signs, the positive signs of a recovery, which is basically the data we get on inventory levels, but also we see our utilization rates going up again*."

206.    The Company's January 24, 2024 earnings press release, filed that same day with the SEC on Form 6-K, also quoted Defendant Wennink as touting "*positive signs*" for the "semiconductor market recovery," including that "*inventory levels continue to improve and litho tool utilization levels are beginning to show improvement*."

207.    In the Company's earnings press conference webcast the same day—January 24, 2024—Defendant Dassen touted "*a few strong indications of a recovery*," including that

"utilization is improving" and "inventory at end customers is actually going down, which is a healthy sign." Dassen said that these were "very positive developments."

208.    Also on January 24, 2024, in a pre-recorded video posted to the Company's website to accompany the earnings report—and in the transcript to that video, also posted to the Company website—Defendant Dassen touted the purported industry recovery, stating, "if we look at the utilization of our tools, *we clearly see that they are improving* . . . *And all the indications* that we're getting is that we believe that that improvement will continue to occur in the course of this year. So good development there."

209.    On April 17, 2024, on the Company's first quarter 2024 earnings call, Defendant Wennink reiterated that Defendants "see *continued improvements in lithography tool utilization levels* at both Logic and Memory customers. *All in line with* the industry's continued recovery from the downturn."

210.    In the associated April 17, 2024 pre-recorded earnings video and transcript thereof, both posted to ASML's website, Defendant Dassen said that the Company was "gearing up towards what we think is going to be a strong year of 2025 . . . *really backed up by some of the industry trends as we see them today*," such as the fact that "*we do see the utilization of our tools . . . further improving*." Based on these "industry trends," Dassen stated, "we do believe that by 2024 we're going to see a recovery. *Clearly* a recovery of the industry. So then fast forward to 2025. Then what do we find ourselves in? First off, *I think we will find ourselves in 2025 in the midst of the upturn*."

211.    During the associated July 17, 2024 earnings call, Defendant Fouquet reiterated this point, stating that Defendants "*see continued improvement in lithography tool utilization level* . . . *[a]ll in line with the industry's continued recovery* from the downturn."

212.     Similarly, in the associated July 17, 2024 pre-recorded video and transcript, both published on ASML's website, Defendant Fouquet stated that "we expect, as we discussed in previous quarters, that the overall semiconductor inventory levels will continue to improve. ***We also see today further improvement in litho tool utilization levels***."

213.     On August 5, 2024, at the Keybanc Technology Leadership Forum, when asked whether utilization rates of ASML's equipment supported the professed industry recovery, Defendant Miller responded, "we're seeing them trending up for both logic and memory. And so, I think that piece of it, I think, will continue, or at least ***our view is that that will continue. And then you'll eventually get to a point where you'll hit utilization levels high enough where you trigger additional demand.***" Miller further touted that Defendants were "seeing the second half of this year for us being stronger. ***That clearly is a sign of you're starting into this industry recovery***."

214.     Defendants' statements describing the state of industry recovery above (¶¶205-213) are false and misleading, omitted material facts, and lacked any reasonable basis. It was materially misleading for Defendants to tout utilization of the Company's tools when, in truth, adverse facts known and/or available only to Defendants (as alleged above in ¶¶98-118) indicated that leading-edge customers such as Intel and Samsung had low utilization, were "cold-bagging" equipment, were pushing out fabs, and suffering from other severe issues, all of which indicated a "factual absence of clear upturn" (¶134) and that as a result those customers would likely and/or already had postponed projects that implicated demand for ASML's tools. Ultimately, as Defendants admitted at the end of the Class Period, the industry recovery they touted did not occur on the timeline that they had assured investors.

**F.    Defendants' False And Misleading Statements And Omissions As To 2025 Performance**

215.    In the January 24, 2024 transcript of ASML's fourth quarter 2023 pre-recorded earnings message, Defendants stated, among other things, "As you know *for 2025 we gave an expectation . . . of a gross margin range between 54% and 56%. And we still believe that that is the right window to look at*. . . . [W]e are building capacity for 2025. And of course *that should lead to, as we expect, higher sales levels for 2025*."

216.    On January 24, 2024, on the Company's fourth quarter 2024 earnings call, in response to an analyst who noted that "consensus has come down really to the lower end of the guidance for 2025," and asked Defendant Wennink whether the Company was "still targeting the middle of the range," Defendant Wennink said that Defendants "feel a bit more comfortable on 2025 after having received €9.2 billion of orders," and further stated, "*I thought the low end of the range was too conservative*. That's what I said. *Now, you can make it in the middle of the range or the high end of the range*." Wennink added, "*I said the low end, I thought it was too conservative, because we do believe that 2025 is going to be a very strong year*," incorporating and stating anew his prior statement during the Company's third quarter 2023 earnings call on October 18, 2023, that "2025 is a very strong year and a very strong year doesn't jibe with [hitting the] low end of the [2025] guidance."

217.    In the April 17, 2024 transcript of ASML's first quarter 2024 pre-recorded earnings message, Defendant Dassen stated, among other things: "In the Investor Day for 2022, we were looking at different scenarios for revenue for 2025. *There was a bandwidth between €30 billion and €40 billion for the 2025 net sales*. . . . The question then is if you want to get, let's say, *to the midpoint of that bandwidth that we provided, so the €35 billion*, what you still need? If you look at what's in the backlog today for 2024, for 2025, beyond 2025, then in the next three quarters

we would need a little bit over €4 billion for each of the three quarters to come in order to, at the beginning of 2025, be fully booked for that midpoint." Defendant Dassen further stated that the Company was "really gearing up towards *what we think is going to be a strong year of 2025. That is really backed up, I think, by some of the industry trends as we see them today.* So we do see the utilization of our tools, both for Memory customers and for Logic customers, further improving," and reiterated "that *we still think about [the guidance] the way we've mentioned that during the Capital Markets day in 2022. Which is somewhere between 54 and 56 percent* [gross margin]" and that "all the fab openings that have been indicated by our customers" were "[l]eading up to *what we think is going to be a very strong 2025.*" Defendant Dassen added that "*in 2025 we will really utilize the higher capacity that we've been building*" to help "*lead to this step up in gross margin to the 54% to 56% that we've been indicating.*"

218.    During ASML's shareholder meeting on April 24, 2024, Defendant Dassen stated that Defendants "*believe that 2025 is a significant growth year*" based on "*the demand that we believe is out there by 2025.*" Defendant Dassen further told shareholders that order numbers "clearly demonstrate[d] that *we're indeed looking at a very healthy trajectory all the way to this growth path in 2025.*" Also at that shareholder meeting, Defendant Dassen projected that "*in 2025, we should find ourselves in the midst of [an] uptick*" in the semiconductor industry, and allayed analysts' concerns about "a few large customers" that "haven't placed orders yet," stating: "of course, *that will come somewhere in the next couple of quarters. . . . So inevitably, that will come back.*"

219.    On July 17, 2024, during the Company's second quarter earnings call, Dassen stated to investors, "*I think we're well on track to achieve the objectives there . . . we're nicely on the way to achieve the objectives and the bandwidth that we've discussed before,*" meaning "between

€30 billion and €40 billion [in 2025], ***and it will not be the low point***"—i.e., 2025 revenues were still set to fall into the higher end of the €30-40 billion range. As Dassen again noted: "[T]hat's the expectation that we've articulated before, and ***that's where we <u>still are</u>***."

220.    During an August 5, 2024 presentation at the Keybanc Technology Leadership Forum, Defendant Miller stated: "In 2025, we said that we have – ***we still see a range between €30 billion and €40 billion. We see a challenge to get to the low end of that range, I don't see how to get there***."

221.    On September 4, 2024, Defendant Fouquet spoke at the Citi Global TMT Conference, and stated that the Company's China revenues would "***go back progressively in the course of the next let's say 12 to 18 months***" to typical levels "***in the 20 to 30% area***," and again reiterated that Defendants "are confident we'll be in the range [of 2025 guidance] . . . ***we believe that we'll not be on the low end of the range***."

222.    On September 10, 2024, Defendant Miller presented at the Goldman Sachs Communacopia + Technology Conference, and was again asked about the effect of Intel's recent cuts to capital expenditures. In response, he stated, "We do have very routine conversations with our customers many times across the quarter in the form of technology and capacity and so on and so forth. . . . ***[W]hat we said in July with respect to our guidance is still very much intact***. . . . And that obviously would include this customer [i.e. Intel] in that story as well." Miller further stated "***[w]e've said we don't see how to get to the low end [of the €30-€40 billion range]***."

223.    Defendants' statements above (¶¶215-222) were materially false and misleading, omitted material facts, and lacked any reasonable basis. It was materially misleading for Defendants to reaffirm the Company's 2025 guidance and further to describe that guidance as "conservative" and state that the Company would likely exceed the low end of that guidance, when,

in truth, adverse facts known and/or available only to Defendants (as alleged above in ¶¶98-118) indicated that leading-edge customers such as Intel and Samsung had low utilization, were "cold-bagging" equipment, were pushing out fabs, and suffering from other severe issues, all of which indicated a "factual absence of clear upturn" (¶134) and that as a result those customers would likely and/or already had postponed projects that implicated demand for ASML's tools. Further, in truth and as Defendants later admitted (as alleged above in ¶¶119-127) (i) Defendants were at this time "overdelivering" on the Company's China backlog, i.e. delivering beyond demand; and (ii) the Company's China customers were ordering "earlier than they originally planned . . ."; in other words, had engaged in inorganic pull-forward stockpiling beyond actual capacity needs. As a result of these inorganic orders and shipments that were untethered to true demand, the Company's China performance would imminently normalize, much quicker than Defendants had misled investors to believe, such that—as Defendants ultimately admitted—the Company could not achieve the performance in 2025 they touted throughout the Class Period. As a result of these issues, as Defendants later admitted, the Company could not achieve its 2025 guidance as touted by Defendants.

## VI. <u>LOSS CAUSATION</u>

224.    During the Class Period, Defendants made materially false and misleading statements and omissions which artificially inflated and/or maintained artificial inflation in the price of ASML ordinary shares (and impacted the value of ASML options which depended on the value of ASML ordinary shares) and operated as a fraud and deceit on the Class. As a result of Defendants' materially false or misleading statements and omissions of material facts, the Company's ordinary shares traded at artificially inflated prices during the Class Period. Relying on the integrity of the market price for ASML ordinary shares and public information relating to ASML, Lead Plaintiffs and other Class members suffered economic loss, i.e. damages, from their

purchases or other acquisitions of ASML ordinary shares and call options and/or sales of put options on ASML ordinary shares during the Class Period.

225.    The artificial inflation in ASML's stock price was removed when the truth and/or risks concealed by Defendants were revealed to the market and/or materialized in connection with ASML's Q3 2024 earnings.

226.    On October 15, 2024, AMSL published its earnings results for the third quarter of 2024. In the press release filed with the SEC on Form 6-K, ASML revealed quarterly bookings of just €2.63 billion, which represented a 53% decline from the €5.6 billion in bookings during the second quarter of 2024, missing analysts' estimates by a staggering €3 billion. ASML also announced that it expected full year 2025 total net sales to be between €30 billion and €35 billion, thus narrowing the Company's previously issued and repeatedly reaffirmed guidance to the bottom half of the €30 billion to €40 billion range—the very range that Defendants had told investors just weeks earlier, "*[W]e don't see how to get to the low end*" of the range.

227.    The Company further announced that it had lowered its 2025 gross margin guidance to between 51% and 53% (versus a previous range of between 54% and 56%), which Defendant Fouquet attributed mainly "to the delayed timing of EUV demand," i.e. pushouts from ASML's leading-edge clients.

228.    Analysts were "surprised" and "disappointed" at Defendants' abrupt change in views, and the resulting decline in 2025 revenue and margin guidance. For example, UBS reported on October 16, 2024 that "we continue to expect downside in 2025E . . . . The 2025 guidance cut primarily came from lower EUV than expected, with shipments now guided to be 50 tools vs 60-85 previously. . . . In our estimates, this reduction is due to weakness at Samsung/Intel . . . ." UBS also explicitly called out China demand weakness, lowering its own 2025 guidance estimate to

€29.5 billion "primarily driven by China declining." Given Defendants' positive Class Period representations, Barclays reported on the 2025 cut being "bigger than feared." In its "autopsy of a disappointment," BofA attributed ASML's revenue guidance reduction to pushouts from Intel, Samsung, and TSMC, and a "sharp decline" in China revenues. BofA attributed the more severe margin revision to fewer low-NA EUV tools and a lower proportion of (high margin) China sales. All analysts reporting on the guidance revision also noted the surprisingly low bookings of just €2.6 billion, which had declined more than 50% from the prior quarter.

229.    After ASML's early earnings release on October 15, 2024, Wolfe Research wrote in a report: "[O]ur math suggests that flat q/q 4Q bookings would drive CY25 revenue of €33.8bn, thus driving the change in guidance." Another Wolfe Research report dated October 15, 2024 noted "areas of weakness potentially behind ASML's [guidance] cuts: INTC, Samsung, memory, China and TSMC." Wolfe stated, "***We believe that [ASML] management was aware of the INTC cuts when they reported in July (and management reiterated the 35-40bn CY25 guide at that point).***" The report also said that "ASML is now saying China revenue will be down to ~20% of revenue next year," and that "the bear case on ASML has been about China restrictions"—but, reflecting the market's misunderstanding, the report continued, "based on the company's commentary thus far, that doesn't appear to have anything to do with this miss." In its October 15, 2024 report, Jefferies stated: "We have clearly got this call wrong, as our forecast for 2025 revenues were at the high end of the range. ***We find the level of order weakness puzzling*** but, at this stage, regard this weakness and the cut to guidance as a delay, which impacts the 2025 outlook from a timing point of view."

230.    In response to these surprising revelations, the price of ASML ordinary shares fell $141.84 per share, or approximately 16.3%, from a close of $872.27 per share on October 14,

2024, to close at $730.43 per share on October 15, 2024, as the artificial inflation in ASML's stock price was partially removed.

231.    The following day, during the accompanying earnings call held before the U.S. markets opened on October 16, 2024, Defendant Dassen characterized the poor bookings results and the lowered guidance expectations for 2025 as being "a reflection of the slow recovery in the traditional [semiconductor] end markets as customers remain cautious in the current environment." Defendant Fouquet also admitted that the semiconductor industry "recovery will extend well into 2025," leading to "a reduced growth curve in 2025 and an [] overall reduction of our lithography demand," elaborating that, "I think today without [artificial intelligence], the market would be very sad if you ask me" and that "the recovery is not what I think [anyone] had wished for." When specifically asked about the factors impacting demand in Logic, in addition to the purportedly sudden market downturn, Fouquet explained that "competitive dynamics" which had been "expressed at length in the press *in the last three months*" were to blame for reduced demand and the corresponding reduction the Company's 2025 guidance.

232.    As to China demand, Defendant Dassen conceded that "we already started to indicate *in the last [earnings] call* that, over time, we do see China trending towards a more normalized percentage," elaborating that "[w]e also now expect our China sales to be around 20% of our total revenue next year, trending back towards our historical China percentage and in line with its share of the backlog." Defendant Dassen's revelation marked a ***radical*** departure from Defendant Fouquet's representations just a month earlier, in September 2024, that China demand would *gradually* normalize over the course of the next 12 to 18 months to 20% to 30% of revenue (¶132).

233.    With respect to pushouts of orders from leading-edge customers, Dassen stated issues were known "*a number of quarters ago*." While Dassen claimed that the factors that had caused Defendants to revise guidance were "risks and uncertainties that we talked about before," he made no attempt to explain Defendants' multiple intervening reaffirmations of guidance in August and September, i.e. in the most recent quarter. *See* ¶¶128-137.

234.    Commenting on these revelations, Wolfe reported on October 16, 2024, "*Management noted that,* while *they were aware of various risks 90 days ago (when they reiterated €35-€40bn CY25 guidance)*, some of those risks finally materialized over the last 90 days." The report also noted that ASML management expressed "a cautious view on China shipments for CY25 based on 'what they read in the newspapers' regarding further export controls," which left the analyst "a bit surprised that would have a material impact," speculating that "perhaps those customers still had DUV orders in ASML backlog."

235.    The Wolfe report also went on: "Also clear from the call is that the reduction in guidance was due to push outs of orders already in the backlog." The report further expressed astonishment, noting:

> *It's rare that ASML surprises investors in this manner. Part of the surprise here is that many of these potential issues (China, INTC) were known 90 days ago, yet management continued to reiterate their €35-40bn guide through the quarter*, and the strength of their CY25 backlog appeared to support that. Given the long lead times and strong visibility that ASML typically has with customers, it's rare for ASML to surprise investors as they just did.

236.    Given Defendants' admissions that these facts had been known for "a number of quarters," Cantor Fitzgerald reported that "*there is no doubt there is a loss of credibility here*," explaining that the "CY25 China revenue guide of €6.5 billion seems very low (mgmt. had been suggesting flattish at €9.0B vs 2024)."

237.    BofA reported on the "sobering update," explaining that "ASML reported a weak order intake and cut drastically their CY25E revenue/GM guide, which had so far anchored investors." UBS, elaborating on its earlier assessment of China demand, forecast -34% China growth as compared to the Company's -25-30% forecast, explaining that "***YMTC and CXMT purchased c100 tools in Sept 22-Aug 24 which suggests litho purchases have been well ahead of overall capacity build***." Evercore reported on the "Much Needed Guidance Cut" stating, "We believe ASML has appropriately reset expectations lower by reducing its 2025 Revenue and implied EPS forecasts by -7% and -20% respectively amid 1) slower non-AI market recovery, 2) meaningful decline in China revs YoY (-50%) in '25 ***as local chipmakers catch up to demand***[.]"

238.    In response to these surprising revelations, the price of ASML ordinary shares fell $46.91 per share, or approximately 6.4%, from a close of $730.43 per share on October 15, 2024, to close at $683.52 per share on October 16, 2024, as the artificial inflation in ASML's stock price was removed.

239.    It was entirely foreseeable that Defendants' materially false or misleading statements and omissions of material fact alleged herein would artificially inflate and/or maintain at artificially inflated levels the price of ASML ordinary shares (and ASML options whose price depended on the price of ASML ordinary shares). It was also foreseeable to Defendants that the disclosures of the previously misrepresented and/or concealed facts and materializations of the previously concealed risks would cause the price of the Company's ordinary shares to fall as the artificial inflation created and/or maintained by Defendants' misstatements and omissions was removed. Thus, the stock price declines alleged above were directly and proximately caused by

Defendants' materially false or misleading statements and omissions of material fact during the Class Period.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

240.    As set forth above and further below, numerous facts demonstrate that Defendants knew or were reckless in not knowing that their statements identified above were materially false and misleading when made. The scienter of ASML as a corporate entity is derived from the scienter of its executives and other controlling persons, which is imputed to ASML.

### A.    Defendants' Insider Sales Support A Strong Inference Of Scienter

241.    Defendants' insider sales during the Class Period, and the millions of euros in proceeds they derived therefrom, support an inference of Defendants' scienter. During the Class Period, Defendants Fouquet and Dassen made over *€15 million* in insider stock sales, while other members of ASML's Board of Management—including Frédéric Schneider-Maunoury, Executive Vice President and Chief Operations Officer, and Wayne Allan[5], Executive Vice President and Chief Strategic Sourcing & Procurement Officer—made over *€5.6 million*. These insider sales and millions in proceeds came during the Class Period, i.e. the same time that Defendants were making materially false and misleading statements that inflated and/or maintained the artificial inflation in ASML's stock price.

242.    Each of these insider sales during the Class Period involved disposition of significant percentages of holdings by these ASML executives, as detailed below.

---

[5] Allan's stock sales were denominated in dollars. For ease of comparison, the value of Allan's stock sales as recounted here relies on a conversion of each sale value to euros using that day's USD/EUR exchange rate.

| | **Percentage Holdings Sold During the Class Period** | **Euro Value of Shares Sold** |
|---|---|---|
| Defendant Dassen | 100% | €12,291,556 |
| Defendant Fouquet | 45.5% | €2,915,538 |
| Allan | 33.3% | €2,132,399 |
| Schneider-Maunoury | 15.1% | €3,469,849 |
| **TOTAL:** | | **€20,809,342** |

243.    These significant insider sales were also unusual in timing and nature, including by comparison to Defendants' trading history. For example, in 2023, Dassen sold the entirety of his holdings—4,039 shares—in two insider sales on or around January 25 and January 30, 2023. In contrast, within just one week of the start of the Class Period—and immediately after Defendants' misrepresentations at the start of the Class Period, on January 24, 2024[6]—Defendant Dassen made three insider sales: approximately 4,370 shares on or around January 24, 2024; approximately 5,196 shares on or around January 25, 2024; and then approximately 1,768 shares on or around January 31, 2024. This final sale was made the same day as shares vested, according to filings with the Dutch Authority for Financial Markets.[7] What's more, unlike in 2023, Defendant Dassen did ***not*** sell the entirety of his holdings by the end of January. Instead, Dassen continued to hold 4,730 shares of the Company's ordinary shares until September 2, 2024, when he then sold the entirety

---

[6] The ASML Insider Trading Rules provide for closed period where trading by executives is not allowed. Close periods are "the periods of 30 calendar days prior to the publication of ASML annual financial report and semi-annual financial report, and of ASML first and third quarterly figures."

[7] ASML has not disclosed whether any of these trades were made pursuant to 10b5-1 plans or even the length of the cooling off period associated with any potential 10b5-1 plans (to the extent they exist).

of those remaining holdings for total proceeds of approximately €3,515,184.30. The timing of this sale is highly suspicious, as it occurred just *two days* before Dassen and other Company executives began a secretive campaign to manipulate market expectations through private meetings with analysts, in which they acknowledged for the first time that China demand would "normalize" over the next 12 to 18 months (rather than the longer period investors had been led to expect), while still continuing to conceal adverse facts facing the Company.

244.    Defendant Fouquet's own Class Period trades came at similarly suspicious times. Like Defendant Dassen, Defendant Fouquet made his first Class Period sale, of approximately 2,000 shares on or around January 24, 2024, for total proceeds of €1,520,000, immediately after Defendants' misrepresentations at the start of the Class Period, on January 24, 2024. Also like Dassen, Fouquet's second Class Period sale, of approximately 1,768 shares on or around January 31, 2024, was made the same day those shares vested.

245.    Further, ASML Board of Management members Frédéric Schneider-Manoury and Wayne Allan each made millions of euros selling ASML ordinary shares during the Class Period, in transactions that departed from their prior practices. As members of the Board, Schneider-Manoury and Allan were responsible for overseeing the day-to-day operations of the company, "managing internal and external risks related to [ASML's] business activities and for ensuring [ASML] compl[ies] with applicable laws and regulations," among other things.

246.    In 2023, Schneider-Manoury made one sale of approximately 2,426 shares on or around January 30, for total proceeds of approximately €1,439,090. In 2024, however, Schneider-Manoury made four sales of approximately 4,468 shares for total proceeds of approximately €3,469,849. And whereas Allen sold no stock during 2023, he made three sales during the Class Period of approximately 2,723 shares for total proceeds of approximately €2,132,399.

247.    Like the early Class Period sales of Defendants Dassen and Fouquet, Schneider-Manoury's first three Class Period sales—two on January 24, 2024 and one on January 25, 2024—were made immediately after Defendants' misrepresentations at the start of the Class Period, on January 24, 2024. And Schneider-Manoury's fourth Class Period sale, of approximately 1,768 shares on or around January 31, 2024, was made the same day those shares vested.

248.    Finally, Allan made his first Class Period sale, of approximately 1,335 shares on or around January 24, 2024, immediately after Defendants' misrepresentations at the start of the Class Period, on January 24, 2024. Allan's second Class Period sale, of approximately 559 shares on or around January 31, 2024, was made the same day those shares vested.

249.    Then, Allan made his third and most irregular Class Period sale on September 3, 2024, selling approximately 829 shares for total proceeds of approximately €669,884. The timing of this final sale is highly suspicious, as it occurred just as Defendants and other Company executives began a secretive campaign to manipulate market expectations through private meetings with analysts, in which they acknowledged for the first time that China demand would "normalize" over the next 12 to 18 months (rather than the longer period investors had been led to expect), while still continuing to conceal adverse facts facing the Company.

250.    The following charts summarize and further detail the irregular and suspiciously timed trades described above.

**Dassen**

| Control Period | | | | Class Period | | | |
|---|---|---|---|---|---|---|---|
| Date | Shares | Value | % of Holdings | Date | Shares | Value | % of Holdings |
| 1/25/23 | 1613 | €973,784 | 100% | 1/24/24 | 4370 | €3,321,200 | 31.4% |
| 1/30/23 | 2426.06 | €1,439,090 | 100% | 1/25/24 | 5196 | €4,059,634 | 54.3% |
| | | | | 1/31/24 | 1768.25 | €1,395,538 | 28.8% |
| | | | | 9/2/24 | 4370 | €3,515,184 | 100% |
| | | | | TOTAL | | €12,291,556 | |

**Fouquet**

| Control Period | | | | Class Period | | | |
|---|---|---|---|---|---|---|---|
| Date | Shares | Value | % of Holdings | Date | Shares | Value | % of Holdings |
| 1/25/23 | 2073 | €1,253,108 | 100% | 1/24/24 | 2000 | €1,520,000 | 45.5% |
| 1/30/23 | 2426.06 | €1,439,090 | 100% | 1/31/24 | 1768.25 | €1,395,538 | 42.5% |
| | | | | TOTAL | | €2,915,538 | |

**Schneider-Manoury**

| Control Period | | | | Class Period | | | |
|---|---|---|---|---|---|---|---|
| Date | Shares | Value | % of Holdings | Date | Shares | Value | % of Holdings |
| 1/30/23 | 2426.06 | €1,439,090 | 15.2% | 1/24/24 | 900 | €679,311 | 5.0% |
| | | | | 1/24/24 | 900 | €684,000 | 5.3% |
| | | | | 1/25/24 | 900 | €711,000 | 5.6% |
| | | | | 1/31/24 | 1768.25 | €1,395,538 | 10.4% |
| | | | | TOTAL | | €3,469,849 | |

**Allan**

| Control Period | | | | Class Period | | | |
|---|---|---|---|---|---|---|---|
| Date | Shares | Value | % of Holdings | Date | Shares | Value | % of Holdings |
| None | | | | 1/24/24 | 1335 | €1,013,992 | 27.8% |
| | | | | 1/31/24 | 559.29 | €448,523 | 12.2% |
| | | | | 9/3/24 | 828.90 | €669,884 | 20.5% |
| | | | | TOTAL | | €2,132,399 | |

*Trade values are rounded to the nearest whole number.*

251.    Defendants' and other executives' insider sales—including, in particular, Defendant Dassen's suspiciously timed liquidation of the ***entirety*** of his remaining personal

holdings of ASML ordinary shares during the Class Period—strongly bolster the inference of scienter.

**B.    Defendants' Unique And Nonpublic Insight Into Their Customers And The Industry Support A Strong Inference Of Scienter**

252.    Defendants' scienter is strengthened by their unique and nonpublic visibility into their customers and the industry generally, which Defendants themselves repeatedly touted. This visibility came in part from ASML's near-monopolistic control over one of the most critical and technical components of the semiconductor supply chain—i.e., the lithography machines used to make semiconductors—as well as other unique aspects of the Company's business.

253.    ***First***, in their own words, Defendants communicated frequently with the Company's customers to understand their roadmap, business strategies, and operational activities. As Defendants stated in ASML's Annual Report for 2024, "***We collaborate with customers at all levels of the organization – from CEO-to-CEO interaction right through to on-the-ground support at individual fabs.***" This included periodic recurring meetings with ASML's clients, such as (1) technology review meetings, where senior technology experts and ASML's CEO and CCO discuss technology roadmaps and requirements with customers; (2) executive review meetings, where members of ASML's senior management and the Board of Management, which includes the Individual Defendants, discuss business and strategies with customers; and (3) operational review meetings, where ASML reviews topics related to customers' operational activities. These formalized and recurring touchpoints between Defendants and the Company's clients allowed ASML to understand the "current and future needs" of its clients and "to adjust our demand plans" accordingly.

254.    Defendants repeatedly touted these customer interactions throughout the Class Period. For example, on January 24, 2024, Defendant Wennink referenced the "meetings we've

had with customers" and "the **detailed discussions and the reviews with our customers**." As another example, on April 17, 2024, Defendant Dassen referenced "the plans of some of our large customers" as the basis for telling investors that it was "pretty clear that in the next couple of quarters, significant orders need to come in," and emphasized further, "**the reality is that we know quite well what customers want, and customers know it as well.**" Dassen further stated that "the relationship that we have with our customers [is] much more one of **partnership** than one of transactional behaviors . . . **we have a pretty good understanding based on our interactions with customers what they really need**, so that's I think – it's the interaction with the customers."

255.    As another example, in a radio interview on July 5, 2024, Defendant Wennink reported that, as CEO of ASML (as he was at the start of the Class Period), he had traveled to China to visit the Company's clients "four or five times a year," and that China "customers came here too." Likewise, on August 5, 2024, Defendant Miller stated that the Company has "very routine and very comprehensive at all levels of the – within the company, **discussions with our customers in terms of their technology needs, capacity needs**."

256.    Thus, the market understood that Defendants had uniquely accurate and non-public insight into customer demand for ASML's products well in advance of any public disclosure touching on those issues. For example, a September 18, 2024 Citi report stated, "It is clear to us that, **as a strategic supplier, [ASML] have been aware of changes at Intel ahead of the public announcement**." A Wolfe Research report released on October 15, 2024 cut even more to the point: "**We believe that management was aware of the INTC cuts when they reported in July** (and management reiterated the 35-40bn CY25 guide at that point)."

257.    **Second**, Defendants' unique knowledge is further bolstered by the fact that ASML's lithography machines require extremely long lead times, as many months or even years

may pass after the customer makes the order before ASML manufactures, tests, ships, installs, and qualifies the final product. Given this long lead time, ASML's clients must and do communicate their detailed needs and changes to those needs to ASML many months if not years in advance of actual production. What's more, given the significant costs in purchasing ASML's equipment, the Company's customers are highly incentivized and do promptly communicate to ASML any changes or pushouts in those plans. As Defendant Miller stated on August 5, 2024, "many times some of the communications around CapEx and other things [from our clients] have already been reflected and adjustments that have been made in the different forecast." In other words, ASML is privy to changes in its customer roadmaps well in advance of any public disclosure.

258.    Further, FE 5 explained that ASML worked closely with their customers and communicated in great detail with regards to their equipment. For example, FE 5 relayed that Samsung in Korea had daily meetings on the status of ASML tools and the percentage of what they needed by the end of the year. They had daily dialogue or emails. FE 5 also recounted how data was also available internally online in a spreadsheet that listed every piece of equipment getting installed globally, the location, the phase the tool is in, the progress of the tool and date to be installed. It listed the percentage of the tool coming to Texas and was very detailed. Any changes to the tool would be updated on this spreadsheet and highlighted.

259.    ***Third,*** even after delivery of the machines to the customers, Defendants continued to gain still further nonpublic insight into the industry based on ASML's collection of data on the use of its machines, from servicing and otherwise, including specifically data related to utilization. Because approximately 95% of the lithography equipment ASML has ***ever*** sold in its 30-year history remains in use today, this data provides Defendants with particular insight which, Defendants claimed, closely correlates with demand for its systems. For example, on January 24,

2024, Defendant Wennink said, "what we're seeing is, of course, ***the information coming off our tools that we see the utilization rates going up***." Similarly, on ASML's April 14, 2024 first-quarter earnings call, Defendant Wennink further said that "overall semiconductor inventory levels continue to improve, trending towards more healthy levels. We also see continued improvements in lithography tool utilization at both logic and memory customers." On that call, Defendant Fouquet added, "the utilization of memory is going up, and we've seen that now quite sustainably for quite a while." Defendants Fouquet and Miller repeated similar statements on July 17, 2024 and on August 5, 2024. Likewise, Defendants stated on September 4, 2024 that they understood "the reality of things . . . We have many proof of that. Some of our system are running for more than 25 years, and the only thing people have done is replace the tires."

260.    Defendants' close monitoring of utilization and other data is further confirmed by former ASML employees. For example, FE 5 stated that utilization metrics were reviewed in daily meetings and provided insight into customers' needs for future machinery. FE 5 added that ASML's equipment is all networked online, allowing him and other ASML employees to see in real time which machines are down, error messages, and utilization levels. Likewise, FE 2 described that ASML ran quarterly townhalls in which laser pulse numbers were presented, which indicated a decrease in pulse numbers and a great reduction in revenue.

261.    Further, FE 7 worked for ASML as a Customer Support Engineer from July 2010 until he retired in July 2023, working from Intel's Hillsboro Oregon R&D location. FE 7 said he worked with Intel repairing and updating ASML's NXT model DUV lithography machines. FE 7 reported that ASML had the capability of monitoring utilization and performance of the lithography machines. He described the process as equipment data logging within the machinery installed at a customer's location being connected to Intel's network. ASML, in turn, has remote

monitoring capability, which allows ASML to monitor what the machine is doing. Depending on customer permissions, ASML can test and/or operate the machine remotely.

262. According to FE 7, the data provided allows insight into tests that have been run, processes that have been performed, maintenance requirements, and the utilization of the machine. The data reports can be accessed and monitored globally by those with appropriate access credentials. The monitoring provides not only system maintenance requirements and functionality data; it assists customer managers in developing contract requirements. For example, the contract manager could look at how many machines are at a certain site to determine how to delegate processes, equipment, and when to negotiate upgrades.

### C. Defendants' Admission That There Was A "Factual Absence" Of Industry Recovery Supports A Strong Inference Of Scienter

263. The inference of scienter is further bolstered by Defendants' private acknowledgment to analysts that there was a "***factual absence*** of clear upturn in the semiconductor market in H2 24," requiring a "clearly more conservative stance on 2025." This admission contradicts Defendants' several statements during the Class Period that touted, among other things, improved "utilization" as a strong barometer of overall market demand and a clear indicator of the ongoing recovery in the semiconductor market. For example, on January 24, 2024, Defendant Wennink stated, "I mean, yes, you've gone through, I think, the bottom of this Memory cycle with prices going up, utilizations increasing." Defendant Miller reiterated this projection on August 5, 2024, when he said that "if you look at the utilization rates, we're seeing them trending up for both logic and memory. And so, I think that piece of it, I think, will continue, or at least our view is that that will continue. And then you'll eventually get to a point where you'll hit utilization levels high enough where you trigger additional demand. . . . And we expect to go through that as we get to the second half of this year."

**D.    Defendants' Admission That Order Intake Does Not "Accurately" Reflect Business Momentum Supports A Strong Inference Of Scienter**

264.    Defendants' admission that the Company's disclosures around order intake are not a reliable indicator of the Company's performance further supports a strong inference of scienter. Throughout the Class Period, Defendants repeatedly tied quarterly orders to their "strong" performance and increased confidence in 2025 guidance. What's more, in response to lower-than-expected orders in the first quarter of 2024, Defendants cited the "lumpy" nature of their order intake to *downplay* concerns. After the Class Period, however, on January 29, 2025, Defendant Dassen admitted that exactly this same "lumpy" nature of the Company's orders had created an inaccurate impression of ASML's "business momentum," and as a result Defendants would stop reporting quarterly bookings entirely in 2026.

**E.    The Close Proximity Between Defendants' False And Misleading Statements And The Revelation Of The Truth Supports A Strong Inference Of Scienter**

265.    The inference of scienter is further bolstered by the temporal proximity of Defendants' false and misleading statements and omissions with the revelation of the truth at the end of the Class Period. Even as late as August and September 2024, Defendants continued to falsely minimize concerns related to China and pushouts by the Company's leading-edge customers, telling investors that China revenues would gradually normalize to 20-30% of revenues, suggesting that Intel's backlog of orders was intact, and that the Company did "not see a way" to hit the lower half of its 2025 guidance range. Less than 6 weeks later, Defendants admitted the opposite—that the Company would, in fact, be in the lower end of the range of its 2025 guidance because of pushouts and cancellations from leading-edge clients and because the Company's China customers had "ordered ahead" of organic demand resulting in an abrupt normalization of revenues.

266.    As there were no intervening events, such as a natural disaster, that would justify such a sudden and extreme change of fortune, the temporal proximity and magnitude of the deviation between Defendants' false and misleading statements and omissions and the subsequent disclosure of the truth supports an inference of scienter.

### F.    The False And Misleading Statements And Omissions Concerned Matters Critical To ASML's Performance, Which Supports A Strong Inference Of Scienter

267.    The inference of scienter is further bolstered by the fact that the subjects of Defendants' false and misleading statements and omissions concern the Company's core operations. During the Class Period, the subjects of Defendants' false statements, including the Company's performance in China and orders from leading-edge customer orders were critically important to ASML's business. Indeed, ASML's China revenues comprised nearly half of the Company's sales during the Class Period. The Company's China sales and the related export restrictions that came into place just before the Class Period, and the prospect of further restrictions throughout the Class Period, thus concerned a critical portion of the Company's revenues and were of paramount importance to ASML and its investors.

268.    Similarly, orders and revenues from the Company's critical leading-edge customers had historically represented as much as approximately 80% of the Company's revenues, as estimated by analysts. Indeed, Defendants acknowledged publicly the critical importance of the leading-edge customers to the Company's performance and growth. For example, in response to an analyst question in December 2022 as to how important Intel was for growth rates for ASML and whether moderated Intel spending would impact the Company's growth rate, Defendant Miller admitted that Intel was "clearly an important customer" and further that it was "critical going forward" that Intel and other customers "drive innovation"; in other words, by continuing spending with ASML.

**G.    That Defendants' False And Misleading Statements Concerned Subjects About Which Defendants Frequently And Authoritatively Spoke Supports A Strong Inference Of Scienter**

269.    As discussed above, throughout the Class Period, analysts carefully monitored and consistently reported on ASML's orders from leading-edge customers, the sustainability of China revenues, and Defendants' 2025 guidance, all of which had critical importance to the Company's performance and financial prospects. As a result, many of Defendants' alleged false statements were made in direct response to specific and repeated questions from analysts about these core metrics, their drivers, and their impact on ASML. The specificity and repetition of these questions, that Defendants were highly-placed executive officers and that Defendants' misrepresentations and/or omissions concerned the true drivers of and adverse facts around the Company's key performance metrics and their impact on ASML's financial performance all further contribute to a strong inference of scienter.

270.    Regarding the Company's leading-edge customers, for example, Defendant Dassen stated on April 17, 2024, "***I'm pretty sure that in the foreseeable future you will see the translation of what we know is firm demand into orders***." Regarding the sustainability of China revenues, Defendant Dassen stated, also on April 17, 2024, that "***demand in China continues to be strong*** . . . ***because they're adding capacity that we believe the world needs***," and that "***we believe that [the capacity] China is adding today in terms of mature capacity is rational***." Regarding Defendants' 2025 guidance, Defendant Fouquet reiterated as late as September 4, 2024 that Defendants were "confident we'll be in the range [of 2025 revenue and margin guidance] . . . ***we believe that we'll not be on the low end of the range***."

271.    Defendants were, at the very least, reckless in not informing themselves about the drivers of the Company's core metrics given that they regularly fielded questions on those topics. For example, when a TD Cowen analyst asked Defendants on April 17, 2024 about ASML

management's statement that the Company "need[s] to hit over EUR 4 billion run rate to hit the midpoint of [guidance for] calendar '25," Defendant Dassen responded, "When I talk about the EUR 4 billion that we need in order to get to the midpoint of next year, I'm indeed talking about everything. So of course, that also includes EUV."

272.    Throughout the Class Period, Defendants repeatedly faced these and other specific questions about the sustainability of China revenues and orders from leading-edge customers. In response, Defendants, highly-placed executives of ASML, offered detailed responses, representing themselves as knowledgeable about these topics. Either Defendants were as well-informed about the state of the business as they claimed and, therefore, knew the truth about the sustainability of China revenues and the lack of orders from the Company's leading-edge clients, or they made these statements without informing themselves on subjects that they knew were critical to ASML's business and the focus of analyst concern, meaning that they were at least severely reckless in making the alleged misstatements.

### H.    Defendants' Involvement In Discussions Around Export Restrictions Supports A Strong Inference Of Scienter

273.    The inference of Defendants' scienter is further demonstrated by their involvement in nonpublic discussions and agreements with governmental entities concerning China export restrictions. Indeed, prior to the Class Period, Defendants had entered into a secret deal with the United States to limit lithography exports to China, which provided Defendants with unique, non-public insight into forthcoming export restrictions. Defendants then knowingly repudiated their secret agreement with the United States by actively lobbying The Hague for export licenses to China in 2023, as global demand faltered in order.

274.    What's more, Defendants repeatedly admitted both before and throughout the Class Period that they were closely and actively involved in discussions of export control policies with

government entities. For example, on January 24, 2024, Defendant Wennink admitted that "*We have been in contact with the US government on their export control regulations*." As another example, as reported on April 5, 2024 by Reuters, officials from the Company met with the Dutch government and the "U.S. export policy chief" to discuss further restrictions around China-business. Two weeks later, on the Company's first quarter 2024 earnings call on April 17, 2024, Defendant Wennink said that Defendants were, "of course, . . . providing input. *We're providing input of the size of and the type of services, and I think it's all being taken into consideration*." Likewise, on September 4, 2024, Defendant Fouquet stated to investors that Defendants "*try to explain of course, as part of the exercise we have with government, we try to educate a bit on the reality of things*." Defendants' active attempts to shape export controls are also supported by significant funding, over $1 million in 2023, paid towards lobbying the United States government.

## I.    The Suspicious Circumstances Of Defendant Miller's Departure Supports A Strong Inference Of Scienter

275.    The suspicious circumstances surrounding the apparent and unexplained departure of Defendant Miller further support an inference of Defendants' scienter. By the start of the Class Period, Defendant Miller had been employed by ASML for over two decades, beginning as Director of Strategic Marketing in December 2002, and serving as Vice President of Investor Relations beginning in January 2018. As Vice President of Investor Relations, Defendant Miller regularly opened ASML's quarterly earnings calls, introducing executives on each such call during the Class Period, i.e., for the fourth quarter of 2023 and the first, second, and third quarters of 2024.

276.    However, shortly after the revelation of the truth, Defendant Miller appears to have left the Company; Defendant Miller is no longer listed on ASML's Investor Relations webpage and he has not spoken in public communications this year. Defendant Miller's (seeming) departure

from ASML is not accompanied by a press release, public statement, or any kind of announcement whatsoever.

277.    The inference of scienter from this suspicious departure is heightened given Miller personally made materially misleading statements on August 5 and September 10, 2024, shortly before the revelation of the truth, and further heightened by the fact that Miller admitted on December 4, 2024 (i.e. after the truth was revealed)—contrary to the impression fostered by Defendants during the Class Period—that "some of those [Chinese customers had ordered] a bit earlier than they originally planned . . ." based on export restrictions (¶¶120; 158).

**J.    Defendants Possessed The Motive And Opportunity To Artificially And Unsustainably Accelerate The Company's China Sales Given Political Pressure And Global Downturn**

278.    During 2023, the Company experienced pressure on its performance from two forces: 1) the semiconductor industry at large experienced a global slowdown; and 2), at the same time, political pressures grew to impose further restrictions on the Company's ability to export its products to Chinese customers. These two pressures compounded to heighten the importance of the Company's China sales, as ASML's China sales grew on both an absolute basis and relative to the Company's declining non-China sales.  These political pressures portended restrictions that posed potentially existential risks to the Company's ability to sell to Chinese customers or even to fulfill the already-existing orders in ASML's backlog, which the Company had historically underdelivered. As a result, Defendants had both the motive and opportunity to overdeliver on their China backlog in excess of organic demand for ASML's products in order to sustain the Company's performance during the industry slump, as well as to ensure that they captured as much China revenue as possible before that revenue stream was choked off by further restrictions.

279.    Defendants' motivation to overdeliver on China demand continued after new restrictions became effective on January 1, 2024, because, as Defendants admitted later, still

further restrictions continued to be actively discussed and were highly likely. This likelihood provided Defendants with further motivation to ensure that they extracted as much revenue from their Chinese backlog and customers, irrespective of the sustainability of such demand.

**K.**    **Defendants' Selective Disclosure Of Material Non-Public Information Supports A Strong Inference of Scienter**

280.    Defendants' scienter is further bolstered by their campaign of selective disclosure, in violation of Nasdaq rules and ASML policy. Specifically, per ABN-Amro, in September 2024, Defendants "conducted a[n] extensive communication campaign (several roadshows and conferences) which were clearly aimed (not actually stated) at bringing down the consensus for 2025." In consequence of Defendants' analyst-focused blitz, "[t]he sell side consensus scaled its expectations back, from € 37.5bn to € 36bn," with the buy side "much lower, at around € 32-33bn, as it took on more (possibly too much) the idea behind management's greater caution." During this campaign to "bring down the consensus for 2025," Defendants told analysts that the "business outlook for ASML in 2025 remains uncertain" and demonstrated a "clearly more conservative" "stance on 2025." Yet even as they quietly tried to temper analysts' consensus for ASML's 2025 performance, Defendants "reiterated the company's EUR30-40bn revenue range for 2025 and stated again that the 'low end' of the range was too conservative."

281.    Defendants' campaign of selected disclosure in private meetings with analysts violated Nasdaq Rule 5250(b)(1), which provides that "a Nasdaq-listed company shall make prompt disclosure to the public through any Regulation FD compliant method (or combination of methods) of disclosure of any material information that would reasonably be expected to affect the value of its securities of influence investors' decisions." The methods of disclosure compliant with Regulation FD are (i) filing a Form 8-K with the SEC and (ii) dissemination of the material information through some method of disclosure "that is reasonably designed to provide broad,

non-exclusionary distribution of the information to the public." 17 CFR § 243.101(e)(2). Nasdaq rules specify the permissible methods of disclosure aside from Form 8-K: (i) a "broadly disseminated press release;" (ii) conference calls, press conferences, or webcasts, "[s]o long as the public is provided adequate notice (generally by a press release) and granted access;" and (iii) company web sites and social media channels. Nonetheless, Defendants did not avail themselves of any such required disclosure methods, making only certain selected analysts and investors privy to their revised expectations; exactly the type of "selective disclosure" of "important nonpublic information" that Regulation FD—and thus also Nasdaq Rule 5250(b)(1)—was designed to prevent.

282.    Likewise, doing so, Defendants also contravened ASML's own relevant policy: "to simultaneously provide shareholders and other parties in the financial markets with equal information when this information concerns matters that may influence the share price."[8]

283.    The information conveyed to analysts in private meetings was highly material; indeed, the AFM categorizes information capable of altering consensus estimates as material. As the AFM explains, "to determine if there is any inside information directly related to the issuer, it may be useful to look at the degree of deviation from previous external communications (including strategy and outlook) and other publicly-known information (such as consensus estimates)." As described above, Defendants' selectively-disclosed material information was intended to and in fact did have a material impact on consensus estimates, demonstrating its materiality.

---

[8] ASML's Bilateral Contacts With Shareholder Policy requires the Company to "simultaneously provide shareholders and other parties in the financial markets with equal information when this information concerns matters that may influence the share price. . . . When engaging in bilateral communication, ASML shall endeavor not to release nonpublic price sensitive information. . . .."

## VIII.  CLASS ACTION ALLEGATIONS

284.    Plaintiffs bring this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all investors who purchased or otherwise acquired ASML ordinary shares, as well as those who purchased or otherwise acquired call options and/or sold put options on ASML ordinary shares, between January 24, 2024, and October 15, 2024, inclusive (the "Class Period"), in domestic transactions or on U.S. exchanges, and were damaged thereby.

285.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

286.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.      Whether Defendants violated the Exchange Act;

b.      Whether Defendants misrepresented material facts;

c.      Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d.      Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e.      Whether the prices of ASML ordinary shares (and options on ASML ordinary shares, the price of which depended on the price of ASML ordinary shares) were artificially inflated; and

f.      The extent of damage sustained by members of the Class and the appropriate measure of damages.

287.    Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

288.    Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in securities class actions. Lead Plaintiffs have no interests that conflict with those of the Class.

289.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## IX.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE

290.    Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

a.    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.    The omissions and misrepresentations were material;

c.    The Company's ordinary shares met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient and automated market;

d.    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's ordinary shares on the Nasdaq; and

e.    Lead Plaintiffs and the Class purchased ASML ordinary shares on the Nasdaq between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

291.    At all relevant times, the market for the Company's ordinary shares on the Nasdaq was efficient because: (1) as a regulated issuer, the Company filed periodic public reports with the SEC; and (2) the Company regularly communicated with public investors using established market communication mechanisms, including through regular disseminations of press releases on the

major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

292.    A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding ASML's business and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

## X.    NO SAFE HARBOR

293.    Defendants' false and misleading statements and omissions are not protected by the "safe harbor" for forward-looking statements.

294.    Many of Defendants' false and misleading statements and omissions alleged above were not accompanied by meaningful cautionary language and thus the "safe harbor" is not applicable.

295.    To the extent Defendants purported to accompany their forward-looking statements with "safe harbor" warnings, those "safe harbor" warnings were ineffective to shield those statements from liability. Defendants are liable for any false and/or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that the forward-looking statement was false. None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future

economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## XI.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**Violation of Section 10(b) of the Exchange Act and
SEC Rule 10b-5 Promulgated Thereunder
Against All Defendants**

296.    Lead Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

297.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Lead Plaintiffs and the Class; and (2) cause Lead Plaintiffs and the Class to purchase ASML ordinary shares in domestic transactions or on U.S. exchanges at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

298.    Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's ordinary shares in domestic transactions or on U.S. exchanges in an effort to maintain artificially high market prices thereof in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

299.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the Class suffered damages in connection with their respective purchases of the Company's ordinary shares in domestic transactions or on U.S. exchanges during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

300.    Lead Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

301.    The Individual Defendants acted as controlling persons of ASML within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of the Company, including the content and dissemination of the various false and/or misleading statements. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

302.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the activities giving rise to the securities violations as alleged herein, and exercised the same.

303.    As described above, the Company and the Individual Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable under Section 20(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their

purchases of ASML ordinary shares in domestic transactions or on U.S. exchanges during the Class Period.

**COUNT III**

**Violation of Section 20A of the Exchange Act,
Against Defendants Dassen and Fouquet**

304.    Lead Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

305.    This count is asserted against Defendant Dassen and Defendant Fouquet (the "Trading Defendants") for violations of Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, on behalf of all members of the Class.

306.    While ASML's securities traded at artificially inflated prices, the Trading Defendants profited by selling approximately 19,472 shares of ASML ordinary shares while in possession of adverse, material non-public information about ASML, liquidating approximately €15 million through illegal insider trading transactions, as detailed above (¶¶241-251).

307.    By contrast, Lead Plaintiffs purchased ASML ordinary shares in domestic transactions or on U.S. exchanges contemporaneously with several of the Trading Defendants' sales, as follows:

| Trading Defendants' Open Market Sales | | | | Lead Plaintiff Detroit P&F's Contemporaneous Purchases | | |
|---|---|---|---|---|---|---|
| Sale Date | Defendant | Shares Sold | Price | Purchase Date | Shares Purchased | Price |
| 1/24/24 | Dassen | 4,370 | €760 | 2/5/24 | 76 | $893.71 |
|  | Fouquet | 2,000 | €760 |  |  |  |
| 1/25/24 | Dassen | 5,196 | €781.30 |  |  |  |
| 1/31/24 | Dassen | 1,768 | €789.22 |  |  |  |
|  | Fouquet | 1,768 | €789.22 |  |  |  |

| Trading Defendants' Open Market Sales | | | | Lead Plaintiff Hollywood Firefighters' Contemporaneous Purchases | | |
|---|---|---|---|---|---|---|
| Sale Date | Defendant | Shares Sold | Price | Purchase Date | Shares Purchased | Price |
| 9/2/24 | Dassen | 4,370 | €804.39 | 9/25/24 | 90 | $817.63 |

308.    Lead Plaintiffs and all other members of the Class who purchased ordinary shares of ASML ordinary shares in domestic transactions or on U.S. exchanges contemporaneously with the sales of ASML ordinary shares by Defendant Dassen and Defendant Fouquet have suffered damages because:

  a.    In reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b), 20(a), and 20A of the Exchange Act as alleged herein; and

  b.    they would not have purchased the ASML ordinary shares at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the Trading Defendants' false and misleading statements and omissions alleged herein.

309.    By reason of the foregoing, the Trading Defendants violated §20A of the Exchange Act and are liable to Lead Plaintiffs and the other members of the Class for the substantial damages suffered in connection with their contemporaneous purchases of ASML ordinary shares in domestic transactions or on U.S. exchanges during the Class Period.

## XII.    PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs pray for relief and judgment, as follows:

  a.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

  b.    Awarding compensatory damages and equitable relief in favor of Lead Plaintiffs and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

   c.  Awarding Lead Plaintiffs and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

   d.  Such other and further relief as the Court may deem just and proper.

## XIII. <u>JURY TRIAL DEMANDED</u>

  Lead Plaintiffs hereby demand a trial by jury.

Dated: May 12, 2025       Respectfully submitted,

            <u>/s/ Salvatore J. Graziano</u>
            **BERNSTEIN LITOWITZ BERGER**
             **& GROSSMANN LLP**
            Salvatore J. Graziano
            Jesse L. Jensen
            Alec T. Coquin
            Matthew S. Goldstein
            1251 Avenue of the Americas
            New York, NY 10020
            Telephone: (212) 554-1400
            Facsimile: (212) 554-1444
            salvatore@blbglaw.com
            jesse.jensen@blbglaw.com
            alec.coquin@blbglaw.com
            matthew.goldstein@blbglaw.com

            *Co-Lead Counsel for Lead Plaintiffs, and Lead*
            *Counsel for the Class*

            **KESSLER TOPAZ MELTZER**
             **& CHECK LLP**

            Sharan Nirmul
            Johnston de F. Whitman, Jr.
            Richard A. Russo, Jr. (*pro hac vice*
            forthcoming)
            Evan R. Hoey (*pro hac vice* forthcoming)
            Aubrie L. Kent (*pro hac vice* forthcoming)
            280 King of Prussia Road
            Radnor, PA 19087
            Telephone: (610) 667-7706
            Facsimile: (610) 667-7056
            snirmul@ktmc.com
            jwhitman@ktmc.com
            rrusso@ktmc.com

ehoey@ktmc.com
akent@ktmc.com

*Co-Lead Counsel for Lead Plaintiffs, and Lead
Counsel for the Class*

Robert D. Klausner
**KLAUSNER, KAUFMAN, JENSEN
  & LEVINSON, P.A.**
7080 Northwest 4th Street
Plantation, FL 33317
Telephone: (954) 916-1202
bob@robertdklausner.com

*Additional Counsel for Lead Plaintiffs Miami
Beach F&P, Hollywood Police, Hollywood
Firefighters, and Pembroke Pines F&P*

Ronald A. King
**CLARK HILL**
215 South Washington Square, Suite 200
Lansing, MI 48933
Tel.: (517) 318-3015 (office)
(517) 449-2860 (cell)
rking@clarkhill.com

*Additional Counsel for Lead Plaintiff Detroit
P&F*