**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE ASML HOLDING N.V.
SECURITIES LITIGATION

Case No. 1:24-cv-8664-NRB-JW

**LEAD PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
THE CONSOLIDATED AMENDED
COMPLAINT AND MOTION TO
STRIKE CERTAIN PORTIONS
THEREOF**

**ORAL ARGUMENT REQUESTED**

# <u>TABLE OF CONTENTS</u>

<b>Page</b>

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF FACTS ......................................................................................3

    A.    ASML's Operations .....................................................................................3

    B.    ASML Issues Its 2025 Guidance ................................................................4

    C.    Defendants Mislead Investors Concerning ASML's Ability to Meet Its 2025 Guidance .............................................................................................5

    D.    ASML Overdelivers on Its China Backlog to Offset Reduced Leading-Edge Revenues ............................................................................................8

    E.    ASML Insiders Cash In ...............................................................................9

    F.    The Relevant Truth Is Revealed ...............................................................10

III.    LEGAL STANDARD ...........................................................................................11

IV.     ARGUMENT ........................................................................................................11

    A.    The Complaint Adequately Alleges False or Misleading Statements ..................11

        1.    Defendants' Materially False or Misleading Statements ..........................12

        2.    The Safe Harbor Does Not Shelter Any Misstatement .............................15

        3.    No Alleged Misstatement Is an Inactionable Opinion ..............................19

        4.    No Alleged Misstatement Is Puffery .........................................................20

    B.    The Complaint Adequately Alleges Scienter ............................................22

        1.    Defendants' Conscious Misbehavior or Recklessness ..............................22

        2.    The Complaint's Motive Allegations Bolster the Scienter Inference ........26

        3.    Defendants Do Not Raise A More Compelling Inference .........................29

    C.    Defendants' Challenges to the FE Allegations Are Meritless ...............................30

        1.    The FE Allegations Should Be Credited ...................................................30

        2.    Defendants' Motion to Strike Should Be Denied ......................................32

    D.    The Complaint Adequately Alleges Loss Causation .................................33

    E.    The Complaint Adequately Alleges Scheme Liability ...............................37

i

F.    The Complaint Adequately Alleges §20(a) Claims ..................................................37

G.    The Complaint Adequately Alleges §20A Claims ..................................................37

V.    CONCLUSION ..........................................................................................................38

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Adient plc Sec. Litig.*,
2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)..........................................................16

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
529 F. Supp 3d 111 (S.D.N.Y. 2021)..................................................... 21-22, 38

*In re Alstom SA Sec. Litig.*,
253 F.R.D. 266 (S.D.N.Y. 2008) ..........................................................................36

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
693 F. Supp. 2d. 241 (S.D.N.Y. 2010).........................................................21, 34

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*,
568 U.S. 455 (2013).............................................................................................35

*In re Apple Inc. Sec. Litig.*,
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) .......................................................25

*In re Applied Micro Circuits Corp. Sec. Litig.*,
2002 WL 34716875 (S.D. Cal. Oct. 4, 2002) .......................................................33

*In re Axsome Therapeutics, Inc. Sec. Litig.*,
2025 WL 965265 (S.D.N.Y. Mar. 31, 2025) ........................................................30

*Bldg. Trades Pension Fund of W. Pa. v. Insperity, Inc.*,
2022 WL 784017 (S.D.N.Y. Mar. 15, 2022) ........................................................14

*Born v. Quad/Graphics, Inc.*,
521 F. Supp. 3d 469 (S.D.N.Y. 2021)...................................................................36

*Campo v. Sears Holdings Corp.*,
635 F. Supp. 2d 323 (S.D.N.Y. 2009)...................................................................33

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D 69 (S.D.N.Y. 2015) .............................................................................35

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014)..........................................................................33-34

*CBS Broad. Inc. v. FilmOn.com, Inc.*,
2010 WL 4840091 (S.D.N.Y. Nov. 17, 2010) ......................................................15

*In re Cerner Corp. Securities Litigation*,
　425 F.3d 1079 (8th Cir. 2005) ................................................................15

*Chanoff v. U.S. Surgical Corp.*,
　857 F. Supp. 1011 (D. Conn. 1994) .........................................................38

*City of Livonia Emps.' Ret. Sys. v. Boeing Co.*,
　711 F.3d 754 (7th Cir. 2013) ..................................................................33

*City of Potomac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
　875 F. Supp. 2d 359 (S.D.N.Y. 2012) ......................................................21

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
　587 F. Supp. 3d 56 (S.D.N.Y. 2022) ........................................................29

*City of Taylor Gen. Emps.' Ret. Sys. v. Magna Int'l*,
　967 F. Supp. 2d 771 (S.D.N.Y. 2013) ..............................................20, 29

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
　477 F. Supp. 3d 123 (S.D.N.Y. 2020) ...............................................27, 31

*City of Warwick Ret. Sys. v. Catalent, Inc.*,
　2024 WL 3219616 (D.N.J. June 28, 2024) ..............................................24

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
　2017 WL 2608243 (S.D. Tex. June 15, 2017) ..........................................38

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
　2018 WL 3772675 (D.N.J. Aug. 8, 2018) ................................................32

*In re Complete Mgmt. Inc. Sec. Litig.*,
　153 F. Supp. 2d 314 (S.D.N.Y. 2001) ...............................................15, 25, 26, 29

*Courter v. CytoDyn, Inc.*,
　2025 WL 1771244 (W.D. Wash. June 25, 2025) ......................................21

*Crews v. Rivian Auto., Inc.*,
　2024 WL 3447988 (C.D. Cal. July 17, 2024) ..........................................35

*Dang v. Amarin Corp.*,
　750 F. Supp. 3d 431 (D.N.J. 2024) ........................................................28

*In re Dentsply Sirona, Inc. Sec. Litig.*,
　665 F. Supp. 3d 255 (E.D.N.Y. 2023) .............................................13, 16, 20, 21

*In re Dynex Cap., Inc. Sec. Litig.*,
　2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009) ..........................................31

*Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford,*
    794 F.3d 297 (2d Cir. 2015)...................................................................................31

*In re Estée Lauder Co., Inc. Sec. Litig.,*
    2025 WL 965686 (S.D.N.Y. Mar. 31, 2025) .................................................. *passim*

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.,*
    986 F. Supp. 2d 428 (S.D.N.Y. 2013)....................................................................18

*Fresno Cnty. Emps.' Ret. Assoc. v. comScore, Inc.,*
    268 F. Supp. 3d 526 (S.D.N.Y. 2017)....................................................................28

*Freudenberg v. E\*Trade Fin. Corp.,*
    712 F. Supp. 2d 171 (S.D.N.Y. 2010).............................................................11, 26

*Ganino v. Citizens Utils. Co.,*
    228 F.3d 154 (2d Cir. 2000)...................................................................................20

*Gimpel v. The Hain Celestial Grp., Inc.,*
    2025 WL 2749562 (2d Cir. Sept. 29, 2025) ............................................27, 34, 35

*Gordon v. Sonar Cap. Mgmt. LLC,*
    962 F. Supp. 2d 525 (S.D.N.Y. 2013)....................................................................38

*Hatamian v. Advanced Micro Devices, Inc.,*
    2015 WL 511175 (N.D. Cal. Feb. 6, 2015) ...........................................................32

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.,*
    422 F. Supp. 3d 821 (S.D.N.Y. 2019)....................................................................17

*Heller v. Goldin Restructuring Fund, L.P.,*
    590 F. Supp. 2d 603 (S.D.N.Y. 2008)....................................................................24

*In re HEXO Corp. Securities Litigation,*
    524 F. Supp. 3d 283 (S.D.N.Y. 2021)....................................................................14

*In re Initial Pub. Offering Sec. Litig.,*
    399 F. Supp. 2d 261 (S.D.N.Y. 2005)....................................................................36

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.,*
    2018 WL 4252537 (E.D. Pa. Sept. 5, 2018) ..........................................................32

*In re Intercept Pharms., Inc. Sec. Litig.,*
    2015 WL 915271 (S.D.N.Y. Mar. 4, 2015) .....................................................11, 14

*Kasilingam v. Tilray, Inc.,*
    2022 WL 4537846 (S.D.N.Y. Sept. 28, 2022)......................................................28

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015)................................................................36

*Lorenzo v. SEC*,
    587 U.S. 71 (2019).......................................................................37

*Loritz v. Exide Techs.*,
    2014 WL 4058752 (C.D. Cal. Aug. 7, 2014)............................................14, 15

*Luo v. Spectrum Pharms., Inc.*,
    2024 WL 4443323 (D. Nev. Oct. 7, 2024) .................................................28

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ..............................................................27

*In re MBIA, Inc., Sec. Litig.*,
    700 F. Supp. 2d 566 (S.D.N.Y. 2010)................................................. 35-36

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances, Inc.*,
    2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) ...........................................20

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013).....................................................13

*In re Millennial Media, Inc. Securities Litigation*,
    2015 WL 3443918 (S.D.N.Y. May 29, 2015) ............................................33

*Moshell v. Sasol Ltd.*,
    2021 WL 3174414 (S.D.N.Y. July 24, 2021) ............................................33

*Moshell v. Sasol Ltd.*,
    481 F. Supp. 3d 280 (S.D.N.Y. 2020)................................................19, 30

*New Orleans Emps.' Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) .......................................................23, 31

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)..............................................................26

*Okla. Firefighters Pension and Ret. Sys. v. Lexmark Int'l, Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019)..............................................19, 20, 25

*In re Omega Healthcare Investors, Inc. Sec. Litig.*,
    563 F. Supp. 3d 259 (S.D.N.Y. 2021)................................................34, 36

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pens. Fund*,
    575 U.S. 175 (2015)......................................................................19

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010)........................................................................36

*In re Oxford Health Plans, Inc.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) ......................................................... 27, 37-38

*Pehlivanian v. China Gerui Adv. Materials Grp., Ltd.*,
   153 F. Supp. 3d 628 (S.D.N.Y. 2015).........................................................17

*Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*,
   2019 WL 2360942 (S.D.N.Y. Mar. 4, 2019) ...............................................28

*Plumbers & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*,
   11 F.4th 90 (2d Cir. 2021) ...........................................................................37

*Porter v. Fairbanks Cap. Corp.*,
   2003 WL 21210115 (N.D. Ill. May 21, 2003) .............................................33

*In re Rayonier Inc. Sec. Litig.*,
   2016 WL 3022149 (M.D. Fla. May 20, 2016) .............................................32

*Richard v. Northwest Pipe Co.*,
   2011 WL 3813073 (W.D. Wash. Aug. 26, 2011) .........................................26

*In re Salix Pharms., Ltd.*,
   2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)......................................... *passim*

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
   32 F. Supp. 3d 300 (S.D.N.Y. 2024)............................................................24

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*,
   75 F.3d 801 (2d Cir. 1996)............................................................................20

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001)............................................................................27

*SEC v. Medallion Fin. Corp.*,
   2024 WL 4227753 (S.D.N.Y. Sept. 18, 2024)..............................................37

*SEC v. Rio Tinto plc.*,
   41 F.4th 47 (2d Cir. 2022) ...........................................................................37

*Set Cap. LLC v. Credit Suisse Grp. AG*,
   996 F.3d 64 (2d Cir. 2021)............................................................................22

*Setzer v. Omega Healthcare Investors, Inc.*,
   968 F.3d 204 (2d Cir. 2020).....................................................................25, 30

*Sharette v. Credit Suisse Int'l*,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015)..................................................11

*Shemian v. Rsch. In Motion Ltd.*,
    2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ......................................14

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018).....................................21

*In re Silver Lake Grp., LLC Sec. Litig.*,
    108 F.4th 1178 (9th Cir. 2024) .........................................................38

*In re Sina Corp. Sec. Litig.*,
    2006 WL 2742048 (S.D.N.Y. Sept. 26, 2006).....................................21

*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010)........................................................ 16-17

*In re SolarEdge Tech., Inc. Sec. Litig.*,
    2025 WL 1031154 (S.D.N.Y. Apr. 6, 2025)........................................13

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
    547 F.3d 406 (2d Cir. 2008).............................................................11

*Stevelman v. Alias Rsch. Inc.*,
    174 F.3d 79 (2d Cir. 1999)........................................................27, 29

*In re STMicroelectronics N.V. Sec. Litig.*,
    2025 WL 2644241 (S.D.N.Y. Sept. 15, 2025) ........................... 17, 23-24

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)...............................................37

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).......................................................................22

*In re Teva Sec. Litig.*,
    671 F. Supp. 3d 147 (D. Conn. 2023)..........................................35, 36

*In re Tufin Software Techs. Ltd. Sec. Litig.*,
    2022 WL 596861 (S.D.N.Y. Feb. 25, 2022).......................................30

*Villare v. Abiomed, Inc.*,
    2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021).....................................16

*In re Vivendi Universal, S.A.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003)...............................................24

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)...................................................................34

*Waterford Tp. Police & Fire Ret. Sys. v. Smithtown Bancorp, Inc.*,
    2014 WL 3569338 (E.D.N.Y. July 18, 2014) ...............................................32, 33

*Waterford Twp. Police & Fire Ret. Sys. v. Smithtown Bancorp, Inc.*,
    2013 WL 1345086 (E.D.N.Y. Mar. 29, 2013) .........................................32

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
    504 F. Supp. 3d 224 (S.D.N.Y. 2020).......................................................28

*In re Wells Fargo & Co. Sec. Litig.*,
    2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021)......................................... 15-16, 22

*Willis v. Big Lots, Inc.*,
    2016 WL 8199124 (S.D. Ohio Jan. 21, 2016) .........................................18

*Wilson v. Comtech Telecomm. Corp.*,
    648 F.2d 88 (2d Cir. 1981)......................................................................38

*Wiseberg v. Toyota Motor Corp.*,
    2012 WL 1108542 (D.N.J. Mar. 30, 2012)............................................33

*In re XL Fleet Corp. Sec. Litig.*,
    2022 WL 493629 (S.D.N.Y. Feb. 17, 2022)...........................................31

*Yannes v. SCWorx Corp.*,
    2021 WL 2555437 (S.D.N.Y. June 21, 2021) .........................................25

*zCap Equity Fund LLC v. LuxUrban Hotels Inc.*,
    2025 WL 2097951 (S.D.N.Y. July 25, 2025) .........................................26

**Statutes**

15 U.S.C. §78u-5(c)(1)(A)(i) ....................................................................17

15 U.S.C. §78u-5(c)(2) .............................................................................17

15 U.S.C. §78u-5(c)(2)(B)(i)-(iii)..............................................................18

## NOTE ON CITATION FORMATS

Unless otherwise noted, all emphasis is added, and all internal punctuation, quotations, and citations are omitted. Commonly used citations in this brief take the following form:

| Citation | Description |
|----------|-------------|
| ¶[•] | Paragraph in the Complaint |
| Complaint | Consolidated Amended Complaint (Dkt. No. 84) |
| MTD | Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Amended Complaint and Motion to Strike Certain Portions Thereof (Dkt. No. 93) |
| DX | Exhibits to the Declaration of Abhinya Swaminathan In Support of Defendants' Motion to Dismiss the Amended Complaint and Motion to Strike Certain Portions Thereof (Dkt. No. 94) |
| PX | Exhibits to the Declaration of Sharan Nirmul In Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss the Amended Complaint and Motion to Strike Certain Portions Thereof, filed herewith |
| 2025 Guidance | ASML's publicly-disclosed 2025 revenue guidance range of €30-40 billion, first announced in November 2022 (¶¶4, 38) |

## I.    INTRODUCTION

After setting ASML's 2025 Guidance of €30-40 billion, Defendants repeatedly assured investors that ASML would beat its low end, which analysts understood as pointing to the top half of the range. However, a semiconductor industry downturn hampered ASML's leading-edge business, which historically generated approximately 80% of its annual revenues and was key to ASML meeting its 2025 Guidance. To sustain its financial performance during the industry slump, ASML aggressively overdelivered its products to Chinese customers who were stockpiling in anticipation of tighter export restrictions. These looming constraints threatened ASML's temporary boost to revenues.

Investors were intensely focused on these trends, consistently asking Defendants about the status of ASML's leading-edge business and whether the recent surge in China revenues was sustainable—rather than resulting from strategic stockpiling by Chinese customers. At every opportunity, Defendants brushed aside these concerns and repeatedly told investors that demand was in an upswing, assured that China performance was sustainable, denied any stockpiling by Chinese customers, and reaffirmed that ASML would not land in the low end of its 2025 Guidance. Throughout, Defendants buttressed their representations with confident claims of deep visibility into customer product and service needs, and touted the Company's putatively strong order intake and backlog.

None of this was true. As Defendants ultimately admitted, far from rational or sustainable, ASML's growing China revenues resulted from customer stockpiling and ASML overdelivering on its China backlog. And ASML's leading-edge business was not recovering during the Class Period: in fact, Defendants knew *no later than early-2024* that leading-edge customer demand was in a rut, and they admitted in September 2024 that there was a "factual absence" of an industry upturn in 2024. Undeterred, Defendants kept misleading the market, assuring investors as late as

1

September 10, 2024, that "we don't see how we get to the low end" of the 2025 Guidance. When the market learned the truth a month later—that ASML would land in the low end of its 2025 Guidance (a difference of **billions of dollars**), and that China sales and revenues would normalize far quicker than Defendants had represented—ASML's stock price cratered. Analysts expressed "surprise" and "disappointment," concluding that Defendants had suffered a "loss of credibility" given their consistent reassuring statements.

Defendants' bid for dismissal fails. In claiming that no alleged misstatement is actionable because none was a "guarantee," Defendants ignore that misstatements need only create a misleading understanding of what was then occurring. From this flawed premise, Defendants broadly claim that every single misstatement is: (i) a forward-looking statement shielded by the PSLRA safe harbor; (ii) an inactionable opinion; ***and*** (iii) immaterial puffery. This kitchen-sink approach does not withstand scrutiny. The safe harbor does not insulate statements of current or historical fact, or material omissions. Nor were Defendants' purported "cautions" meaningful: they failed to address the specific risks Plaintiffs allege were concealed and described as hypothetical risks that already materialized. Defendants also cannot side-step liability by characterizing all of their misstatements as opinions. Most were not opinions, and those that arguably were omitted material facts, rendering each misleading and actionable. Nor was any misstatement immaterial puffery: in context, each concerned important topics about which investors were laser-focused, or made material and verifiable claims.

While ignoring their repeated admissions of insight into customer demand, Defendants improperly attack the Complaint's scienter allegations in isolation. Moreover, their challenges to the Complaint's motive allegations are premature fact disputes—largely based on documents not cited or relied on in the Complaint—that cannot be decided now.

Defendants' attacks on the Complaint's FE allegations also fail, as Defendants demand a level of detail the law does not require. Their request to strike certain FE allegations should also be rejected. It is predicated on untested declarations that defense counsel obtained under unexplained circumstances to raise fact disputes that cannot be decided at the pleading stage.

Defendants' remaining arguments are easily rejected. In challenging Plaintiffs' loss causation allegations, Defendants contend they did not conceal anything, so the corrective events revealed nothing new—a circular truth-on-the-market defense that the Supreme Court has cautioned should not be determined at this juncture. Finally, Defendants' claims that Plaintiffs did not sufficiently plead scheme claims under Rule 10b-5(a) and (c) or insider trading claims under Section 20A are meritless, as they ignore the Complaint's allegations and applicable law.

Defendants' MTD should be denied.

## II.    STATEMENT OF FACTS

### A.    ASML's Operations

ASML produces two main categories of products for photolithography: Deep Ultraviolet ("DUV") and Extreme Ultraviolet ("EUV"). ¶34. Photolithography uses varying light wavelengths to "etch" a pattern onto a substrate, an essential step in producing semiconductors. ¶33. ASML holds a dominant position in the global semiconductor industry. ¶¶2, 4, 33, 35.

DUV machines are ASML's older "trailing-edge" technology that are less expensive than EUVs and use higher wavelength light. ¶¶3, 6, 34, 40. ASML is the world's sole supplier of EUV machines, the Company's innovative "leading-edge" technology needed to produce the most advanced semiconductors. ¶33. EUVs use lower wavelength light to etch significantly smaller features onto semiconductors. ¶¶3, 33-36. ASML's leading-edge customers, including Intel, Samsung, and TSMC, purchase and utilize EUV machines. ¶¶6, 11, 51, 268. Cymer is the ASML division that manufactures and maintains the light sources used in the Company's lithography

equipment. ¶¶33, 102.

DUV and EUV machines are installed and serviced in "fabs" (also called factories or foundries), where chipmakers manufacture semiconductors. ¶3. New fab construction signals significant revenues for ASML. ¶¶11, 36, 56, 105. As Defendants said in reaffirming ASML's 2025 Guidance, "new fabs that are being built across the globe" indicated that 2025 would be "a strong year" for ASML. ¶56. Delays in fab construction and utilization downturns negatively impact ASML's revenues. ¶¶4, 116.

DUV and EUV machines carry substantial lead times between order and delivery, giving ASML a unique lens into its future revenues. ¶¶4, 14, 37, 92, 126, 150-51, 235-36, 257. DUV machines cost tens of millions of euros, with an approximately six-month lead time, while EUV machines cost approximately €220-350 million, with a 12- to 18-month lead time. ¶¶4, 37. Given these long lead times, Defendants represented that ASML had deep and accurate revenue forecasting insight. ¶¶4, 71, 124-26. Consequently, ASML's guidance is afforded significant credibility by analysts and investors. *E.g.*, ¶¶66-67, 76-78.

### B.    ASML Issues Its 2025 Guidance

In November 2022, ASML publicly announced its 2025 Guidance, representing that it would increase revenue to €30-40 billion in 2025. ¶¶4, 38. The Company's leading-edge and China sales were critical to achieving its 2025 Guidance: sales to leading-edge customers, including Samsung, Intel, and TSMC, historically accounted for as much as 80% of ASML's revenue, and China sales accounted for around 15-20% of ASML's annual revenue through 2022. ¶¶6-7, 11, 39, 51, 59, 268.

ASML, however, is affected by shifting political pressures. ¶¶8-9, 42-48, 64, 68, 80, 159-60, 189, 274. Since 2019, export controls prohibited ASML from selling EUVs to China. ¶¶7, 39. In 2022, the U.S. pushed for greater restrictions on ASML's DUV sales to China, leading ASML

4

to enter into a non-public agreement with the U.S. to prioritize non-China DUV shipments. ¶¶8, 40-41.

Restrictions limiting ASML's China sales coincided with a global downturn in the semiconductor industry in 2023, which reduced ASML's other revenues and threatened ASML's ability to achieve its 2025 Guidance. ¶¶42, 278. ASML responded by aggressively delivering DUVs to China, driving the Company's net China sales *from 9% in 4Q22 to 39% in 4Q23*. ¶¶7-8, 42, 44, 64. In 3Q23 alone, ASML exported €2.44 billion of lithography equipment to China, nearly eclipsing ASML's total 2022 China revenues. ¶44.

Nevertheless, throughout 2023, ASML faced the continued threat of additional China restrictions. ¶43. In turn, investors were intensely focused on whether ASML's booming China revenues reflected organic and sustainable growth, rather than Chinese customers' stockpiling products in advance of tighter restrictions. ¶¶7, 10, 45-46. Defendants, however, consistently assured that ASML's China sales would "continue to be sustainable," and were ***not*** "just a one-time pull forward." ¶47. Defendants also stressed that ASML's increased China DUV deliveries came from its "backlog" (orders previously placed but not delivered) in response to lower non-China demand. ¶48. Investors credited Defendants' assurances, while continuing to focus on the state of ASML's business from leading-edge customers (¶¶11, 49-52).

### C.    Defendants Mislead Investors Concerning ASML's Ability to Meet Its 2025 Guidance

At the beginning of the Class Period, Defendants reaffirmed ASML's 2025 Guidance and assured that the Company would exceed its low end. During ASML's January 24, 2024 earnings call, addressing whether ASML "was still targeting the middle of the range" of its 2025 Guidance, Wennink stated "***the low end of the range was too conservative***." ¶216. Similarly, on July 17, 2024, Dassen reaffirmed the 2025 Guidance and declared "***it will not be the low point***." ¶219; *see*

5

*also* ¶85 ("***it's not the low point of that guidance***"). On September 4, 2024, Fouquet assured "***we'll not be on the low end of the range***." ¶221; *see also* ¶¶203 ("we're nicely on track" for "***the midpoint of the range***"), 215, 217-18, 220, 222 ("we don't see how to get to the low end").

Analysts understood Defendants' statements to mean that ASML would achieve the midpoint or higher of its 2025 Guidance. For example, after the Company's April 17, 2024 earnings call, Citi issued a report stating that ASML's "***management clearly reiterat[ed] their aim of revenue in the top half of the €30-40bn range***." ¶77. Additionally, after Defendants made statements directing away from the low end of ASML's 2025 Guidance on August 5, 2024, Barclays issued an August 12, 2024 report noting that ASML could "get towards the ***upper end of its guidance range***." ¶93. Similarly, Mizuho wrote in a September 8, 2024 report that "[m]anagement thinks the probability of the low end of its target range (EUR30bn-40bn) for 2025 sales is low." ¶133.

Throughout the Class Period, analysts consistently asked Defendants about the state of ASML's China demand and leading-edge business, including as a result of reports of decreased spending by some of ASML's largest leading-edge customers. ¶¶55, 59-60, 64-66, 68, 70-73, 79-80, 82-85, 88-90, 95-97. Each time, Defendants assuaged investors' concerns. For example, during ASML's January 24, 2024 earnings call, Defendants downplayed concerns over the sustainability of China demand, stating "[w]hile the export regulations had impact on our business, ***we continue to see strong demand for mid-critical and mature nodes in China***," and assured that, "***fundamentally, it's pretty clear that the China demand remains very strong***" (¶181) and "***very, very solid***" (¶183). On April 17, 2024, Defendants claimed that China demand was "***strong***" and tamped down any concerns Chinese customers were stockpiling, stating that the capacity "China is adding today in terms of mature capacity ***is rational***." ¶187. Defendants made similar statements

6

on February 14 and July 17, 2024. ¶¶185, 189.

Then, on August 5, 2024, Defendants minimized the recent outsized revenue contributions from China sales as "***more of a reflection of the non-China space [not] recovering yet***" (¶191), rather than resulting from ASML overdelivering on its China backlog or any stockpiling by Chinese customers. Analysts were reassured. ¶97. On September 5, 2024, Defendants represented that China revenues would decrease "progressively in the course of the next let's say 12 to 18 months" to "20-30%" of revenues. ¶193; *see also* ¶195. Analysts also credited these assurances. ¶¶63 (Citi, 2/7/24: "***Chinese demand is viewed as real, not stockpiling***"); 87 (Jefferies, 8/5/24: "***no material change in ASML's China business***"); 133 (Haitong, 9/8/24: "[w]e believe China won't be a risk for ASML in 2025"); *see also* ¶¶66, 74, 134.

Defendants simultaneously misled investors about demand from ASML's leading-edge customers. ¶¶165 (Wennink, 1/24/24: assuring "positions that customers have taken are ***pretty rock solid***," and "***we don't see <u>any</u> indication or <u>any</u> customer messaging to us that those things won't happen***"); 168 (Dassen, 4/17/24: touting ASML's deep insight into customer demand, explaining, "the reality is that we know quite well what customers want" and assuring "I'm pretty sure that in the foreseeable future ***you will see the translation of what we know is firm demand into orders***"); *see also* ¶¶169, 171. Similarly, on August 5, 2024, following adverse news impacting two of ASML's largest leading-edge customers (¶¶88-89), Miller soothed concerns about any impact on ASML, stating "***many times some of the communications around CapEx and other things have already been reflected and adjustments have been made in the different forecast***" (¶175). *See also* ¶177. Defendants made similar statements on July 17 and September 10, 2024. ¶¶173, 179.

To further allay investor questions over ASML's ability to hit its 2025 Guidance, Defendants pointed to the Company's purportedly "strong" order intake (¶¶201-03) and backlog

(¶¶197-99). Defendants also repeatedly assured that ASML would benefit from a global semiconductor industry recovery, which they claimed was well underway based on improving "utilization levels" of ASML's lithography tools that Defendants could "clearly see." ¶¶205-13. Analysts responded positively to these statements, raising their price targets for ASML shares because of "*[g]rowing confidence in a 'boom' year in 2025*" and because large leading-edge customers like "Samsung and Intel are set to order more and we still see a marked upturn in the memory segment." ¶¶61-63, 66-67, 74-78, 86-87, 93.

D.    **ASML Overdelivers on Its China Backlog to Offset Reduced Leading-Edge Revenues**

In reality, Defendants knew that ASML's pull-forward China sales were unsustainable and would normalize rapidly. ¶¶119-25, 158. ASML received real-time utilization data, which indicated many Chinese customers were not using their ASML lithography equipment efficiently. ¶123. The Company also communicated frequently with customers, including at the "CEO-to-CEO" level, on topics like capacity needs. ¶¶124-25. Moreover, Wennink was highly familiar with ASML's China clients and visited them "four or five times a year," in addition to Chinese customers visiting ASML. ¶124. As Defendants admitted after the Class Period, Chinese customers were ordering "earlier than they originally planned" due to looming export restrictions, resulting in a pull-forward of revenues from later years. ¶¶120, 123-26. Defendants also admitted that ASML was "overdelivering" to China. ¶¶121, 184.

Moreover, Defendants knew that the downturn in the semiconductor industry persisted, with ASML's leading-edge customers postponing or cancelling their orders. ¶¶99-116, 252-62. Numerous FEs report that ASML's leading-edge customers were delaying fabs, "cold bagging" ASML equipment, delaying orders, and suffering slowdowns. ¶98. For instance, FE-1 reported that Intel ramped down or "cold bag[ged]" (i.e., fully shut down) half the machines at its Arizona

fab from late 2022 through at least September 2024. ¶101. FE-2 reported that Cymer used software to track pulses of lasers used in DUV machines, and that decreased pulse numbers were presented at quarterly townhalls. ¶¶102, 106, 260. FE-2 corroborated FE-1's report of slowing utilization, stating that he observed a significant decline in Intel's utilization of ASML equipment in Oregon in 2022, with the number of lasers in use decreasing from 120-130 to 40 by the end of 2024, and slated to further decline to 30 by year-end 2025, significantly reducing revenues. ¶¶102-04, 106, 108. FE-6, an ASML engineer who coordinated EUV upgrades, reported that TSMC cancelled or postponed approximately ***$1 billion*** in scheduled upgrades during the first six months of 2024. ¶118; *see also* ¶¶112-15 (FE-5's account of delays at Samsung Texas fab). ASML also regularly participated in "detailed discussions" with its customers, enabling ASML to learn its clients' "current and future needs" and "to adjust [] demand plans" accordingly. ¶¶253-54; *see also* ¶¶256, 258. Reflecting this, Defendants assured that "the reality is that we know quite well what customers want." ¶254.

Despite publicly representing that the semiconductor industry was recovering, Defendants privately admitted in September 2024 to a "factual absence" of such recovery in 2H24. ¶134. Indeed, as Dassen conceded on October 16, 2024, ASML realized there was decreased customer demand for ASML products and services "***a number of quarters ago***"—i.e., no later than early 2024. ¶146.

### E.    ASML Insiders Cash In

Capitalizing on ASML's inflated stock price, Dassen, Fouquet, and two members of ASML's Board of Management—Frédéric Schneider-Maunoury and Wayne Allan—collectively sold over €20 million of ASML stock while possessing material nonpublic information. ¶¶128-30, 241-51, 304-09. In fact, Dassen liquidated his ***entire*** remaining personal holdings of ASML ordinary shares just weeks before the alleged corrective events. ¶¶243, 250.

### F.    The Relevant Truth Is Revealed

On October 15, 2024, ASML stunned the market when it released its 3Q24 financial results, disclosing quarterly bookings of just €2.63 billion and admitting 2025 revenues would be between €30 and €35 billion, the low end of its 2025 Guidance that Defendants had consistently claimed ASML would exceed. ¶¶138-39, 226-27. ASML attributed the negative news to "competitive foundry dynamics [that] have resulted in a slower ramp of new nodes at certain customers, leading to several fab push outs and resulting changes in litho demand timing, in particular EUV," the very issues into which Defendants consistently assured they had deep insight and which they claimed were already incorporated into the Company's forecasts. ¶¶4, 71, 124-26, 140, 175. The next day, Defendants admitted that the leading-edge order pushouts fueling the reduced guidance were known "*a number of quarters ago*," i.e., no later than early 2024. ¶¶148, 233. Defendants also revealed that ASML's China sales would drop to just 20% of its total revenue in 2025, rather than the gradual decline to 20-30% over 12-18 months that Defendants claimed just a month earlier. ¶¶148, 232.

Analysts were "surprised" and "disappointed." ¶228. For example, Citi wrote that "*as recently as early September, [ASML] management had [] reiterated that the low-end of the 2025 range was still 'conservative.'*" ¶143. Wolfe Research wrote that, "[g]iven the long lead times and strong visibility that ASML typically has with customers, it's *rare for ASML to surprise investors as they just did*." ¶150. As Wolfe explained, "[p]art of the surprise here is that many of these potential issues (China, I[ntel]) were known 90 days ago, yet *management continued to reiterate their €35-40bn guide through the quarter*." *Id.*

On this news, ASML's share price declined by more than 21% over two days, from a close of $872.27 on October 14, 2024, to a close of $683.52 on October 16, 2024, erasing billions of dollars of shareholder value. ¶¶1, 144, 157, 230, 238.

III.    **LEGAL STANDARD**

To state a Section 10(b) claim, Plaintiffs must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Intercept Pharms., Inc. Sec. Litig.*, 2015 WL 915271, at *4 (S.D.N.Y. Mar. 4, 2015) (Buchwald, J.). "On a motion to dismiss . . . the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in [P]laintiff[s'] favor." *Id.*

Defendants introduce 96 exhibits to support their counterfactual narrative, including numerous documents not referenced in the Complaint. *See, e.g.*, DXs 79-80 (non-ASML earnings call transcripts); DXs 85, 87, 89, 91 (non-public foreign trading plans). None of these documents may be considered for "the truth of their contents." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

IV.    **ARGUMENT**

A.    **The Complaint Adequately Alleges False or Misleading Statements**

To allege falsity, a plaintiff need only plead facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 89 (S.D.N.Y. 2015). False or misleading statements need not guarantee a particular outcome—"[a] statement is misleading if a reasonable investor would have received a false impression from the statement." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010). Whether falsity is adequately alleged requires "an examination of defendants' representations, taken together and in context." *In re Estée Lauder Co., Inc. Sec. Litig.*, 2025 WL 965686, at *2 (S.D.N.Y. Mar. 31, 2025).

### 1. Defendants' Materially False or Misleading Statements

Defendants repeatedly misled investors about ASML's ability to realize the midpoint or higher of its 2025 Guidance and the linchpins for hitting it—China demand and revenues, and ASML's leading-edge business. Defendants rebuffed concerns that ASML's growing China sales were inorganic and unsustainable, assuring instead that China demand was "strong," "robust," and "solid." ¶¶181, 183, 187. Defendants also rejected any notion that stockpiling in advance of trade restrictions drove China sales. ¶187 (Chinese demand "*is rational*"). Moreover, despite telling investors in September 2024 that China-based revenues would "progressively" revert to 20-30% of ASML's annual revenues over the next 12-18 months (¶¶191, 193, 195), non-EUV orders had plunged, signaling the end of ASML's ability to use China to backfill revenues (¶¶122, 194).

For ASML's leading-edge business, Defendants assured they did not "see *any* indication or *any* customer messaging to us that" leading-edge customer orders "won't happen." ¶165. Defendants likewise claimed that based on ASML's data, its leading-edge business would benefit from a purportedly ongoing semiconductor market recovery. ¶¶205-13. Defendants also touted their deep visibility into customers' needs, which they assured was reflected in ASML's forecasts. ¶175; *see also* ¶¶166, 168-69, 171, 173, 177, 179; Section II.C, *supra*. Meanwhile, Defendants consistently: (i) reaffirmed ASML's 2025 Guidance; (ii) claimed that ASML would not achieve the low end of the range (¶221 (stating "*we'll not be on the low end of the range*"), ¶¶215-18, 220-22; *see also* ¶¶5, 66, 93, 97); and (iii) represented that their statements were "supported by [ASML's] strong backlog" and "strong order intake" (¶¶197, 201; *see also* ¶¶198-99, 202-03).

Contrary to these statements: (i) booming Chinese demand was due to stockpiling and overdelivering, rendering the Company's China results inorganic and unsustainable; (ii) demand for ASML's tools was declining among leading-edge customers, who were "cold bagging" equipment and delaying new fab construction; (iii) by early-2024, customer demand became "a

question mark"; (iv) ASML's quarterly order intake was not a reliable metric for its financial performance; and (v) as a result, ASML could not exceed the low end of its 2025 Guidance. *See* Section II.D, *supra*. Viewed together and in context, Defendants' statements were materially false or misleading. *See, e.g.*, *Estée Lauder*, 2025 WL 965686, at \*6-7 ("glimmering predictions about future sales or prospects in China based on misrepresentations of the present-day facts on the ground" misleading because defendants "omit[ed] key information" about "current goings-on in the market"); *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 283 (E.D.N.Y. 2023) (representations that revenues driven by "strong demand" misleading "because, whether the revenues were driven by 'inflated channel inventory' or 'end-user demand' 'fundamentally differ in sustainability'").[1]

Defendants' challenges to these misstatements fail. To start, they claim their statements reaffirming ASML's 2025 Guidance range are inactionable because they never "guaranteed" ASML would achieve the midpoint or higher. MTD 22-23. However, misleading statements need not be framed as "guarantees," as Defendants consistently claim. MTD 1-2, 9, 15, 19, 21-24, 28-29, 35. Rather, misstatements need only create a misleading understanding of what Defendants were then seeing in the business. *See In re SolarEdge Tech., Inc. Sec. Litig.*, 2025 WL 1031154, at \*6 (S.D.N.Y. Apr. 6, 2025) (statement misleading "if a reasonable investor would have received a false impression from the statement"). Here, throughout the Class Period, analysts understood

---

[1]     Far from a "puzzle pleading" (MTD 21 n.18), the Complaint pleads misstatements in categories, emphasizing the portions alleged to be actionable, followed by a paragraph explaining why they were false or misleading. *See* Complaint, §§V.A-E. That suffices. *See, e.g.*, *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 309 (S.D.N.Y. 2013) (similar approach sufficient). Plaintiffs do not merely repeat the same reason why each statement was false or misleading. *E.g.*, ¶¶182, 194, 196 (different reasons why China misstatements actionable). Regardless, that statements are actionable for the same or similar reasons is no basis for dismissal.

Defendants' statements to mean ASML would hit at least the mid-point of its 2025 Guidance.[2]
¶¶66, 93, 96-97; Section II.C, *supra*; *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *11
(S.D.N.Y. Apr. 22, 2016) ("allegation that several different analysts understood" alleged
misstatements a particular way "provides support for the Court's conclusion that Defendants'
statements are reasonably interpreted as such").[3] Moreover, the meaning of Defendants' statements
cannot be decided now, *Loritz v. Exide Techs.*, 2014 WL 4058752, at *6-8 (C.D. Cal. Aug. 7,
2014) (statement's meaning is a "question for the trier of fact"), and the Complaint's allegations
must be construed in Plaintiffs' favor. *See Intercept*, 2015 WL 915271, at *4.[4]

Defendants' suggestion that it was not misleading to claim that ASML's China revenues
would gradually decline to roughly 20-30% of the Company's revenues over 12-18 months fails
for the same reasons. MTD 29 & n.39. Defendants' strained reading—that these statements
conveyed that ASML's China revenue would fall to 20% in 2025—cannot be squared with the
plain meaning of Fouquet's statement or analysts' later statements that they were misled. ¶¶151-
52 (noting ASML's revised 2025 China revenue guidance "seems very low" versus what "mgmt.
had been suggesting"). Defendants' quibbles over what Miller "conveyed" through his August 5
statement concerning ASML's 2025 Guidance (MTD 24) raise additional premature fact disputes.

---

[2]    As late as September 10, 2024, Defendants continued to claim "we don't see how we get
to the low end" of the 2025 Guidance. ¶222.

[3]    Defendants baselessly claim that investors had all information required to determine
whether ASML would achieve its 2025 Guidance. MTD 23. But Defendants actively misled
investors when questioned about the guidance, as evidenced by analysts' (i) consistent belief that
ASML would obtain the higher end of that guidance (¶¶5, 66, 93, 97) and (ii) surprise when the
relevant truth was revealed (¶¶228-29, 234-37). *See* Sections II.F, IV.D, *supra*. *In re HEXO Corp.
Securities Litigation*, 524 F. Supp. 3d 283, 310 (S.D.N.Y. 2021) is inapposite, as plaintiffs
***conceded*** that available data enabled investors to discern whether projections were "overly-
confident." Plaintiffs make no such concession here.

[4]    Neither *Bldg. Trades Pension Fund of W. Pa. v. Insperity, Inc.*, 2022 WL 784017, at *8
(S.D.N.Y. Mar. 15, 2022) nor *Shemian v. Rsch. In Motion Ltd.*, 2013 WL 1285779, at *22
(S.D.N.Y. Mar. 29, 2013) (MTD 22) involved assurances about exceeding the low end of a
guidance range.

*See Loritz*, 2014 WL 4058752, at *6-8.

Defendants also argue that their China statements are not actionable because Plaintiffs have not quantified the alleged customer stockpiling. MTD 28-29. This demands an unrequired level of specificity. By contrast, the statements in *In re Cerner Corp. Securities Litigation*, 425 F.3d 1079, 1084 (8th Cir. 2005), were not actionable because plaintiffs alleged "pulling in" "caused an overstatement in [defendant]'s earnings" but did not quantify the amount of pull in transactions. Here, Defendants **admitted** that stockpiling was a driving force in elevated China revenues. Section II.F, *supra*.

### 2.    The Safe Harbor Does Not Shelter Any Misstatement

Defendants broadly claim that *every* alleged misstatement is protected by the PSLRA safe harbor. MTD 2, 18-21. However, "misrepresentations of present fact aren't protected, even if they're part of a forward-looking statement." *Estée Lauder*, 2025 WL 965686, at *6. Statements that omit material facts are likewise ineligible. *See In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 340 (S.D.N.Y. 2001) (Buchwald, J.) (safe harbor and bespeaks caution doctrine do not apply to "material omissions or misstatements of historical fact").

Here, many alleged misstatements: (i) were not forward-looking; (ii) were "mixed" statements containing representations of putative current or historical fact; or (iii) omitted material facts. *E.g.*, ¶¶165 ("We don't see any delay"); 181 ("we continue to see strong demand"); 191 ("there's nothing been published to date that's new"); PX 1 (identifying statements of current and/or historical fact within the misstatements Defendants deem forward-looking).[5] The safe harbor does not shield these misstatements. *See, e.g., In re Wells Fargo & Co. Sec. Litig.*, 2021

---

[5] While Plaintiffs were compelled to include a responsive chart of the alleged misstatements, Defendants' Annexes (Dkt. Nos. 93-1 through 93-5) total 63 pages and include arguments not made in their brief. This is a "flagrant violation" of the word limits. *CBS Broad. Inc. v. FilmOn.com, Inc.*, 2010 WL 4840091, at *1 (S.D.N.Y. Nov. 17, 2010) (Buchwald, J.)

WL 4482102, at *18 (S.D.N.Y. Sept. 30, 2021) ("we're in complete agreement" and "we're in the midst of implementing" not shielded by safe harbor).[6]

Additionally, Defendants' statements omitted that: (i) China revenues were driven by unsustainable stockpiling and overdelivering; (ii) business with leading-edge customers was slumping, negatively impacting revenues; (iii) by early-2024, customer demand became "a question mark"; (iv) they knew of decreased customer demand no later than early 2024; and (v) ASML's quarterly order intake was not a reliable barometer of its financial performance, all of which undermined ASML's 2025 Guidance. *See Estée Lauder*, 2025 WL 965686, at *2, 7 ("[w]e anticipate sequential acceleration to strong organic sales and adjusted EPS growth in the second half of our fiscal year as these pressures begin to abate" not eligible for safe harbor because of material omissions).

Even if any of Defendants' misstatements is purely forward-looking, such statement would qualify for safe-harbor protection only if: (i) it was "identified and accompanied by meaningful cautionary language"; (ii) it was "immaterial"; or (iii) "the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Dentsply*, 665 F. Supp. 3d at 293.[7] None of these circumstances applies.

**No Meaningful Cautionary Language.** Meaningful "cautionary language must be prominent and specific, and must directly address exactly the risk that plaintiffs claim was not disclosed." *Salix*, 2016 WL 1629341, at *11. Here, Defendants fail to "carry the burden of demonstrating that they are protected by the meaningful cautionary language prong of the safe

---

[6]    Defendants' cases do not involve current fact representations. *See Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *16 (S.D.N.Y. Sept. 21, 2021) (statements "d[id] not provide specific information about the current situation"); *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *19 (S.D.N.Y. Apr. 2, 2020) (same).

[7]    Defendants do not contend that the safe harbor's second prong applies. MTD 19-21.

harbor." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 773 (2d Cir. 2010).

Defendants point to a collection of supposedly cautionary statements, claiming all were "meaningful." MTD 19-20 & Annex A.[8] This fails because Defendants do not provide "any additional information about how the alleged cautionary language related to the risks that allegedly occurred." *Pehlivanian v. China Gerui Adv. Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 647 n.7 (S.D.N.Y. 2015). Nevertheless, Defendants' cautions did not address "exactly the risk[s]" that were concealed. *Salix*, 2016 WL 1629341, at *11. None addressed, for example, the financial risk related to China customers stockpiling or ASML over-delivering. *See Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 847 (S.D.N.Y. 2019) (cautions not "meaningful" where they did not relate to "specific risks"). Nor are vague, generic statements such as "Cyclicality is no stranger to this industry" and "[t]he slope of the industry recovery is still uncertain" (e.g., Annex A at 14, 21) sufficient. Such "generic, boilerplate . . . disclaimer[s], listing garden-variety business concerns" are not meaningful. *In re STMicroelectronics N.V. Sec. Litig.*, 2025 WL 2644241, at *4 (S.D.N.Y. Sept. 15, 2025).[9]

Moreover, most alleged misstatements are oral statements. The safe harbor has exacting prerequisites for oral forward-looking statements, including identifying a readily-available written document providing factors that might cause actual results to differ materially from those in the

---

[8]    Forward-looking statements must be "accompanied by meaningful cautionary statements." 15 U.S.C. §78u-5(c)(1)(A)(i), (c)(2). Defendants' inclusion of supposed cautionary language from **before** the Class Period, and from documents and/or presentations extrinsic to the Complaint, is unavailing. *See* Annex A at 1-9. With few exceptions, these cautions did not accompany or were not explicitly incorporated by reference into Defendants' Class Period statements.

[9]    The putative cautions in ASML's earnings releases are similarly boilerplate and reference ASML's annual report. *See, e.g.*, DX 20.

oral forward-looking statement. 15 U.S.C. §78u-5(c)(2)(B)(i)-(iii).[10] Many of Defendants' oral misstatements failed to make such a reference, barring safe harbor applicability. *See* Annex A at 10-11, 23-26 (no such reference made during January 24, 2024 earnings video or webcast (DX 21, 22), April 17, 2024 earnings video (DX 26), July 17, 2024 earnings video (DX 30), or August 5, September 4, and September 10, 2025 investor conferences (DX 32, 33, 35)); *Big Lots*, 2016 WL 8199124, at *23-24 (no safe harbor for oral statements where "no oral warning" given). Nor can Defendants shield their oral misstatements with "general reference[s]" at the outset of calls "to factors 'discussed in our press releases and SEC filings'" (DX 23 at 3, DX 27 at 4, DX 31 at 4, Annex A at 11, 18, 21), as that "fails to supply the necessary specificity." *Salix*, 2016 WL 1629341, at *11.

Furthermore, warning that "[t]he semiconductor industry **can be** cyclical and we **may be** adversely affected by any downturn," and that "[e]conomic uncertainty has led to reduced consumer and business spending, and **could** cause our customers to decrease, cancel or delay their orders" (Annex A at 2, 16) was not meaningful. Purported cautionary language does not "insulate from liability the failure to disclose that the risk ha[d] transpired." *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 428, 487 (S.D.N.Y. 2013). Here, customer demand became "a question mark"[11] by early 2024, and ASML's ability to lean on China sales to buoy revenues plummeted by September 2024, both of which jeopardized ASML's ability to exceed the low end of its 2025 Guidance (Sections II.D, IV.A.1, *supra*).

---

[10]    Accordingly, the Court should not consider Defendants' references to other oral statements or representations in documents that were not readily available. *See Willis v. Big Lots, Inc.*, 2016 WL 8199124, at *23 (S.D. Ohio Jan. 21, 2016) ("PSLRA immunizes an oral forward-looking statement as long as it is accompanied by sufficient ***oral*** cautionary statement that refers listeners to a more detailed, written statement.") (emphasis in original).

[11]    On October 16, 2024, Dassen admitted that ASML knew of leading-edge customer order delays "***a number of quarters ago***." ¶233.

**Defendants' Actual Knowledge.** As set forth below in Section IV.B.1, Defendants made any forward-looking statement with actual knowledge that it was false or misleading. *See Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 292 (S.D.N.Y. 2020).[12]

### 3.    No Alleged Misstatement Is an Inactionable Opinion

"A fact is a thing done or existing or an actual happening." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pens. Fund*, 575 U.S. 175, 183 (2015). Belying Defendants' claim that *every* alleged misstatement is an inactionable opinion (MTD 22-24, 28-30), many purported to represent current or historical facts. *E.g.*, ¶¶165 ("*we don't see* any indication or any customer messaging to us that those things won't happen"); 168 ("These fabs . . . *are scheduled to take our tool[s]*."); 205 ("*we are seeing* the first signs, the positive signs of a recovery," "*also we see our utilization rates going up again*"); *see also* PX 1 (identifying fact representations within misstatements Defendants deem opinion); *see Okla. Firefighters Pension and Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 32 (S.D.N.Y. 2019) ("historical facts" not opinions). Defendants' consistent affirmations that ASML would exceed the low end of its 2025 Guidance likewise were not opinions because "there was very little equivocation in Defendants' statements." *Id.*

Even if some statements are deemed opinions, they are actionable because each: (i) "omit[ted] material facts about the [Defendants'] inquiry [] or knowledge;" and (ii) the omitted facts "conflict[ed] with what a reasonable investor would take from the statement." *Omnicare*, 575 U.S. at 189; *see also* PX 1.[13] As explained in Section IV.A.2, Defendants' statements omitted material facts regarding China, the leading-edge business, and ASML's order intake that

---

[12]    For the same reasons, the bespeaks caution doctrine does not apply. MTD 18, 20 n.17; *Salix*, 2016 WL 1629341, at *11 (safe harbor and bespeaks caution inapplicable on same basis).

[13]    *See also Omnicare*, 575 U.S. at 192 ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another."); *Estée Lauder*, 2025 WL 965686, at *7 (opinions that "fail[] to provide critical context" actionable).

contradicted the impressions their false statements created. *See Dentsply*, 665 F. Supp. 3d at 292-93 (failure to disclose sales of excess inventory and "lack of end-user demand" rendered opinions misleading); *Lexmark*, 367 F. Supp. 3d at 32-33 (statement attributing revenues to "strong end-user demand" not inactionable opinion where "revenues were driven by inflated channel inventory and not increased end-user demand because those forces fundamentally differ in sustainability").[14]

### 4.    No Alleged Misstatement Is Puffery

Defendants also incorrectly claim *every* misstatement is immaterial puffery. MTD 21-24, 28-30. "While certain statements, viewed in isolation, may be mere puffery, when the statements are made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become material to investors." *Dentsply*, 665 F. Supp. 3d at 284. That "is especially so where the statements are made in response to direct questions on the subject." *Id.* As a materiality challenge, puffery is a fact-intensive inquiry typically reserved for the jury. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

Considered in context, none of Defendants' statements was immaterial puffery. Each concerned key topics of investor focus—ASML's 2025 Guidance,[15] its leading-edge business, or ASML's China-based demand and performance—and many were made in response to analyst questions to assuage concerns about those issues. *See Dentsply*, 665 F. Supp. 3d at 284 (statements

---

[14]    Defendants' cases are inapposite. *See, e.g.*, *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances, Inc.*, 2021 WL 1199035, at *16 (S.D.N.Y. Mar. 30, 2021) (plaintiffs did not plead defendants knew undisclosed facts undermining projections); *City of Taylor Gen. Emps.' Ret. Sys. v. Magna Int'l*, 967 F. Supp. 2d 771, 796 (S.D.N.Y. 2013) (plaintiffs only argued defendants "could not have reasonably or genuinely believed" their opinions).

[15]    Defendants claim that optimistic statements about future earnings are always puffery (MTD 21), but the Second Circuit has "consistently rejected a formulaic approach to assessing . . . materiality." *Ganino*, 228 F.3d at 162. *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801 (2d Cir. 1996) does not counsel otherwise. There, general announcements that defendant was "optimistic" about earnings and "expected" Marlboro to "perform well" did not mislead about company's specific marketing plan. *Id.* at 811.

describing relationships as "very strong and terrific" and "unique and important," including in response to analyst questions, not puffery when made to "reassure investors"); *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *11-12 (S.D.N.Y. Nov. 26, 2018) (reassurances that portfolio was "strong," "very strong," and "very healthy" "not puffery at all").[16] That analysts raised their ASML price targets based on Defendants' misstatements (¶¶62, 67, 77-78) and expressed surprise following the alleged corrective disclosures (¶¶228-29, 234-37) further demonstrates Defendants' statements were material. *See City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 368 (S.D.N.Y. 2012) ("that analysts were clearly surprised and disappointed after the misstatements were corrected" supported materiality); *Courter v. CytoDyn, Inc.*, 2025 WL 1771244, at *7 (W.D. Wash. June 25, 2025) (analyst report increasing target price supported materiality).

Further, many of Defendants' statements are not puffery because they "convey[ed] something concrete and measurable." *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d. 241, 272 (S.D.N.Y. 2010) (Buchwald, J.). These include Defendants' claims that the semiconductor industry was recovering because ASML saw "inventory levels continu[ing] to improve and litho tool utilization levels [] beginning to show improvement" and representations about ASML's "strong order intake." ¶¶201, 206; PX 1 (identifying verifiable statements challenged as puffery).[17] No such statement is puffery because each spoke to investor concerns, was "grounded in historical facts," "designed to mislead investors into believing that [ASML's] present (as well as its future) was rosier than reality." *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp 3d

---

[16]    In *In re Sina Corp. Sec. Litig.*, 2006 WL 2742048, at *6 (S.D.N.Y. Sept. 26, 2006), plaintiffs failed to "specifically identify how or why any particular representations were misleading." Here, context demonstrates Defendants' statements were not puffery.

[17]    Defendants' misstatements about ASML's order intake and backlog are not puffery (MTD 30) because those statements were predicated on verifiable data.

111, 173 (S.D.N.Y. 2021) (Buchwald, J.). When making these statements, Defendants knew of leading-edge customers' low utilization of ASML tools, delays in fab construction, and that ASML was "overdelivering" to China, which was stockpiling. *Wells Fargo*, 2021 WL 4482102, at *19 (bank "making great progress" not puffery where inconsistent with regulator feedback).

### B.    The Complaint Adequately Alleges Scienter

Scienter may be pled by alleging facts (i) "that constitute strong circumstantial evidence of conscious misbehavior or recklessness," or (ii) "show[ing] that defendants had both motive and opportunity to commit fraud." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 78 (2d Cir. 2021). Courts must consider whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). The scienter inference need only be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

### 1.    Defendants' Conscious Misbehavior or Recklessness

The Complaint's allegations show Defendants knew information contradicting their statements.[18] Defendants repeatedly claimed intimate knowledge of ASML's China revenues, leading-edge customers, and 2025 Guidance. *See* Section II.C-D. For example, Defendants assured they "know quite well what customers want" based on frequent "detailed discussions," which enabled ASML to learn its clients' "current and future needs" and "adjust [ASML's] demand plans" accordingly, factoring that information into ASML's forecasts. ¶¶56, 71, 73, 90, 124-26, 253-258.[19] The customer discussions Defendants frequently referenced were, in part, necessitated

---

[18]    The Individual Defendants' scienter can be imputed to ASML. MTD 36 n.61; *see Estée Lauder*, 2025 WL 965686, at *9-10.

[19]    Each Individual Defendant made such representations (*e.g.*, ¶¶71 (Dassen), 73 (Fouquet), 90 (Miller), 254 (Wennink)). *Contra* MTD 34.

by the massive costs and long lead times for ASML's machines.[20] ¶126. Defendants also admitted to closely monitoring customer usage, explaining, for example, that they "s[aw] continued improvements in lithography tool utilization." ¶259; *see also* ¶¶205, 210-11, 260-62.

Defendants also frequently spoke about China sales, export restrictions, order backlog, leading-edge customers, and ASML's 2025 Guidance—all topics of intense analyst focus—which supports scienter. *See Estée Lauder*, 2025 WL 965686, at *9 (that defendant "has spoken multiple times about [the relevant topic] and the company" supported scienter); *New Orleans Emps.' Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011) (speaking on "a subject about which investors and analysts often inquired" supports scienter).[21]

Numerous FE accounts show that ASML was plagued by undisclosed adverse issues impacting the topics about which Defendants professed intimate knowledge, including: (i) the loss of roughly $1 billion in orders from a single leading-edge customer in 1H24 alone (¶118); (ii) declining laser pulse rates, signifying decreased use of ASML products, as discussed at town halls (¶¶102, 106, 260); and (iii) that leading-edge customers were scaling back usage of or shutting down entirely ASML tools and pushing out orders (¶¶101-04, 106, 108, 112-15). *See also* Section II.D, *supra*.

Considering these allegations holistically, it is implausible that Defendants were unaware of facts contradicting their statements. *See STMicroelectronics*, 2025 WL 2644241, at *3

---

[20]    Defendants' claim that long-lead times prompted ASML to pre-build machines based on a supposed "belief" that orders would eventually come is irrelevant. MTD 34-35. Even assuming (improperly) the truth of Defendants' contention, it does not contradict that long lead times prompted customers to communicate changes in their needs to ASML, Defendants' admission that they spoke often to customers about their needs, or Defendants' October 24 admission that they saw customer demand become a "question mark" several quarters earlier.

[21]    Defendants' claim that the ASML-U.S. deal ended in 2023 (MTD 35) ignores the plausible, compelling inference that Defendants acted recklessly by downplaying concerns over potential forthcoming trade restrictions when simultaneously involved in trade restriction discussions (¶274), which they later admitted necessitated a "more cautious" view of China demand (¶127).

("Defendants' concrete statements regarding inventory visibility and [] their assertions that they were 'monitoring very carefully' their inventory" support scienter); *City of Warwick Ret. Sys. v. Catalent, Inc.*, 2024 WL 3219616, at *14 (D.N.J. June 28, 2024) (statements touting "hands-on" and "active[]" involvement "alone separate this case from others in which courts have found that scienter was inadequately pled"). "If, on the other hand, [defendants] didn't monitor these topics but made definitive statements as if they did, they still might have been reckless." *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 319 (S.D.N.Y. 2024).

Defendants' post-Class Period admissions that Chinese customers ordered "earlier than they originally planned" and that ASML "overdeliver[ed]" on its China backlog further support scienter. ¶¶120, 123-26, 184, 264. Moreover, Defendants admitted on October 16, 2024, that they knew of decreased customer demand "***a number of quarters ago***"—i.e., no later than early 2024. ¶146. By September 2024, Defendants also knew of a "factual absence" of a semiconductor industry recovery in 2H24. ¶¶134, 263.[22] Yet, rather than disclose any of this information, during August and September 2024, Defendants falsely reassured investors about the stability of ASML's China revenues, the state of its leading-edge business, and that ASML would beat the low end of its 2025 Guidance. *See* Section II.C, *supra*. These "allegations alone are enough to satisfy the pleading requirement for scienter." *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 622 (S.D.N.Y. 2008); *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 181 (S.D.N.Y. 2003) (plaintiffs may "rel[y] on post-class period data") (alteration in original).

Additional facts bolster the scienter inference.

**<u>Core Operations</u>.** The alleged fraud concerns ASML's core operations. During the Class

---

[22]    Defendants' claim that their admission of a "factual absence" of an industry upturn was "consistent" with ASML's earlier disclosures (MTD 34) is a premature truth-on-the-market defense. Section IV.D, *infra*.

Period, ASML generated nearly 50% of its revenue from China, and just three leading-edge customers historically accounted for approximately 80% of ASML's revenue. ¶¶11, 92, 266-67; *see Setzer v. Omega Healthcare Investors, Inc.*, 968 F.3d 204, 215 (2d Cir. 2020) (that alleged fraud implicated "significant source of income" supported scienter); *Lexmark*, 367 F. Supp. 3d at 38 (fraud impacting "primary profit engine" supported scienter); *Complete Mgmt.*, 153 F. Supp. 2d at 325-26 (reasonable to infer "principal managers . . . are aware of matters central to that business's operation"). Considered with the Complaint's other allegations, these facts support scienter.

**Temporal Proximity.** The short gap between Defendants' September 2024 misstatements and the revelation of the truth weeks later supports scienter. ¶¶265-66; *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *8 (N.D. Cal. Nov. 4, 2020) (two months between misstatements and corrective disclosure supported scienter). Because Plaintiffs do not allege that temporal proximity alone establishes scienter, Defendants' authorities are inapposite. MTD 35 (citing, e.g., *In re Supercom Inc. Sec. Litig.*, 2018 WL 4926442, at *32 (S.D.N.Y. Oct. 10, 2018) ("temporal proximity alone" does not establish scienter) & *In re Ferroglobe PLC Sec. Litig.*, 2020 WL 6585715, at *11 (S.D.N.Y. Nov. 10, 2020) (same)). Nor is this fraud-by-hindsight (MTD 34), as Defendants' admissions "serve to confirm what the defendants were at least reckless in not knowing" during the Class Period. *Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *7 (S.D.N.Y. June 21, 2021).

**Defendants' Influence Campaign.** Defendants' efforts to privately influence analysts' 2025 revenue estimates while publicly assuring that ASML would beat the low end of its 2025 Guidance—in violation of ASML's internal policies, Regulation FD, and NASDAQ rules (¶¶280-83)—supports scienter. *See Novak v. Kasaks*, 216 F.3d 300, 311-12 (2d Cir. 2000) (allegations that

"defendants knowingly . . . violated the Company's own" policy satisfy "standard for scienter"). Defendants contest these allegations on the basis that all of the information ASML privately told analysts was publicly disclosed. MTD 35-36. This is another premature truth-on-the-market argument. Section IV.D, *infra*.

**Miller's Sidelining.** Defendants quibble that Miller announced his resignation, rather than left the Company, at the end of 2024. MTD 36 n.60. No matter—"resignation and retirement of company insiders alleged to have been involved in the scheme" supports scienter. *zCap Equity Fund LLC v. LuxUrban Hotels Inc.*, 2025 WL 2097951, at *23 (S.D.N.Y. July 25, 2025). Miller made alleged misstatements (¶¶175, 177, 179, 191, 195, 213, 220, 222) and suddenly announced that he would be leaving ASML shortly after the corrective events (¶¶30, 275-77). *See LuxUrban*, 2025 WL 2097951, at *23 (leaving "under suspicious circumstances—soon after" truth revealed supported scienter).

### 2.    The Complaint's Motive Allegations Bolster the Scienter Inference

"Motive is not required to plead scienter," *Freudenberg*, 712 F. Supp. 2d at 200, but such allegations strengthen the scienter inference, as is the case here. ***First***, to offset flagging leading-edge demand, Defendants overdelivered on ASML's China backlog and concealed that China demand resulted from customer stockpiling. *See Richard v. Northwest Pipe Co.*, 2011 WL 3813073, at *4 (W.D. Wash. Aug. 26, 2011) (crediting motive to avoid "miss[ing] Wall Street expectations"); *Complete Mgmt.*, 153 F. Supp. 2d at 328 ("artificial inflation of a stock price in order to achieve some more specific goal may satisfy the pleading requirement").

Defendants' challenge to these allegations as a mere desire to "boost sales in difficult times" that is "generally possessed" by corporate officers ignores that: (i) Defendants exploited unsustainable China sales to mask ASML's flagging performance; and (ii) the industry downturn persisted as ASML's unsustainable China revenues waned, imperiling ASML's ability to beat the

low end of its 2025 Guidance. MTD 33. Defendants' effort to cast these allegations as conflating a motive to drive sales with a motive to mislead ignores that both can coexist: Defendants' "gamble" provides sufficient motive because it is akin to "embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing." *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).

**Second**, "unusual insider trading" may "permit an inference of bad faith and scienter." *Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 85 (2d Cir. 1999); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001) (timing of the sales relative to the fraudulent misstatements and corrective disclosures a factor for evaluating whether trading unusual). Here, Fouquet, Dassen, and two ASML Board of Management members sold 15% to 100% of their respective holdings, reaping proceeds from €2.1 to €12.2 million—for a total of over €20 million and inconsistent with their pre-Class Period trading. ¶242; *see In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (11% supported scienter); *Scholastic*, 252 F.3d at 68, 74 (sales supported scienter when inconsistent with prior sales).[23] Moreover, each sold shares: (i) the day of Defendants' January 24, 2024 misstatements; (ii) during the next 6 days; and (iii) the same day shares vested. ¶¶243-50; *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 137 (S.D.N.Y. 2020) (scienter supported by "[u]nusual insider sales at the time of the alleged withholding of negative corporate news"). Moreover, Dassen and Allan sold shares roughly six weeks before the relevant truth was revealed, with Dassen liquidating his entire remaining holdings at that time. ¶¶243, 249; *Oxford*, 187 F.R.D. at 139 ("Trades made a short time before a negative public announcement are suspiciously timed.").

---

[23]    Plaintiffs' gross proceed allegations are sufficient. *See Gimpel v. The Hain Celestial Grp., Inc.*, 2025 WL 2749562, at *14 (2d Cir. Sept. 29, 2025) (there is "no net-profit pleading requirement").

Defendants claim these insider trades were made pursuant to the non-public Dutch-equivalent of a 10b5-1 trading plan. MTD 31-33. At this stage, however, "the existence of a Rule 10b5-1 Trading Plan is an affirmative defense that must be pled and proved." *Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*, 2019 WL 2360942, at \*6 (S.D.N.Y. Mar. 4, 2019); *Kasilingam v. Tilray, Inc.*, 2022 WL 4537846, at \*9 (S.D.N.Y. Sept. 28, 2022) ("[T]he mere presence of a 10b5-1 plan is not a complete defense to scienter."). These plans were not, as Defendants argue, "identified on the AFM filings" for Defendants' trades (MTD 31 n.46); rather, those filings merely indicated "Ja" next to the cryptic phrase "Discretionary management mandate." *See, e.g.*, DXs 84, 86; *see also, e.g.*, *Dang v. Amarin Corp. plc*, 750 F. Supp. 3d 431, 457 (D.N.J. 2024) (declining to judicially notice non-public trading plans). Here, the Complaint's **only** reference to any trading plans noted that none was disclosed. ¶243 n.7. Moreover, claiming stock sales were made to cover tax liabilities (MTD 31-33) is a premature fact-dispute that does not preclude scienter. *See Fresno Cnty. Emps.' Ret. Assoc. v. comScore, Inc.*, 268 F. Supp. 3d 526, 555 (S.D.N.Y. 2017) (whether sales made to pay taxes raises a "disputed issue" of fact); *Luo v. Spectrum Pharms., Inc.*, 2024 WL 4443323, at \*5 (D. Nev. Oct. 7, 2024) (declining to consider trading plan for truth of the matter asserted).

Relying extensively on extrinsic material, Defendants also dispute the Complaint's calculation of the percentages the insiders sold or retained and make arguments based on their own calculations. MTD 32-33 & n.49. This is improper. *See In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 258 (S.D.N.Y. 2020) (motive sufficient where "[l]ooking only at the [complaint], Plaintiffs allege that [a defendant] sold approximately 60% of his [company] shares" because "at this stage, this Court must confine itself to the pleadings"). Additionally, Defendants ignore the law in claiming that non-defendants' insider sales are "irrelevant." MTD 33; *see, e.g.*,

*Alias*, 174 F.3d at 85 (that "several other [non-defendants] unloaded" stock may "permit an inference of bad faith and scienter"); *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 97 (S.D.N.Y. 2022) (sales by non-defendants can contribute to scienter). Defendants' suggestion that sales below ASML's highest Class Period stock price are irrelevant to scienter is unsupported. *See Complete Mgmt.*, 153 F. Supp. 2d at 321, 329 (sales at $13.75/share supported scienter where class period high price was $20/share).[24]

### 3.    Defendants Do Not Raise A More Compelling Inference

Defendants assert the "***only***" rational inference is that, throughout the Class Period, they guaranteed nothing, made only cautious statements, and updated investors to new developments in real-time. MTD 36-37. This inference is neither cogent nor more compelling than the inference of culpability. For example, Defendants' claim they revised ASML's 2025 Guidance "once [they] had enough information" (MTD 37) is a factual argument ***belied by their October 2024 admission*** that they knew of problems "a number of quarters ago"—i.e., early 2024. ¶¶146, 149-50. And the claim that they provided sufficient disclosure ignores investors' shock when the truth came out. Section II.F, *supra*.

It is cogent and at least as compelling that, after serially claiming that ASML would exceed the low end of its 2025 Guidance, ASML attempted to sustain its financial performance through outsized China sales until the concealed leading-edge client business downturn abated. When the downturn persisted, and ASML could no longer fuel its unsustainable China-based revenues, Defendants were forced to reveal the truth. Courts routinely credit such scienter inferences. *See, e.g.*, *Estée Lauder*, 2025 WL 965686, at *9 (more plausible "that Estée Lauder saw an opportunity

---

[24]    *Magna*, 967 F. Supp. 2d at 800, does not establish a bright line rule—it found insider sales at lower prices earlier in the class period non-suspicious where there were no such sales "at the end of the putative class period, when insiders would have 'rushed to cash out.'"

to make up for lost sales, went for it despite the regulatory risks and reputational drawbacks, and then kept quiet out of fear of spooking investors"); *Setzer*, 968 F.3d at 215 (statements that company "was on the road to recovery" "create a compelling inference that Defendants made a conscious decision to not disclose the Loan in order to understate the extent of [underlying] financial difficulties").

### C.     Defendants' Challenges to the FE Allegations Are Meritless

#### 1.     The FE Allegations Should Be Credited

"[C]ourts consider and take as true the statements of confidential witnesses" where they "are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Axsome Therapeutics, Inc. Sec. Litig.*, 2025 WL 965265, at *4 (S.D.N.Y. Mar. 31, 2025). The Complaint meets this standard. ¶¶99, 102, 108-09, 111-13, 117, 262. The FE allegations should be credited.

Defendants' protests that no FE could view ASML's worldwide demand or had "direct involvement" in customer accounts or finance (MTD 25) are unavailing, as it "demand[s] a level of involvement the case law doesn't." *Estée Lauder*, 2025 WL 965686, at *6 (rejecting arguments that witness lacked "access to [defendant]'s aggregate sales data" and did not work in specific region); *In re Tufin Software Techs. Ltd. Sec. Litig.*, 2022 WL 596861, at *7 (S.D.N.Y. Feb. 25, 2022) (rejecting that "low-level" witnesses "could not speak for [company] as a whole").[25] Moreover, the FE allegations must be "taken collectively" with the Complaint's other allegations. *Moshell*, 481 F. Supp. 3d at 290. Here, several FEs provided corroborative accounts of declining customer utilization and demand (*e.g.*, ¶¶102, 108, 116), so their information should be credited.

---

[25]     Defendants' cases are inapposite. MTD 25 (citing, *e.g.*, *Damri v. LivePerson, Inc.*, 772 F. Supp. 3d 430, 450 (S.D.N.Y. 2025) (no allegations that witnesses were positioned to possess information alleged); *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 526 (S.D.N.Y. 2020) (allegations concerning "tiny fraction" of company insufficient for systemic misconduct)).

*See In re Dynex Cap., Inc. Sec. Litig.*, 2009 WL 3380621, at *7 (S.D.N.Y. Oct. 19, 2009) (corroborative FEs accounts sufficient).

Defendants' suggestion that no FE reported that Defendants accessed the utilization and other customer data they recounted (MTD 34) "has no applicability where, as here," Defendants "admitted that [ASML] itself [had customer utilization and demand data], and thus must have been aware of," negative trends related thereto. *World Wrestling*, 477 F. Supp. 3d at 136. Defendants' related argument that no FE provides "one iota" of information from these reports is incorrect. MTD 34. They ignore that FE-2 recounted townhalls where declining pulse numbers were presented (¶260), while FE-5 explained ASML had an online spreadsheet listing the phase and progress of the tool and date for installation for all equipment being installed globally. ¶258. Defendants' corroborative representations that they reviewed and monitored utilization and demand data bolsters reliability. *See In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629, at *5 (S.D.N.Y. Feb. 17, 2022) (crediting confidential witness accounts corroborated by other allegations).[26] Nor is providing hearsay disqualifying. MTD 27; *World Wrestling*, 477 F. Supp. 3d at 132 (crediting hearsay). Similarly, that FE-7 left ASML before the Class Period, and that some FEs relayed pre-Class Period information (MTD 25-26) does not undermine their allegations. *See Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) ("allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period"). Finally, Defendants' attempt to undermine the FE allegations by pointing to additional, purportedly "non-fraudulent" context from untested declarations (MTD 26-27) raises improper fact disputes. Section IV.C.2, *infra*.

---

[26]    Defendants' assertion that the Complaint wrongly correlates utilization rates and demand (MTD 26) overlooks that Defendants did the same. *See* ¶213.

### 2.    Defendants' Motion to Strike Should Be Denied

Rule 12(f) "motions to strike are viewed with disfavor and infrequently granted." *Waterford Tp. Police & Fire Ret. Sys. v. Smithtown Bancorp, Inc.*, 2014 WL 3569338, at *4 (E.D.N.Y. July 18, 2014). Defendants fail to meet their concededly high burden. MTD 27.

Defendants premise their request on untested declarations their counsel obtained from five FEs that contain new factual assertions and purportedly question certain allegations. MTD 27-28; DXs 92-96. Courts, however, consistently "refuse[] to strike allegations attributed to confidential witnesses at the pleading stage when presented with declarations of those witnesses that are supposedly inconsistent with the allegations in the complaint." *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675, at *12 (D.N.J. Aug. 8, 2018) (denying motion to strike); *Hatamian v. Advanced Micro Devices, Inc.*, 2015 WL 511175, at *1 (N.D. Cal. Feb. 6, 2015) (same). Here, Lead Counsel's lawyers and investigators spoke to each FE, told them who they were and what they were investigating, and told each FE that the information they provided may be included in the Complaint, confirmed the information, and now attest to the Complaint's accuracy. *Compare id.* at *6-12 *with* PX 2-5.

Facing extrinsic FE declarations, the Court "has two options"—"exclude the additional material and decide the motion on the complaint alone" or "convert the motion to one for summary judgment." *Waterford Twp. Police & Fire Ret. Sys. v. Smithtown Bancorp, Inc.*, 2013 WL 1345086, at *5 (E.D.N.Y. Mar. 29, 2013). Accordingly, courts consistently exclude extrinsic declarations at the pleading stage. *See, e.g.*, *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2018 WL 4252537, at *4-5 (E.D. Pa. Sept. 5, 2018) (disregarding "outside-the-pleading declaration"); *In re Rayonier Inc. Sec. Litig.*, 2016 WL 3022149, at *1 (M.D. Fla. May 20, 2016) (declining to consider witness declaration); *Smithtown*, 2014 WL 3569338, at *4 (declining to consider affidavit outside the pleadings). The basis for excluding extrinsic declarations in this context is sound: after

contact from Defendants' attorneys, it "boils down to an issue of credibility to be determined by a trier of fact." *In re Applied Micro Circuits Corp. Sec. Litig.*, 2002 WL 34716875, at *11 (S.D. Cal. Oct. 4, 2002); *see also Moshell v. Sasol Ltd.*, 2021 WL 3174414, at *15 (S.D.N.Y. July 24, 2021) (FE declarations raised inappropriate "factual disputes and credibility issues").

Defendants' suggestion that the Court should strike the limited allegations they characterize as lacking "indicia of reliability" is meritless. MTD 27. They cite no Second Circuit authority endorsing this "reliability" test, and the out-of-Circuit decisions they cite (neither involving FE allegations) are distinguishable. *Porter v. Fairbanks Cap. Corp.*, 2003 WL 21210115, at *7 (N.D. Ill. May 21, 2003) (striking "irrelevant" "complaints . . . posted on internet"); *Wiseberg v. Toyota Motor Corp.*, 2012 WL 1108542, at *12 (D.N.J. Mar. 30, 2012) (striking as irrelevant allegation listing anonymous internet complaints).

Defendants' remaining cases are factually and procedurally distinguishable, involving witnesses who provided deposition testimony in discovery. *See City of Livonia Emps.' Ret. Sys. v. Boeing Co.*, 711 F.3d 754, 759-61 (7th Cir. 2013); *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 330 n.54 (S.D.N.Y. 2009). Nor is there a requirement witnesses have "the opportunity to review" statements attributed to them before they are included in a complaint. MTD 28. *In re Millennial Media, Inc. Securities Litigation*, 2015 WL 3443918 (S.D.N.Y. May 29, 2015) does not mandate otherwise—the court's views on witness verification were *dicta*. There also is no "pervasive" recantation here.

### D.    The Complaint Adequately Alleges Loss Causation

To plead loss causation, a plaintiff must allege that "the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014). Loss causation may be shown by a "corrective disclosure" that reveals the fraud or by the "materialization of [the] risk" that had been obscured

by the fraud. *Id.* at 233. "Whether the truth comes out by way of a corrective disclosure . . . or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 262 (2d Cir. 2016). As this Court has recognized, "[p]laintiffs' burden in pleading loss causation is not a heavy one." *In re Omega Healthcare Investors, Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 266 (S.D.N.Y. 2021) (Buchwald, J.). And the Second Circuit recently clarified that "there is no heightened pleading standard" for loss causation allegations. *Gimpel*, 2025 WL 2749562, at *18.

The Complaint identifies as corrective events ASML's: (i) October 15, 2024 earnings release for 3Q24, in which the Company stunned investors by lowering its 2025 Guidance to a range of €30-35 billion—the low end of the range from which Defendants had consistently guided away (¶¶226-27); and (ii) October 16, 2024 earnings call, revealing that ASML slashed its 2025 Guidance because of delayed orders from leading-edge customers, which Dassen admitted were known "a number of quarters ago," and a more rapid decline in demand from China than Defendants had previously represented (¶¶231-33). Following each of these disclosures, ASML's share price fell, and analysts linked the price declines to the new information. ¶¶228-30, 234-38. Plaintiffs' loss causation allegations are sufficient. *See Gimpel*, 2025 WL 2749562, at *18 (by pleading stock price declines "following [ASML's] negative disclosures, the [p]laintiffs have met the pleading standard."); *Ambac*, 693 F. Supp. 2d at 273 (complaint "must provide a causal connection between the misrepresentation and the plaintiffs' loss, and must allege that the company's share price 'fell significantly after the truth became known'").

Defendants claim, erroneously and without specificity, that neither corrective event revealed new information. MTD 2 ("nothing was previously concealed"); *see also id.* 37-38. This is a "truth-on-the-market" defense that is improper at the pleading stage. *See, e.g., Gimpel*, 2025

WL 2749562, at *12 ("the truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a §10(b) complaint") (quoting *Ganino*, 228 F.3d at 167); *In re Teva Sec. Litig.*, 671 F. Supp. 3d 147, 197-98 (D. Conn. 2023) (rejecting truth-on-the-market defense to loss causation allegations). As the Supreme Court admonished in *Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*, whether or when "news of the truth had entered the market and dissipated the effects of prior misstatements[] is a ***matter for trial***." 568 U.S. 455, 482 n.11 (2013).

Even if considered, Defendants' arguments fail to establish that "the corrective information . . . [was previously] conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Gimpel*, 2025 WL 2749562, at *12. Here, each corrective event provided new information about ASML's 2025 revenues and demand from China (¶¶226-27, 231-33), as confirmed by: (i) analyst surprise and disappointment (¶¶228-29, 234-37);[27] and (ii) the significant accompanying declines in ASML's stock price—a telltale indicator of "new news" (¶¶230, 238).[28] *See In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 582 (S.D.N.Y. 2010) (analysts' reactions defeated truth-on-the-

---

[27]    Emblematic of Defendants' truth-on-the-market defense, they suggest that the corrective events did not reveal new information because a handful of analysts updated their ASML revenue expectations in August 2024 (MTD 14 n.10), while deeming "irrelevant" the analysts that expressed "surprise" and "disappointment" in response to the later corrective events (MTD 38 n.62). *See Crews v. Rivian Auto., Inc.*, 2024 WL 3447988, at *13 (C.D. Cal. July 17, 2024) (no truth-on-the-market where "several analysts treated Rivian's ultimate price increase, particularly the size of the increase, as surprising").

[28]    In an efficient market, confirmatory information (i.e., old news) does not move stock prices. *See, e.g.*, *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D 69, 87 (S.D.N.Y. 2015) (when a disclosure "merely confirms market expectations, there will be no reactionary price impact."). Defendants do not challenge Plaintiffs' allegations that ASML stock traded in an efficient market. ¶¶290-91.

market defense);[29] *Omega*, 563 F. Supp. 3d at 269 ("allegations of sharp drops in [ASML's] share price . . . suggest that the market had not fully internalized the extent of the risks"). Defendants provide *no alternative explanation* for the stock price declines in response to the alleged corrective information, and any belated effort to do so would be unavailing. *See, e.g.*, *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 189 (2d Cir. 2015) (plaintiff pleading loss causation has no "obligation to rule out other contributing factors").

Finally, Defendants incorrectly suggest that the Complaint's loss causation allegations fail because ASML did not conceal the risk that eventually materialized. MTD 38. Putting aside the impropriety of their arguments at this stage, Defendants cannot dispute that they never revised ASML's 2025 Guidance downward or explained their reasons for doing so prior to October 15, 2024.[30] *See, e.g.*, *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 292 (S.D.N.Y. 2008) (rejecting argument that class period should end on date when accounting improprieties were first revealed, because "[a]t that time . . . the full financial impact of the alleged improprieties" was not disclosed); *Teva*, 671 F. Supp. 3d at 196 (risk that materialized not previously disclosed because "the market had no conception of its breadth").

---

[29]    Defendants misleadingly cite *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010), a case where market commentary ***was*** the alleged corrective disclosure, as supporting that analyst "surprise" ***in response to*** a corrective disclosure is "irrelevant" to evaluating loss causation allegations. MTD 38 n.62. Not so. *Omnicom* is a summary judgment decision concluding that "a negative characterization of already-public information" is not corrective. *Id.* at 512-13. Neither corrective event here characterizes previously disclosed information.

[30]    Defendants' claim that a forecast revision cannot serve as a corrective event (MTD 37) misses the mark, as the revised guidance in Defendants' cases was not, as here, the ***subject*** of the alleged misstatements. *See In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) (facts revealed in corrective event "is not the scheme plaintiffs allege"); *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 494 (S.D.N.Y. 2021) (plaintiffs "reduced to relying solely on [d]efendants' revelation of poor financial results" because unable to allege corrective event "that even remotely suggests" prior statements were false or misleading). Earnings reports can serve as corrective events when, as here, the revisions are "plausibly linked" "to the risks concealed by the fraud." *Dentsply*, 732 F. Supp. 3d at 325.

### E.    The Complaint Adequately Alleges Scheme Liability

Defendants are also liable under Rule 10b-5(a) and (c) for "disseminating" false and misleading statements and engaging in other deceptive conduct, including by overdelivering to China to sustain the Company's performance during an industry slump (¶¶119-27) and engaging in a "communication campaign" to get analysts to walk-back guidance expectations (¶280). *See Lorenzo v. SEC*, 587 U.S. 71, 78-83 (2019); *SEC v. Medallion Fin. Corp.*, 2024 WL 4227753, *13 & n.156 (S.D.N.Y. Sept. 18, 2024) (private influence of banks sufficient for scheme liability). Accordingly, the Complaint alleges that Defendants committed deceptive acts beyond the alleged misstatements, as required by *SEC v. Rio Tinto plc.*, 41 F.4th 47, 49 (2d Cir. 2022) (MTD 38).[31]

### F.    The Complaint Adequately Alleges §20(a) Claims

Defendants do not dispute that they are control persons of ASML, contending only that Plaintiffs fail to allege a primary violation. MTD 38. "Because [P]laintiffs have successfully stated a §10(b) violation, their §20(a) claim may also go forward." *Estée Lauder*, 2025 WL 965686, at *11.

### G.    The Complaint Adequately Alleges §20A Claims

Section 20A claims require a predicate violation and that plaintiff and defendant traded contemporaneously. *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 309 (S.D.N.Y. 2008). Plaintiffs satisfy both requirements.

***First***, Plaintiffs alleged predicate violations of Sections 10(b) and 20(a). *See* Sections IV.A-F, *supra*. ***Second***, Plaintiffs' purchases occurred between three and seventeen trading days after Defendants' sales (¶307), which is within "a reasonable period" for contemporaneity. *See Oxford*,

---

[31]    *Plumbers & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90 (2d Cir. 2021) (MTD 38) is inapposite, as there was no alleged deceptive conduct other than the alleged misstatements.

187 F.R.D. at 144 (five days contemporaneous); *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2608243, at *3 (S.D. Tex. June 15, 2017) (trades contemporaneous "anywhere from on the same day, to less than a week, to within a month, to the entire period while relevant and nonpublic information remained undisclosed").[32]

Defendants offer no support for contending that contemporaneity requires trading on the same exchange (MTD 39), and the Ninth Circuit recently rejected this exact argument. *See In re Silver Lake Grp., LLC Sec. Litig.*, 108 F.4th 1178, 1190 (9th Cir. 2024).[33] Defendants' claim that jurisdiction is lacking for Dassen and Fouquet also fails. MTD 38-39. Dassen and Fouquet conceded jurisdiction for the Section 10(b) and 20(a) claims—the predicate violations for the Section 20A claims—which is sufficient. *Cf. In re Aegean*, 529 F. Supp. 3d at 139-40, 176 (S.D.N.Y. 2021) (Buchwald, J.) (jurisdiction for predicate violation sufficient for purposes of Section 20A claim).

## V.    CONCLUSION

For the reasons herein, the MTD should be denied. Should the Court grant any portion of the MTD, Plaintiffs respectfully request leave to amend.

Dated: October 7, 2025                                  Respectfully submitted,

                                                       */s/ Sharan Nirmul*

                                                       **KESSLER TOPAZ MELTZER**
                                                       **& CHECK, LLP**
                                                       Sharan Nirmul
                                                       Johnston de F. Whitman, Jr.
                                                       Richard A. Russo, Jr. (*pro hac vice* pending)
                                                       Evan R. Hoey (*pro hac vice* pending)
                                                       Aubrie L. Kent (*pro hac vice* pending)
                                                       280 King of Prussia Road

---

[32]    *Gordon v. Sonar Cap. Mgmt. LLC*, 962 F. Supp. 2d 525, 532 (S.D.N.Y. 2013) (MTD 39), did not address contemporaneity.

[33]    *See Chanoff v. U.S. Surgical Corp.*, 857 F. Supp. 1011, 1021 (D. Conn. 1994) (trading on same market is ***an example*** of transaction implicating Section 20A); *Wilson v. Comtech Telecomm. Corp.*, 648 F.2d 88, 94-95 (2d Cir. 1981) (one month not contemporaneous). MTD 39.

Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
snirmul@ktmc.com
jwhitman@ktmc.com
rrusso@ktmc.com
ehoey@ktmc.com
akent@ktmc.com

*Co-Lead Counsel for Lead Plaintiffs, and
Lead Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
Salvatore J. Graziano
Adam Wierzbowski
Alec T. Coquin
Matthew S. Goldstein
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
adam@blbglaw.com
alec.coquin@blbglaw.com
matthew.goldstein@blbglaw.com

*Co-Lead Counsel for Lead Plaintiffs, and
Lead Counsel for the Class*

**KLAUSNER, KAUFMAN, JENSEN
  & LEVINSON, P.A.**
Robert D. Klausner (*pro hac vice*
forthcoming)
7080 Northwest 4th Street
Plantation, FL 33317
Telephone: (954) 916-1202
bob@robertdklausner.com

*Additional Counsel for Lead Plaintiffs
Miami Beach F&P, Hollywood Police and
Hollywood Firefighters*

**CLARK HILL**
Ronald A. King (*pro hac vice* forthcoming)
215 South Washington Square, Suite 200
Lansing, MI 48933
Telephone: (517) 318-3015 (office)
(517) 449-2860 (cell)
rking@clarkhill.com

*Additional Counsel for Lead Plaintiff
Detroit P&F*

## <u>CERTIFICATE OF COMPLIANCE</u>

Counsel hereby certifies that this memorandum complies with the 12,250 word-count limitation set in the Court's July 18, 2025 Order (Dkt. No. 90). As measured by the word processing system used to prepare it, this memorandum contains 12,212 out of 12,250 words.

*/s/ Sharan Nirmul*
Sharan Nirmul