UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

IN RE ASML HOLDING N.V. SECURITIES
LITIGATION

------------------------------------X

**MEMORANDUM AND ORDER**

24 Civ. 8664 (NRB)

**NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE**

Lead plaintiffs[1] bring this action pursuant to Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, against  defendants ASML Holding N.V. ("ASML" or the "Company"), Cristophe Fouquet ("Fouquet"), Roger Dassen ("Dassen"), Peter Wennink ("Wennink"), and Skip Miller ("Miller," together with Fouquet, Dassen, and Wennink, the "Individual Defendants," and collectively with all defendants, "defendants"), on behalf of a class of investors who purchased ASML stock between January 24, 2024, and October 15, 2024, inclusive (the "Class Period").  Presently before the Court is defendants' motion to dismiss the amended complaint and strike certain portions thereof pursuant to Federal Rules of Civil

---

[1]    As used herein "plaintiffs" or "lead plaintiffs" refers to City of Hollywood Firefighters' Pension Fund, City of Hollywood Police Officers' Retirement System, City Pension Fund for Firefighters and Police Officers in the City of Miami Beach, City Pension Fund for Firefighters and Police Officers in the City of Pembroke Pines, and Police and Fire Retirement System of the City of Detroit.

Procedure 9(b), 12(b)(2), 12(b)(6), and 12(f), and the Private Securities Litigation Reform Act of 1995 ("PSLRA").

This case arises from ASML's 2025 revenue forecast, initially made in November 2022, in which the Company projected that it would bring in revenue of €30-40 billion in 2025.  ECF No. 84 ("AC" or "Amended Complaint") ¶ 4.[2]  Subsequently, defendants made numerous statements that, in conjunction with the Company's 2025 forecast, plaintiffs allege materially misrepresented the state of defendants' potential revenues and misled investors.  Ultimately, on October 15, 2024, the Company announced its third quarter 2024 earnings, "reveal[ing] . . . a 54% decline [in quarterly bookings] from the prior quarter," and simultaneously revised its projected revenue forecast, narrowing the prediction to €30-35 billion, or the lower half of the Company's initial projection.  AC ¶ 138.  In the following days, ASML's stock price fell, dropping $188.75 per share, or approximately 21.6%.  Id. ¶ 156.

---

[2]    Because ASML "is a Dutch corporation headquartered [in] . . . the Netherlands," AC ¶ 26, most of the currency values herein are denominated in Euros, as they are in the Amended Complaint.  The EUR to USD exchange rate on November 15, 2022 was 1.0372 USD per Euro.  Historical Rates for the EU Euro, United States Federal Reserve (last visited Mar. 25, 2026), https://www.federalreserve.gov/releases/h10/hist/dat00_eu.htm.  Meaning, in November 2022, defendants' revenue guidance for 2025 was approximately $31.116 billion to $41.488 billion USD.  The Euro to USD exchange rate as of March 20, 2026, was 1.1543.  Id.  Thus, the monetary values provided in Euros throughout the opinion can be approximately converted into today's USD by multiplying the value by 1.1543.

<u>**BACKGROUND**</u>

Before turning to the legal arguments raised by the parties in their respective briefing, we will summarize the allegations in the Amended Complaint, which must be accepted as true at this stage.  <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d Cir. 2007).

**I.    The Parties**

Lead plaintiffs are each pension funds established for the benefit of current and retired firefighters and/or police officers in Detroit, Michigan, and various cities in Florida.  AC ¶¶ 21-25.  Together, lead plaintiffs manage over $5 billion on behalf of nearly 15,000 members and their beneficiaries.  <u>Id.</u>  Each of the lead plaintiffs "purchased ASML securities on U.S. exchanges and in domestic transactions . . . during the Class Period[.]"  <u>Id.</u>

Defendant ASML "is a Dutch corporation" with ordinary shares "listed on the Nasdaq under the ticker symbol 'ASML.'"  <u>Id.</u> ¶ 26.  ASML's "principal executive offices [are located] in Veldhoven, the Netherlands."  <u>Id.</u> ¶ 33.

Defendant Cristophe Fouquet "was the Company's Chief Business Officer from July 2022 through April 24, 2024, and has served on the Company's Board of Management since April 2018."  <u>Id.</u> ¶ 27.  Since April 25, 2024, Fouquet "has served as the Company's President and Chief Executive Officer[.]"  <u>Id.</u>

Defendant Roger Dassen "is the Company's Executive Vice President and Chief Financial Officer, and has served in that role since June 2018."  Id. ¶ 28.

Defendant Peter Wennink previously was the Company's "President and Chief Executive Officer from 2013 until April 24, 2024."  Id. ¶ 29.  Before that time, Wennink "served as the Company's CFO since 1999."  Id.  Wennink is no longer employed by the Company.  Id.

Defendant Skip Miller "served as the Company's VP of Investor Relations and Head of Worldwide Investment Relations during the Class Period, having held that role since January 2018."  Id. ¶ 30.  Prior to that time, Miller "served as Director of Strategic Marketing since December 2002."  Id.  Miller left the Company shortly after the Class Period ended.  Id.

## II.  ASML's Business Activities

ASML's primary business activities are the "design[], develop[ment], integrat[ion], market[ing], and servic[ing] [of] photolithography machines and other equipment for use in the semiconductor fabrication process."  Id. ¶ 33.  "It is the largest supplier for the semiconductor industry[.]"  Id.  As plaintiffs describe it, "[p]hotolithography is a microfabrication technique that uses light to create intricate patterns on a substrate, like a silicon wafer, by transferring a pattern from a photomask to a

4

light-sensitive material called photoresist," a process that "is a crucial step in manufacturing semiconductor devices and other micro-sale components." Id. ASML also owns a "lithography light source supplier" called Cymer, "which is now the division of [ASML] that manufactures the light sources that power the Company's lithography equipment." Id.

The Company primarily sells "two categories of lithography machines: (i) DUV systems, which were first introduced in the late 1990s; and (ii) EUV systems, the Company's 'leading-edge' product that is currently being tested and used to build the next generation of semiconductors." Id. ¶ 34. EUV systems are unique in that they "can etch significantly smaller features onto a semiconductor," which in turn "increases the number of functions a microchip can perform." Id. ¶ 35. As a result, "EUV systems are required to produce the most advanced microchips[.]" Id. ¶ 36. ASML is "the sole supplier in the world of the EUV ultraviolet lithography machines that are required to manufacture the most advanced semiconductors." Id. ¶ 33. DUV systems, on the other hand, "print the basic layers of a microchip, but are highly productive and cost effective." Id. ¶ 35. Both DUV and EUV machines "are extremely expensive and carry long lead times between order and delivery" with DUV machines costing "tens of millions of euros" and requiring "lead times of approximately six months,"

while EUV machines "cost approximately €220-350 million and require lead times of approximately 12 to 18 months." Id. ¶ 37.

### III. Plaintiffs' Allegations

The Amended Complaint is lengthy, spanning 115 pages and alleging misstatements and omissions across dozens of paragraphs. Id. ¶¶ 164-223. A complete recitation of each alleged misstatement here would be both impractical and unproductive. Instead, examples of the alleged misstatements will suffice. Plaintiffs' allegations of "False and Misleading Statements and Omissions" are broken into six categories, including: (i) "Adverse Facts Related To The Company's Leading-Edge Customers," id. ¶¶ 165-80; (ii) "China Performance," id. ¶¶ 181-96; (iii) "The Strength Of The Company's Backlog," id. ¶¶ 197-200; (iv) "The Company's Order Intake," id. ¶¶ 201-04; (v) "The State Of The Industry Recovery," id. ¶¶ 205-14; and (vi) "2025 Performance," id. ¶¶ 215-23. A summary of the allegations in each category is provided herein.

### A. Leading-Edge Customers

Plaintiffs allege that throughout the Class Period, defendants made repeated statements relating to the expected demand and orders from their most advanced, "leading-edge" customers and those customers' plans to open new semiconductor chip fabrication plants ("fabs") that plaintiffs allege were

materially false or misleading.[3]  For example, on January 24, 2024, defendant Dassen stated that "[i]t's clear that many fab openings are scheduled that will require the intake of quite some tools in the 2025 time frame.  So we look at 2025 as a strong year of growth[.]"  Id. ¶ 166; see also id. ¶ 169 (Dassen: "all the fab openings that have been indicated by our customers" are "[l]eading up to what we think is going to be a very strong 2025.") (alteration in original).

Plaintiffs allege that defendants' statements about leading-edge customers were false and misleading because defendants "concealed adverse facts" "indicating that the Company's leading-edge customers would postpone or cancel outright their orders with ASML[.]"  Id. ¶ 98.  In support of these allegations, plaintiffs provide the statements of anonymous former employees ("FE") that worked for ASML and, in some cases, "with (and at) ASML's major customers," id., who recounted that around this time "existing fabs were only operating at 50% capacity," id. ¶ 99, customers were delaying or abandoning construction of new fabs, id. ¶¶ 100, 113-16, customers were ramping down or "cold bag[ging]" machines at their fabs, id. ¶ 101, utilization of ASML's machines was declining, id. ¶¶ 102-04, 110, and key customers were cancelling or postponing scheduled upgrades to ASML machines, id. ¶¶ 117-18.

---

[3]    AC ¶¶ 165-66, 168-69, 171, 173, 175, 177, 179.

## B. China Performance

Plaintiffs next allege misstatements and omissions of fact relating to the Company's performance in China.[4]  For example, on January 24, 2024, on the Company's Q4 2023 and full year 2023 earnings call, Wennink stated that while export regulations, imposed by the Dutch Government partly at the urging of the United States,[5] "had an impact on our business, we continue to see strong demand for mid-critical and mature nodes in China," and, on the same call, repeated, "we do see the demand from China being very robust. . . . fundamentally it's pretty clear that the China demand remains very strong."  AC ¶ 181 (alteration in original). Similarly, on July 17, 2024, during an earnings call, Fouquet stated that "look[ing] at the opportunity we see on the mature semiconductor market. . . . In 2023, 2024, China has been investing a large part of this market.  And this is why, I think, our revenue on China has been high."  Id. ¶ 189 (second alteration in original).

Plaintiffs allege that defendants' statements about China were materially misleading because "ASML's China performance was not driven by organic and sustainable demand, but instead by pull-forward demand from" customers stockpiling machines ahead of

---

[4]    AC ¶¶ 181, 183, 185, 187, 189, 191, 193, 195.

[5]    See e.g., AC ¶¶ 41, 43, 48.

tighter export restrictions, "as well as ASML overdelivering on its China backlog." Id. ¶ 119. In fact, plaintiffs allege, Miller acknowledged on December 4, 2024, that "some of [the Company's Chinese customers had ordered] a bit earlier than they originally planned." Id. ¶ 120 (alteration in original). Plaintiffs further allege that "Defendants admitted at the end of the Class Period that, in fact, ASML had been 'overdelivering' on its China backlog, i.e., filling China orders faster than demand would sustain." Id. ¶ 121. Plaintiffs further allege that defendants' statements relating to China were materially false because defendants had frequent and repeated interaction with their customers in China and had access to non-public information about those customers' utilization of defendants' tools that indicated that defendants' statements were misleading when made. Id. ¶¶ 123-27.

## C. The Company's Backlog

Plaintiffs turn next to allegedly false and materially misleading misstatements about the strength of the Company's order backlog.[6] Specifically, plaintiffs allege that on January 24, April 17, and July 17, 2024, defendants made similar statements that "[b]ased on discussions with [the Company's] customers and supported by our strong backlog, we currently expect 2025 to be a strong year." Id. ¶ 197; see also id. ¶¶ 98-99. Plaintiffs allege

---

[6]     AC ¶¶ 197-99.

that these statements were materially misleading or false for the same reasons as alleged in connection with defendants' statements regarding their leading-edge customers and China customers, namely that leading-edge customer demand was faltering, and demand in China was propped up by inorganic pull-forward orders and stockpiling.  Id. ¶ 200 (citing id. ¶¶ 98–127, 134).

**D. The Company's Order Intake**

Additionally, plaintiffs allege several misstatements relating to the Company's order intake.[7]  First, on January 24, 2024, on the Company's earnings call and the associated press release and pre-recorded earnings video, defendants "touted €9.2 billion in quarterly bookings," and Wennink told an analyst that "the order intake actually gives us at least some level of confidence" that "2025 is going to be a very strong year."  Id. ¶ 201.  Similarly, in the Company's second quarter 2024 earnings call on July 17, 2024 and in a related pre-recorded video, defendants "touted €5.6 billion in quarterly bookings" and stated that "we're nicely on track" for "the midpoint of the [2025 guidance] range," again "still confirm[ing] that our expectation is between the €30 billion and €40 billion" for 2025.  Id. ¶ 203.

Plaintiffs allege that these statements were materially false or misleading because defendants have since "admitted that their

---

[7]    AC ¶¶ 201–03.

order intake is not a reliable indicator of the Company's performance." Id. ¶ 161. Specifically, Dassen, on January 29, 2025, "admitted that the Company's prior reporting on customer orders on a quarterly basis created an inaccurate impression of the ASML's 'business momentum,' explaining '[the Company's] order flow on a quarterly basis can be lumpy and does not necessarily reflect our business momentum accurately.'" Id.

### E. Industry Recovery

Next, plaintiffs allege that defendants made several misstatements about the recovery of the semiconductor industry generally.[8] For example, on January 24, 2024, Wennink stated that while the "semiconductor industry is currently working through the bottom of the cycle," "there are some positive signs" as "[i]ndustry end-market levels continue to improve," while further assuring investors that the Company was seeing "the positive signs of recovery," including "the data we get on inventory levels, but also we see our utilization rates going up again." Id. ¶ 205 (alteration in original). A press release on the same day quoted Wennink as noting "positive signs" for the "semiconductor market recovery," including that "litho tool utilization levels are beginning to show improvement." Id. ¶ 206.

---

[8]    AC ¶¶ 205–13.

Plaintiffs allege that these and similar statements were materially false or misleading for the same reasons discussed above in connection with defendants' statements about its leading-edge customers, namely, that key customers were reducing the utilization of ASML's tools and delaying or cancelling the construction of new fabs. Id. ¶ 214. Additionally, on September 11, 2024, ABN-Amro reported "that ASML privately 'highlighted three factors to justify its clearly more conservative stance on 2025'" including "the factual absence of a clear upturn in the semiconductor market in H2 24[.]" Id. ¶ 134. Plaintiffs allege that this acknowledgment shows that defendants knew of the inaccuracy of their statements regarding industry recovery.

F. **2025 Performance**

Finally, plaintiffs allege a series of misstatements relating to the Company's expected performance in 2025.[9] For example, on a January 24, 2024 earnings call, an analyst asked Wennink whether the Company was "still targeting the middle of the [2025 guidance] range." Id. ¶ 216. In response, Wennink stated that defendants "feel a bit more comfortable on 2025 after having received €9.2 billion of orders," and further noted that he "thought the low end of the [2025 guidance] range was too conservative." Id. Similarly, on July 17, 2024, Dassen stated, "we're nicely on the

---

[9]    AC ¶¶ 215-22.

way to achieve the objectives and the bandwidth that we've discussed before," in other words, "between €30 and €40 billion [in 2025], and it will not be the low point." Id. ¶ 219 (alteration in original). Again, on August 5, 2024, Miller made a similar statement: "we still see a range between €30 billion and €40 billion [for 2025]. We see a challenge to get to the low end of that range, I don't see how to get there." Id. ¶ 220.

Plaintiffs allege that these and similar statements were materially false and misleading for the same reasons as the other alleged misstatements. Specifically, defendants knew facts indicating that leading-edge customers had low utilization rates of ASML tools and other "severe issues, all of which indicated a 'factual absence of clear upturn.'" Id. ¶ 223 (citing id. ¶¶ 98–118, 134). Further, plaintiffs allege that defendants were aware that they were overdelivering on the Company's backlog of China orders and the Company's customers in China were ordering "earlier than they originally planned." Id. ¶ 223 (citing id. ¶¶ 119-127).

## G. Insider Sales

In addition to the alleged misstatements and omissions summarized above, plaintiffs allege that two of the Individual Defendants, Dassen and Fouquet, and other members of ASML's board of management made insider sales of ASML stock during the Class Period. Id. ¶ 241-51. Specifically, Dassen sold 100% of his

13

holdings during the Class Period for a total of €12,291,556; Fouquet sold 45.5% of his holdings during the class period for a total of €2,915,538; Frédéric Schneider-Maunoury[10] sold 15.1% of his holdings for a total of €3,469,849; and Wayne Allan[11] sold 33.3% of his holdings for a total of €2,132,399.  Id. ¶ 242.

Plaintiffs allege that these sales were suspiciously timed, with Dassen making three sales "within just one week of the start of the Class Period—and immediately after Defendants' misrepresentations at the start of the Class Period[,]" and selling the remainder of his shares on September 2, 2024, "two days before" plaintiffs allege that "Dassen and other Company executives began a secretive campaign to manipulate market expectations[.]"  Id. ¶ 243.  Dassen's third sale "was made the same day as [his] shares vested[.]"  Id.  Fouquet's initial sales were made, like Dassen's, on or around January 24, 2024.  Id. ¶ 244.  Fouquet made another sale on January 31, 2024, the same day that the shares he sold vested.  Id.  Similarly, Schneider-Maunoury made four sales across January 24, 25, and 31, 2024, with the last sale occurring on the day those shares vested, and Allan made two sales on January 24,

---

[10]    The Company's Executive Vice President and Chief Operations Officer.  AC ¶ 241.

[11]    The Company's Executive Vice President and Chief Strategic Sourcing & Procurement Officer.  AC ¶ 242.

2024, and January 31, 2024, with his final sale made the same day his shares vested.  Id. ¶¶ 247-48.

### H. Market Revelation

Plaintiffs allege that these "materially false and misleading statements and omissions [] artificially inflated and/or maintained artificial inflation in the price of ASML ordinary shares (and impacted the value of ASML options which depended on the value of ASML ordinary shares)[.]" Id. ¶ 224.  That artificial inflation was removed when, "[o]n October 15, 2024, ASML published its earnings results for the third quarter of 2024" "reveal[ing] quarterly bookings of just €2.63 billion, which represented a 53% decline from the €5.6 billion in bookings during the second quarter of 2024, missing analysts' estimates by a staggering €3 billion." Id. ¶ 226.  Simultaneously, "ASML also announced that it expected full year 2025 total net sales to be between €30 billion and €35 billion, thus narrowing the Company's previously issued and repeatedly reaffirmed guidance to the bottom half of the €30 billion to €40 billion range[.]"  Id.  The Company "further announced that it had lowered its 2025 gross margin guidance to between 51% and 53%[.]"  Id. ¶ 227.

By the close of the market on October 15, 2024, the day of ASML's earnings and accompanying revelations, the share price of ASML ordinary shares "fell $141.84 per share, or approximately

16.3%, from a close of $872.27 per share on October 14, 2024, to close at $730.43 per share on October 15, 2024[.]" Id. ¶ 230.

The next day, October 16, 2024, during an earnings call, Dassen characterized the Company's lowered guidance as "a reflection of the slow recovery in the traditional [semiconductor] end markets as customers remain cautious in the current environment." Id. ¶ 231 (alteration in original). The same day, Fouquet suggested that the industry "recovery will extend well into 2025," resulting in "a reduced growth curve in 2025 and an [] overall reduction of our lithography demand[.]" Id. (first alteration in original).

Regarding China demand, Dassen stated that "we do see China trending towards a more normalized percentage," and "[w]e also now expect our China sales to be around 20% of our total revenue next year, trending back towards our historical China percentage and in line with its share of the backlog." Id. ¶ 232 (alteration in original). Regarding order pushouts from leading-edge customers, Dassen suggested that the Company knew of issues "a number of quarters ago." Id. ¶ 233.

Following these additional statements, ASML's ordinary share price again "fell $46.91 per share . . . from a close of $730.43 per share on October 15, 2024, to close at $683.52 per share on October 16, 2024[.]" Id. ¶ 238. Thus, ASML's share price fell

16

from $872.27 at close of market on October 14, 2024, to $683.52 at close of market on October 16, 2024, for a total loss of $188.75 per share, or approximately 21.6%.  Id. ¶ 156.

### LEGAL STANDARDS

On a Rule 12(b)(6) motion to dismiss, the Court must "accept[] all factual allegations in the complaint [as true] and draw[] all reasonable inferences in the plaintiff's favor."  ATSI Commc'ns, Inc., 493 F.3d at 98.  However, to survive dismissal, plaintiffs must "raise a right to relief above the speculative level," by pleading "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007).

Further, securities fraud claims brought under Section 10(b) and Rule 10b-5 are subject to heightened pleading requirements. First, "the circumstances constituting fraud . . . shall be stated with particularity" under Federal Rule of Civil Procedure 9(b). Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000) (citation omitted) (alteration in original).  Rule 9(b) requires that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Id. (internal quotation marks omitted).  Second, the PSLRA requires that a complaint (i) "'specify each statement

17

alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed,'" ATSI Commc'ns, Inc., 493 F.3d at 99 (quoting 15 U.S.C. § 78u 4(b)(1)), and (ii) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," id. (quoting 15 U.S.C. § 78u-4(b)(2)). Accordingly, the heightened pleading standards of Rule 9(b) and the PSLRA require that plaintiffs "do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004).

## DISCUSSION

Before beginning our analysis, it is necessary to first parse what the Court will and will not consider among the many factual sources submitted in support of the parties' respective briefing.

First, defendants submitted 105 exhibits in support of their motion to dismiss, ECF Nos. 94, 113, as well as over 60 pages of "annexes" to their memorandum of law in support of its motion to dismiss, ECF Nos. 93-1–93-6.  "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents

18

attached to the complaint as exhibits, and documents incorporated by reference in the complaint." United States ex rel. Foreman v. AECOM, 19 F.4th 85, 106 (2d Cir. 2021) (internal quotation marks omitted). "Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." Id. (internal quotation marks omitted) (alteration in original).

Here, many of defendants' exhibits are little more than the transcripts and other source materials for statements quoted or otherwise referenced in plaintiffs' Amended Complaint. As such, these documents are either "incorporated by reference in the complaint," or "integral to the complaint." Id. Thus, the Court will consider these exhibits when they are useful in providing the full language that plaintiffs excerpt in their Amended Complaint. To the extent the documents provided by defendants as exhibits are wholly independent from any documents referenced or quoted in the Amended Complaint, the Court will not consider those exhibits at this stage. Id. ("Where a district court considers material outside of the pleadings that is not attached to the complaint, incorporated by reference, or integral to the complaint, the district court, to decide the issue on the merits, must convert the motion into one for summary judgment.").

Similarly, defendants' Annexes A, B, and C provide language from defendants' exhibits, organized by category and/or date for the Court's convenience, oftentimes with direct reference to where in plaintiffs' Amended Complaint the language was originally quoted or referenced. See, e.g., ECF Nos. 93-1 ("Annex A"), 93-2 ("Annex B"). Likewise, defendants' Annex H points the Court to purported disclaimers relating to the misstatements that plaintiffs allege. The Court will consider these annexes.

Defendants' Annex D, on the other hand, contains additional argument, including the "Basis for Striking" certain allegations found in plaintiffs' FE statements. ECF No. 93-4. The Court will not consider Annex D in deciding this motion to dismiss.[12]

The Court also declines to consider Defendants' Annexes E and F at this stage. ECF Nos. 93-5, 93-6. These annexes contain additional information regarding sales of ASML stock made by certain individuals, including two of the individual defendants. As discussed below in connection with the Court's scienter analysis, infra Discussion Section I.C, consideration of non-public trading plans is not appropriate at the motion to dismiss stage. To the extent that the stock sales of certain individuals

---

[12]    We note that the issue of whether to consider Annex D is largely academic, because, as we discuss shortly, infra pp. 21–22, the Court will decline to strike plaintiffs' FE statements.

20

are relevant, the Court will take the facts as alleged in the Amended Complaint to be true, as we must on a motion to dismiss.[13]

Finally, plaintiffs' complaint includes statements from anonymous former employees. Defendants contend that these statements are not only immaterial but indeed should be struck under Rule 12(f) of the Federal Rules of Civil Procedure. ECF No. 93 ("Mot.") at 25-28. Under Rule 12(f), "the court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed R. Civ. P. 12(f). The District Court has discretion in determining whether to grant a motion to strike under Rule 12(f). Morse v. Weingarten, 777 F. Supp. 312, 319 (S.D.N.Y. 1991). As defendants concede, "the burden for a Rule 12(f) movant is high[.]" Mot. at 27.

Defendants' argument in support of striking the FE statements relies on defendants' submission of declarations from five of the FEs in which the FEs stated that they were not provided an opportunity to review the statements plaintiffs attribute to them, the statements omitted non-fraudulent explanations for the FEs' statements, and they did not say certain statements attributed to them. Mot. at 28; see also ECF Nos. 94-92-94-96. Courts consistently "refuse[] to strike allegations attributed to

---

[13]    Defendants' Annex G provides ASML's "Percentage [of] System Sales to China" from 2022 through Q3 2025. ECF No. 112-1. These facts are immaterial to the Court's resolution of this Motion. Thus, Annex G will not be considered.

confidential witnesses a[t] the pleading stage when presented with declarations of those witnesses that are supposedly inconsistent with the allegations in the complaint." In re Cognizant Tech. Solutions Corp. Sec. Litig., 2018 WL 3772675, at *12 (D.N.J. Aug. 8, 2018) (collecting cases). The Court reaches the same conclusion here.

Defendants, in effect, ask the Court to consider factual disputes and issues of credibility, which are not appropriately determined at the motion to dismiss stage. Accordingly, the Court will credit the FE statements included in the complaint for purposes of this motion and will not consider defendants' declarations.[14] This approach is consistent with our obligation at the motion to dismiss stage to "accept[] all factual allegations in the complaint [as true] and draw[] all reasonable inferences in the plaintiff's favor." ATSI Commc'ns, Inc., 493 F.3d at 98.

## I. Plaintiffs' Section 10(b) Claim

We turn next to plaintiffs' claim under Section 10(b) of the Exchange Act and SEC Rule 10b-5 (the "Section 10(b) Claim"). To state a Section 10(b) claim, plaintiffs must allege "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or

---

[14]    The same reasoning applies to plaintiffs' exhibits 2 through 5. ECF Nos. 104-2-104-5. As such, the Court will not consider those exhibits in connection with this motion.

omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 267 (2014) (quoting Amgen Inc. v. Conn. Ret. Plans and Trust Funds, 568 U.S. 455, 461 (2013)). Defendants challenge plaintiffs' Section 10(b) Claim on the grounds that (i) defendants' alleged misstatements are protected by the PSLRA's safe harbor for forward-looking statements and the bespeaks caution doctrine; (ii) the Amended Complaint fails to plead an actionable misrepresentation or omission; (iii) the Amended Complaint fails to plead scienter; and (iv) the Amended Complaint fails to plead loss causation. Mot. at 18–38. Defendants also challenge the sufficiency of plaintiffs' allegations regarding scheme liability. Id. at 38.[15] The Court will consider each argument in turn, beginning with whether plaintiffs have plausibly alleged an actionable misrepresentation or omission.

### A. The AC Sufficiently Pleads Several Actionable Misrepresentations or Omissions

Defendants argue that the Amended Complaint fails to plead any actionable misrepresentation or omission because plaintiffs "fail to plead facts identifying an actionable statement that was false when made." Mot. at 21. "The test for whether a statement

---

[15] For pleading purposes, defendants do not challenge the third, fourth, or fifth elements of plaintiffs' Section 10(b) Claim. As such, the Court finds those elements satisfied for purposes of this motion.

is materially misleading under Section 10(b) . . . is whether the defendants' representations, taken together and in context, would have misled a reasonable investor." City of Hialeah Employees' Ret. Sys. v. Peloton Interactive, Inc., 153 F.4th 288, 295 (2d Cir. 2025) (quoting Rombach v. Chang, 355 F.3d 164, 172 n.7 (2d Cir. 2004)) (internal quotation marks omitted) (alteration in original).  The falsity of a statement is evaluated at the time the challenged statement was made.  In re Barrick Gold Corp. Sec. Litig., 341 F. Supp. 3d 358, 371–72 (S.D.N.Y. 2018); In re Lululemon Sec. Litig., 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), aff'd, 604 F. App'x 62 (2d Cir. 2015).

For purposes of their argument, defendants separate the alleged misstatements into five categories: (i) statements about the Company's expected 2025 performance; (ii) statements about leading-edge demand; (iii) statements about China demand; (iv) statements about industry recovery; and (v) statements about backlog strength and order intake.  Mot. at 21–30.  For clarity, the Court maintains defendants' categorization of the statements in our analysis and considers each category in turn.[16]

---

[16]    We note that defendants' five categories are materially identical to the six categories into which the Amended Complaint separates the misstatements. See supra pp. 6–13.  Defendants simply combine plaintiffs' categories for misstatements relating to the Company's "backlog" and the Company's "order intake" into one category.  Some of plaintiffs' alleged misstatements are repeated in more than one of defendants' categories.  Compare Annex B-1 at 1 (including an April 17, 2024 alleged misstatement in the "Expected 2025 Performance" category), with Annex B-2 at 2 (including the same alleged misstatement in the "Leading-Edge Demand" category).  This repetition is of no

## 1. Statements About Expected 2025 Performance

Defendants first challenge each of the alleged misstatements concerning the Company's expected 2025 performance[17] as "inactionable general corporate optimism" and "inactionable opinion." Mot. at 21. Specifically, defendants argue first that "general announcements of optimism about future earnings or growth are too vague to be relied upon and thus are inactionable," id., and second, "the statements are unquestionably forward-looking opinions," id. at 22. Defendants also argue that their "reaffirmation" of the 2025 guidance is inactionable because it was "narrowed, not lowered (or missed)." Id. (emphasis in original)

"To be actionable, a misrepresentation must be one of existing fact, and not merely an expression of opinion, expectation, or declaration of intention." In re Moody's Corp. Sec. Litig., 599 F. Supp. 2d 493, 507 (S.D.N.Y. 2009) (internal citation and quotation marks omitted). However, an opinion may still be actionable if (i) "the speaker did not hold the belief she professed" or (ii) "the supporting fact she supplied were untrue." Tongue v. Sanofi, 816 F.3d 199, 209-10 (2d Cir. 2016) (quoting

_____

moment because the defendants include all of the misstatements alleged by plaintiff in their proposed categories.

[17]    Defendants include in this category the statements alleged in the Amended Complaint ¶¶ 166, 168-69, 173, 175, 197-99, 201, 203, 215-22. See Annex B-1; ECF No. 32-3 ("Annex C").

Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 185-86 (2015)).  Moreover, "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." Tongue, 816 F.3d at 210 (citing Omnicare, 575 U.S. at 195–96). From the perspective of a "reasonable investor," an opinion must not only be genuinely held but must also "fairly align[] with the information in the [speaker]'s possession at the time."  Omnicare, 575 U.S. at 188–89.

Defendants are correct that some of the alleged misstatements concerning the Company's expected 2025 performance are inactionable as opinion or optimism.  For example, defendants' statement that the Company does not "comment on customer specific revenue[,]" but that "many times some of the communications around [capital expenditure] and other things have already been reflected and adjustments that have been made in the different forecast" is inactionable.  AC ¶ 175.  This statement simply recounts that the Company "many times" incorporates client communications into their forecasts and predictions.  Plaintiffs have not shown that this statement was false when made, nor demonstrated with specificity how that is so.  Thus, this statement is inactionable.[18]

---

[18]   Given the volume of alleged misstatements in this case, it would be impractical for the Court to recount each alleged misstatement that is

That does not mean, however, that none of the alleged misstatements relating to the Company's expected 2025 performance are actionable. Indeed, several statements in this category are actionable. First, on April 17 and July 17, 2024, defendants recounted that they expected "2025 to be a strong year," and each time noted that there were a "number of new fabs that are being built across the globe . . . and are scheduled to take our tool[s]." AC ¶¶ 168 (alterations in original); see also id. ¶¶ 173, 199. Similarly, on January 24, 2024, Dassen stated that "[i]t's clear that many fab openings are scheduled that will require the intake of quite some tools in the 2025 time frame. So we look at 2025 as a strong year of growth[.]" Id. ¶ 166.

These statements incorporated then-current fact when they insisted that a "significant number of new fabs" were slated to be built and were, as a matter of fact, "scheduled to take" defendants' tools or would "require the intake of quite some tools." Under plaintiffs' allegations, defendants by this point knew that key customers were postponing the building of new fabs, meaning that the Company's tools would not be needed. Id. ¶ 100, 113. Taking plaintiffs' allegations as true, it would have been

---

ultimately inactionable. As such, if a statement is not specifically found to be actionable in the text of this opinion, the Court has concluded that alleged misstatement is inactionable because plaintiffs have failed to "demonstrate with specificity why and how that" statement was false or misleading at the time it was made. Rombach, 355 F.3d at 174.

materially misleading for the Company to tout its expectation of a strong 2025 performance based on the building of new fabs that will take defendants' tools when they knew, at the time, that those fabs were not being built, or were unlikely to be built, rendering these statements actionable.

Similarly, on April 17, Dassen stated that the Company was expecting "a very strong 2025," based in part on the fact that "we do see the utilization of our tools, both for Memory customers and for Logic customers, further improving[.]" Id. ¶ 217.  Plaintiffs allege that defendants knew, at the time this statement was made, that customer fabs were operating in some instances "at 50% capacity," id. ¶ 99, and that large customers, including Intel, were ramping down their machines, id. ¶ 101.  Plaintiffs further allege that the Company was aware of notable reductions in its customers' utilization of the Company's equipment.  Id. ¶¶ 102–106, 108–110.  Thus, defendants' statement, by incorporating what defendants then knew about their customers' utilization of ASML's tools and customer dynamics, injected facts that plaintiffs plausibly allege were false, rendering the statement misleading to the reasonable investor and actionable.

Finally, throughout July, August, and September of 2024, defendants repeatedly stated that they were on track to reach the upper-end of the €30-40 billion range they had estimated for 2025,

specifically noting that (i) "the low end of the range was too conservative," id. ¶ 216, (ii) "it will not be the low point," id. ¶ 219, (iii) defendants saw "a challenge to get to the low end of that range" and "don't see how to get there," id. ¶ 220, (iv) defendants believed "that we'll not be on the low end of that range," id. ¶ 221, (v) "we're nicely on track" for "the midpoint of the [2025 guidance] range, id. ¶ 203, and (vi) as late as September 10, 2024, that "we don't see how to get to the low end" of the range, id. ¶ 222.

Plaintiffs allege that defendants at this time knew of several issues indicating that they would, in fact, come in at the "low end" of their 2025 guidance, including the issues with utilization rates and the building of new fabs discussed above. See supra pp. 27-28. Additionally, defendant Dassen, on October 16, 2024, acknowledged that the Company knew of certain issues relating to customer demand "a number of quarters ago," i.e., well before September 2024. AC ¶ 233. Plaintiffs' allegations, taken as true, suggest that defendants knew that they were unlikely to exceed the lower end of their 2025 guidance, a conclusion further supported by the fact that defendants revised their guidance only one month after the latest affirmation that they did not see how to get to the low end of the range. Thus, plaintiffs have "demonstrate[d]

with specificity why and how" these statements were misleading to the reasonable investor, rendering these statements actionable.

Accordingly, the misstatements alleged in paragraphs 166, 168, 173, 199, 203, 216, 217, 219, 220, 221, and 222 survive defendants' motion to dismiss.

### 2. Statements About Leading-Edge Demand

We turn next to analysis of defendants' allegedly false and misleading statements and omissions concerning facts related to the Company's leading-edge customers.[19]  Defendants here again argue that these statements are inactionable because they qualify as opinion and optimism.  Mot. at 24.

Defendants are correct as to some of the alleged statements in this category.  For example, defendant Wennink's statement on January 24, 2024, that he "certainly" thought certain leading-edge customers' orders would be signed up "for 2025" is merely an optimistic statement of Wennink's opinion.  AC ¶ 165.

However, defendants include in this category the three statements discussed above, supra pp. 27–28, noting that new fabs are being opened and "are all scheduled to take [the Company's] tools" or would "require the intake of quite some tools in the 2025 time frame."  AC ¶¶ 166, 168, 173.  Similarly, on August 5, 2024, Miller stated that the Company saw "a stronger second half

---

[19]    Defendants include in this category the statements alleged in the Amended Complaint ¶¶ 165–66, 168–69, 171, 173, 177, 179.  See Annex B-2; Annex C-2.

[of 2024], and into 2025" based in part on "fabs that . . . are currently going to be ready to take machines." Id. ¶ 177 (second alteration in original). These statements are misleading and actionable for the same reasons as discussed above. See supra pp. 27–28.[20]

### a. **FE Statements**

Defendants, at this juncture, argue that plaintiffs' FE statements do not demonstrate the falsity of defendants' statements and should be struck. Mot. at 25–28. The Court has already concluded that it will not strike plaintiffs' FE statements because doing so would entail resolution of factual disputes inappropriate on a motion to dismiss. See supra pp. 21–22. Further, the FE statements, accepted as true, do support findings of falsity in this case. Taken together, the FEs accounts of declining customer utilization and demand, see e.g., AC ¶¶ 102–06, 108, 116, Company townhalls in which declining utilization numbers were presented, id. ¶ 260, and other indications that key customers would delay or cancel the building of new fabs and the installation of ASML equipment, id. ¶¶ 100, 113, lend credibility to the allegation that defendants knew that their statements about

---

[20]    Defendants' similar statement that "fab openings [] have been indicated by our customers," AC ¶ 171, is not actionable because unlike the actionable statements discussed in this section, this statement does not suggest that fab openings are factually slated to take the Company's tools. As such, it only reflects the speaker's opinion and optimism that customers would be building new fabs.

the planned usage of ASML's tools at new fabs around the world were false. Thus, the statements contained in paragraphs 166, 168, 173, and 177 of the Amended Complaint are actionable.

### 3. Statements About China Demand

Next, defendants challenge each of the alleged misstatements concerning demand in China.[21] Defendants once again argue that each of these statements is inactionable as corporate optimism or opinion because the statements provided the bases for defendants' views and gave investors no guarantees. Mot. at 28.

Defendants are correct that many of the alleged misstatements pertaining to China demand are inactionable as opinion or optimism. For example, defendants' statements that they were able to "step[] up [the Company's] China order fill rate," AC ¶ 185, because other customers "t[ook] their foot off the accelerator," ECF No. 94-24 at 41, and similar statements made early in the class period that defendants "continue[d] to see strong demand . . . in China" and that China demand was "robust" and "strong," AC ¶ 181, are inactionable corporate optimism. These statements have not been demonstrated to be false or misleading when they were made early in 2024.

---

[21]    Defendants include in this category the statements alleged in the Amended Complaint ¶¶ 181, 183, 185, 187, 189, 191, 193, 195. See Annex B-3; Annex C-3.

However, two of defendants' statements concerning China are actionable. First, on July 17, 2024, Fouquet noted on an earnings call that looking "at the opportunity we see on the mature semiconductor market . . . [i]n 2023, 2024, China has been investing a large part of this market. And this is why, I think, our revenue on China has been high." AC ¶ 189. Plaintiffs allege that the Company's increased revenues from China during the class period were the result of "pull-forward demand from stockpiling customers" with Chinese customers ordering early to get ahead of impending export restrictions. Id. ¶¶ 119-20. Plaintiffs further allege that defendants "admitted at the end of the Class Period that, in fact, ASML has been 'overdelivering' on its China backlog, i.e. filling China orders faster than demand would sustain."[22] AC ¶ 121 (emphasis in original). These allegations, taken as true, suggest that defendants knew, at the time this statement was made, that "revenue on China" was high not because of China's investment in the mature semiconductor market, but because of inorganic demand. As a result, this statement would have been materially misleading to the reasonable investor.

---

[22] Defendants' contention that "Plaintiffs wrongly seize on Dassen's . . . statement of 'over-delivering' on China backlog" because "he merely reiterated the same point regarding ability to fill older, underfilled China orders[,]" Mot. at 29 n. 38, does not change the Court's conclusion. At this stage, plaintiffs have sufficiently pled that defendants were over-delivering on their China backlog in a way that renders defendants' statement false or misleading to the reasonable investor. Determination of what specifically Dassen intended to convey with his statement is inappropriate at the motion to dismiss stage.

Similarly, near the end of the Class Period, on September 10, 2024, Miller noted that "we see [China demand] continuing to be strong[.]"  Id. ¶ 195 (alteration in original).  At this point, only one month before plaintiffs allege that the truth was revealed to the market, defendants' insistence that China demand remained strong was materially false and misleading considering the allegations relating to inorganic China demand recounted above. See supra p. 33.  Additionally, plaintiffs' allegations recount that the Company experienced an "abrupt falloff in non-EUV orders" "amounting to just €1.2 billion in Q3 2024."  Id. ¶ 196.  Non-EUV orders, plaintiffs allege, "were a bellwether of China demand," further suggesting that at this time, near the end of Q3 2024, defendants knew facts contradicting their statement that China demand remained strong.  Id.  Accordingly, the misstatements alleged by plaintiffs concerning China demand on July 17, 2024, and September 10, 2024, AC ¶¶ 189, 195, are actionable.

### 4. Statements About Industry Recovery

Turning next to defendants' alleged misstatements concerning the recovery of the semiconductor industry generally,[23] defendants again contend that each of the alleged misstatements are inactionable as optimism and opinion.  Mot. at 29.  However, a

---

[23]    Defendants include in this category the statements alleged in the Amended Complaint ¶¶ 205–213.  See Annex B-4; Annex C-4.

closer look at the statements shows that they incorporate and rely on actionable statements of then-current fact.

Specifically, on January 24, 2024, defendants made several statements reflecting that they were seeing "positive signs" and "strong indications" for the "semiconductor market recovery."  AC ¶¶ 205-08.  In each case, these predictions were based in part on the fact that the Company saw customers' "utilization" of the Company's tools improving.  See id. ¶¶ 205 ("we see our utilization rates going up again"), 206 ("litho tool utilization levels are . . . show[ing] improvement"), 207 ("utilization is improving"), 208 ("if we look at the utilization of our tools, we clearly see that they are improving").  Further, on April 17, 2024, defendants made the following statements: first, Wennink stated that defendants "see continued improvements in lithography tool utilization levels at both Logic and Memory customers.  All in line with the industry's continued recovery from the downturn."  Id. ¶ 209. Next, Dassen stated that the Company was "gearing up towards what we think is going to be a strong year of 2025 . . . [which was] really backed up by some of the industry trends as we see them today" including that "we do see the utilization of our tools . . . further improving[,]" concluding that he thought "we will find ourselves in 2025 in the midst of the upturn."  Id. ¶ 210 (first and third alterations in original).

35

Similar statements were made on July 17, 2024, when Fouquet reiterated that defendants "see continued improvement in lithography tool utilization level . . . [a]ll in line with the industry's continued recovery from the downturn," id. ¶ 211 (alteration in original), and further stated that "[w]e also see today further improvement in litho tool utilization levels," id. ¶ 212.  Finally, another similar statement was made on August 5, 2024, when Miller, after being asked about utilization rates, responded "we're seeing them trending up for both logic and memory . . . our view is that will continue.  And then you'll eventually get to a point where you'll hit utilization levels high enough [to] trigger additional demand."  Id. ¶ 213.

Plaintiffs' allegations are replete with alleged facts that by this point in 2024, defendants were well aware that the utilization of their tools by certain key customers was declining. See AC ¶¶ 98–118.  Plaintiffs allege that these utilization level issues were broadly known at the Company and were even discussed during quarterly Company townhalls.  Id. ¶¶ 106, 260.  Further, defendants' statement that "eventually" they would "get to a point where you'll hit utilization levels high enough where you trigger additional demand," id. ¶ 213, lends further support to plaintiffs' contention that the industry was not recovering as defendants were representing at the time, because the utilization levels were not

36

yet high enough to support additional demand.  Taken as true, plaintiffs' allegations regarding these concerns create an issue as to whether defendants' statements were materially false or misleading that cannot be resolved on a motion to dismiss. Accordingly, the statements regarding industry recovery and the utilization levels of ASML equipment in paragraphs 205, 206, 207, 208, 209, 210, 211, 212, and 213 of the Amended Complaint are actionable.

### 5. Statements About Backlog Strength and Order Intake

Finally, we turn to defendants' alleged misstatements concerning the Company's backlog strength and order intake.[24]  Here defendants argue for a final time that each of plaintiffs' alleged misstatements are reflections of corporate optimism and opinion and are therefore inactionable.  The Court agrees as to all but two statements in this category.

Defendants made repeated statements throughout the Class Period that they expected 2025 to be a strong year, a prediction "supported by [the Company's] strong backlog," id. ¶¶ 197–98, and based on the Company's "order intake[,]" id. ¶¶ 201–02.  Plaintiffs have not sufficiently pled that the Company had reason to doubt their order intake and backlog at the time these statements were made.  Indeed, plaintiffs' allegations suggest that the Company

---

[24]    Defendants include in this category the statements alleged in the Amended Complaint ¶¶ 197–99 and 201–203.  See Annex B-5; Annex C-5.

did have a strong backlog.  See e.g., id. ¶¶ 119, 121.  The fact that Dassen noted that the Company's "order flow on a quarterly business can be lumpy and does not necessarily reflect our business momentum accurately," id. ¶ 161; see also id. ¶¶ 162, 204, does not render these statements materially false or misleading.  The Company's order flow can support the Company's future predictions even if the prediction does not always prove to be accurate.  Additionally, these statements do not include the same assurances as the actionable statements discussed above, supra pp. 28-29, that the Company would not come out on the low end of its projected 2025 guidance.  In the absence of sufficient allegations to render these statements materially false or misleading when made, these statements are no more than inactionable opinion and optimism.  Accordingly, the statements relating to backlog strength and order intake in paragraphs 197, 198, 201, and 202 of the Amended Complaint are inactionable.

However, two statements included in this category are actionable.  First, "[o]n the Company's second quarter 2024 earnings call held on July 17, 2024 and in [the related] pre-recorded earnings video," "Defendants touted €5.6 billion in quarterly bookings" and told investors that "we're nicely on track" for "the midpoint for the [2025 guidance] range[.]"  AC ¶ 203 (third alteration in original).  This statement provides the same

38

guidance and assurance that the Company would not come in at the low end of its 2025 guidance that has already been discussed above. Supra pp. 28-29.  It is actionable for the same reasons, namely, plaintiffs have alleged that defendants at this time knew of issues indicating that they would not exceed the "low end" of their 2025 guidance.

Defendants also include in this section the alleged misstatement in paragraph 199 of the Amended Complaint.  We have already found this statement to be actionable, supra pp. 27-28, 30, and the same reasoning applies here.  Thus, the statements alleged in paragraphs 199 and 203 of the Amended Complaint are actionable.

### B. PSLRA Safe Harbor

Before turning to the remaining elements of plaintiffs' Section 10(b) Claim, it is necessary to consider defendants contention that "each challenged statement is forward-looking" and protected by the PSLRA's safe harbor.[25]  Mot. at 18-21.  The Court

---

[25]    Defendants allude to the "bespeaks caution doctrine" alongside the PSLRA Safe Harbor.  However, a close review of defendants' arguments both in their moving papers and their reply brief reveals that defendants make no argument addressing the bespeaks caution doctrine beyond a brief reference in a footnote. Mot. at 20 n. 17.  Because the bespeaks caution doctrine is distinct from the PSLRA Safe Harbor, Plumbers & Pipefitters National Pension Fund v. Davis, 2020 WL 1877821, at *11 (S.D.N.Y. Apr. 14, 2020) ("The PSLRA's 'safe-harbor provision' is 'a counterpart' to the bespeaks caution doctrine."), in the absence of substantive briefing on the bespeaks caution doctrine, the Court will not address it at length here.  In any event, as discussed infra pp. 41-47, the Court finds that the actionable alleged misstatements either (i) were statements of present fact, or (ii) did not include meaningful cautionary language.  Accordingly, the bespeaks caution doctrine does not protect any of the actionable alleged misstatements for purposes of this motion.  In re General

will consider defendants' arguments only as they relate to the statements earlier found to be actionable.

The PLSRA's safe harbor provides that a forward-looking statement is not actionable if it "is identified and accompanied by meaningful cautionary language or is immaterial or the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading."  Slayton v. American Exp. Co., 604 F.3d 758, 766 (2d Cir. 2010).  The PSLRA defines what constitutes a forward-looking statement, including, inter alia:

> a statement containing a projection of revenues . . . or other financial items; (B) a statement of the plans and objectives of management for future operations . . .; (C) a statement of future economic performance . . .; (D) Any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C)[.]

15 U.S.C. § 78u-5(i)(1)(A)-(D).  Statements that "project[] results in the future" are "plainly forward looking."  Slayton, 604 F.3d at 769.  Similarly, statements that a company is "on track with its projected goals" or that a company thinks it is on track to meet its targets are forward looking.  Villare v. Abiomed, 2021 WL 4311749, at *17 (S.D.N.Y. Sep. 21, 2021).

---

Elec. Co. Sec. Litig., 857 F. Supp. 2d. 367, 384 (S.D.N.Y. 2012) (The "bespeaks caution doctrine[ does] not apply to statements of present or historical facts."); In re Duane Reade Inc. Sec. Litig., 2003 WL 22801416, at *6 (S.D.N.Y. Nov. 25, 2003) ("Under the 'bespeaks caution' doctrine, 'courts have held that meaningful cautionary language can render omissions or misrepresentations immaterial.").

However, "misrepresentations of present fact aren't protected, even if they're part of a forward-looking statement." In re Estée Lauder Co., Inc. Sec. Litig., 2025 WL 965686, at *6 (S.D.N.Y. Mar. 31, 2025).  Nor are statements that omit material facts.  In re Complete Mgmt. Inc. Sec. Litig., 153 F. Supp. 2d 314, 340 (S.D.N.Y. 2001).

Defendants broadly contend that "[e]ach challenged statement is forward-looking" and argue that each statement is protected by the safe harbor because (i) the statements were "accompanied by 'meaningful' notes of caution[,]" and (ii) plaintiffs "fail[] to plead that any [forward-looking statement] was made with 'actual knowledge' of its falsity[.]"  Mot. at 18-21.

In response, plaintiffs argue that "many alleged misstatements" "were not forward looking[,]" "were 'mixed' statements containing representations of putative current or historical fact[,]" or "omitted material facts."  ECF No. 103 ("Opp.") at 15.  Plaintiffs further contend that even if any of defendants' statements were purely forward looking, those statements still do not qualify for safe-harbor protection because they do not contain meaningful cautionary language and were made with actual knowledge.  Id. at 16–19.

41

### 1. Whether Defendants' Statements Were Forward Looking

As an initial matter, the Court agrees with plaintiffs that not <u>all</u> the actionable alleged misstatements were forward looking. Indeed, plaintiffs allege myriad misstatements that are mixed statements containing representations about current or historical facts. For example, the statements discussed above, <u>supra</u> pp. 27–28, 30–31, in which defendants contended that there were a "number of new fabs that are being built across the globe . . . [and they] are scheduled to take our tools," AC ¶ 168; <u>see also</u> <u>id.</u> ¶¶ 173, 199, that "many fab openings are scheduled that will require the intake of quite some tools in the 2025 time frame," <u>id.</u> ¶ 166, and that fabs were "currently going to be ready to take machines," <u>id.</u> ¶ 177, are statements of present fact.

The same is true for many of the other alleged misstatements that we have found to be actionable. <u>See</u> AC ¶¶ 189 (stating factual reasons for high China revenues), 195 (omitting material facts about China demand), 205–13 (relying on current facts about utilization rates), 217 (same).

Each of those statements is not protected by the safe harbor for forward-looking statements because "misrepresentations of present fact aren't protected, even if they're part of a forward-looking statement[,]" <u>Estée Lauder</u>, 2025 WL 965686, at *6, and the safe harbor and bespeaks caution doctrine do not apply to "material

42

omissions or misstatements of historical fact[,]" Complete Mgmt.,
153 F. Supp. 3d at 340; accord In re Hi-Crush Partners L.P. Sec.
Litig., 2013 WL 6233561, at *19 (S.D.N.Y. Dec. 2, 2013) (finding
that the Safe Harbor was inapplicable because "Plaintiff complains
of [] concealment of a fact that was 'historical' at the time" the
misstatement was made.).

However, the fact that many of defendants' alleged
misstatements are not forward-looking statements does not mean
that none of defendants' statements are forward looking.
Specifically, the actionable alleged misstatements relating to the
Company's predictions that they expected to meet the 2025 revenue
guidance and would exceed the low point of that guidance are each
forward looking.  AC ¶¶ 203, 216, 219-22.  Thus, with regards to
these statements, we must examine whether they were accompanied by
meaningful cautionary language and were made with knowledge of
their falsity.

### 2. Meaningful Cautionary Language

To be meaningful, "cautionary language must be prominent and
specific, and must directly address exactly the risk that
plaintiffs claim was not disclosed." In re Salix Pharms., Ltd.,
2016 WL 1629341, at *11 (S.D.N.Y Apr. 22, 2016).  Further,
"generic, boilerplate . . . disclaimer[s], listing garden-variety
business concerns" are not considered meaningfully cautionary.  In

43

re STMicroelectronics N.V. Sec. Litig., 2025 WL 2644241, at *4 (S.D.N.Y. Sep. 15, 2025).

Notably, the PSLRA's safe harbor includes additional requirements for forward-looking statements to garner protection if the statements were made orally. Specifically, "[t]he PSLRA immunizes an oral forward-looking statement as long as it is accompanied by [a] sufficient **_oral_** cautionary statement that refers listeners to a more detailed, written statement." Willis v. Big Lots, Inc., 2016 WL 8199124, at *23 (E.D. Ohio Jan 21, 2016) (citing 15 U.S.C. § 78u-5(C)(2)(a)(i) and (ii)).

Defendants' purported cautionary language relating to these statements does not satisfy the requirements of the safe harbor. Defendants' first statement in this category was made on January 24, 2024. AC ¶ 216. Defendants' Annex A at pages 11–13 provides the purported cautionary language provided on that date. While the call included a "[d]isclaimer cautioning that comments made during the earnings call will include forward-looking statements" and referenced the "risks and uncertainties . . . indicated in the Earnings Release, in ASML's Annual Report . . . and other documents filed with the SEC," Annex A at 11, such a general statement of "garden-variety" business concerns does not suffice. STMicroelectronics, 2025 WL 2644241, at *4. Further, none of the purported cautionary language defendants point to during this

44

earnings call "directly address[ed] exactly the risk that plaintiffs claim was not disclosed," Salix, 2016 WL 1629341, at *11, namely, that the Company knew, at the time these statements were made, of customer demand issues and other issues related to the utilization of their tools that made it unlikely that the Company would exceed the lower range of its 2025 guidance. Indeed, defendants' purported cautionary language reiterated the very statements that the Court has found to be actionable, noting that while "utilization levels are still running lower than normal, [they] are now improving in both Logic and Memory," and "we see our utilization rates going up again," alongside statements that the low-end of the 2025 guidance was "too conservative." Annex A at 11-12.

We next address the statements that were made on July 17, 2024, during the Company's second quarter earnings call. AC ¶ 203, 219. Defendants' Annex A at pages 21-23 provides the purported cautionary language provided on that earnings call. A similar disclaimer cautioning listeners about forward-looking statements was made, but here again none of the purported cautionary language defendants point to during this earnings call "directly address[ed] exactly the risk that plaintiffs claim was not disclosed." Salix, 2016 WL 1629341, at *11. And again, the very statements that are actionable were repeated as part of

defendants' "cautionary language."  See e.g., Annex A at 21 ("We also see continued improvement in lithographic tools utilization.").

The same analysis applies to defendants' statements on August 5, 2024.  AC ¶ 220.  Indeed, defendants' purported cautionary language provided on that date reiterates the very sentiments that the Court has deemed actionable.  Annex A at 24 ("We, again, said difficult to be at the low end of [the 2025 guidance range.]").

The defendants' argument fares no better with respect to the September 4, 2024 statement.  AC ¶ 221.  Defendants' purportedly cautionary language on that date did not address the risk that plaintiffs allege transpired.  Annex A at 24-25.  Defendants' references to the general uncertainty surrounding the industry downturn, normalization of China demand, and other "competitive foundry dynamics," id., were not "meaningful" under the circumstances.  Again, while purportedly providing cautionary language, defendants repeated that "we believe that we will not be on the low end of the [2025] range."  Id. at 25.

Finally, with respect to the actionable alleged misstatements that defendants made on September 10, 2024, AC ¶ 222, defendants failed to address the specific risks that plaintiffs alleged transpired, and again, defendants repeated the very statements that the Court finds actionable.  Annex A at 25 (noting that

46

"[l]itho tool utilization [is] going up"), 26 ("we're seeing utilization levels and inventories moving in the right direction[,]" and again, "we don't see how to get to the low end" of the 2025 range).

Further, the purported cautionary statements made on August 5, September 4, and September 10, 2024, do not appear to refer listeners to a more detailed, written statement sufficient to meet the requirements for an oral cautionary statement. Big Lots, Inc., 2016 WL 8199124, at *23.

Plaintiffs have sufficiently alleged that at the time these statements were made, defendants knew of concerns that indicated that they were unlikely to reach the upper range of their estimated 2025 guidance including issues with declining utilization rates and delays in the building of new fabs. These issues were known by defendants "a number of quarters ago" as of October 16, 2025 i.e., before these statements were made. AC ¶ 233. Despite that knowledge, defendants did not include meaningful cautionary language that addressed these concerns, and often repeated the statements that plaintiffs allege was misleading while purportedly cautioning investors. Thus, these statements, if made with actual knowledge, will not be protected by the PSLRA's safe harbor. In re Symbol Techs., Inc. Sec. Litig., 2013 WL 6330665, at *15 (E.D.N.Y. Dec. .5, 2013) (finding that the Safe Harbor did not

47

protect "the revenue projections at issue" because "the cautionary language did not specifically reveal the particular risks allegedly known to [defendant]").

### 3. Actual Knowledge

Finally, plaintiffs have sufficiently alleged that defendants' misstatements were made with actual knowledge. As discussed at length above, see supra pp. 27–39, plaintiffs' allegations, including the allegations contained in the FE statements, sufficiently plead that the Company was aware of the very issues about which plaintiffs complain well before the time that the actionable statements were made. At the motion to dismiss stage, plaintiffs' allegations are sufficient to meet defendants' argument that their statements were protected by the PSLRA's safe harbor.[26]

### C. Scienter

Having determined that several of plaintiffs' alleged misstatements and misrepresentations are actionable and are not protected by the PSLRA safe harbor or bespeaks caution doctrine, we turn next to scienter. Defendants argue that plaintiffs' Amended Complaint fails because it "does not plead 'particularized

---

[26]   Defendants do not argue that the alleged misstatements were "immaterial" and should therefore be protected under the Safe Harbor for that reason. See Mot. at 18–21 (the "forward-looking statements are shielded from liability under two safe harbor prongs. First, they were accompanied by 'meaningful' notes of caution . . . Second, the AC fails to plead that any FLS was made with 'actual knowledge' of its falsity[.]"); see also ECF No. 112 ("Reply") at 5–6.

facts' giving rise to a 'strong inference' of scienter[.]"  Mot. at 30.  To adequately plead scienter, plaintiffs must allege facts either (1) "constitut[ing] strong circumstantial evidence of conscious misbehavior or recklessness," or (ii) "show[ing] that defendants had both motive and opportunity to commit fraud."  Set Cap. LLC v. Credit Suisse Grp. AG, 996 F.3d 64, 78 (2d Cir. 2021). In considering scienter, courts consider whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322–23 (2007).  The showing of scienter must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Id. at 324.

"To plead corporate scienter, a plaintiff must allege 'facts sufficient to create a strong inference either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading.'"  Estée Lauder, 2025 WL 965686, at *9 (quoting Loreley Fin. (Jersey) No. 3 Ltd v. Wells Fargo Sec., LLC, 797 F.3d 160, 177 (2d Cir. 2015)). "Courts in this district generally conclude that the scienter of

'management level' employees can be attributed to the corporation." Id.

Defendants first argue that the AC fails to adequately allege scienter because it does not plead that any of the defendants had any motive to commit fraud. Mot. at 31-33. Second, defendants argue that the AC fails to establish scienter because plaintiffs have not established any conscious misbehavior or recklessness. Id. at 33-37. Plaintiffs, for their part, rely primarily on the argument that defendants' actions reflect conscious misbehavior or recklessness, and that the Amended Complaint's allegations about defendants' motives bolster the scienter inference. Opp. at 22-29. We will begin with plaintiffs' arguments concerning conscious misbehavior or recklessness.

### 1. Conscious Misbehavior or Recklessness

Plaintiffs argue that their allegations show that defendants knew information contradicting their statements. Id. at 22. Specifically, defendants repeatedly claimed to have knowledge of ASML's revenues from China customers, leading-edge customers, and about defendants' 2025 guidance. Id. For example, defendants assured the market that they "know quite well what customers want" because of "detailed discussions," enabling the Company to learn about its clients' "current and future needs" and to "adjust [ASML's] demand plans" accordingly, which was then factored into

ASML's forecasts.  Id. (citing AC ¶¶ 56, 71, 73, 90, 124-26, 253-258) (alteration in original).  Further, plaintiffs contend that the fact that defendants frequently spoke about sales in China, export restrictions, the Company's order backlog, leading-edge customers, and the 2025 guidance supports an inference of scienter. Id. at 23.  Plaintiffs' allegations also show that as of October 2024, defendants knew of decreased customer demand "a number of quarters ago," i.e., early in 2024, and defendants knew of a "factual absence" of industry recovery by September 2024.  See AC ¶¶ 134, 146, 263.  Nonetheless, defendants continued to reassure investors about the stability of ASML's China revenues, its leading-edge business, and that it would come in above the low end of its 2025 guidance.  Opp. at 24.

Plaintiffs argue that a finding of scienter is bolstered by (i) the fact that the alleged fraud concerns the Company's "core operations"; (ii) the temporal proximity between Defendants' statements in September 2024 and the "revelation of the truth weeks later"; (iii) defendants' efforts to privately influence analysts' 2025 revenue estimate while assuring the public that ASML would come in above the low end of its 2025 guidance; and (iv) Miller's departure from the company at the end of 2024.  Id. at 24-25.

Defendants, for their part, raise several related arguments, including that (i) communications with customers do not suggest

scienter as plaintiffs' pleadings do not identify what information was relayed to whom or when, Mot. at 34; (ii) the fact that Individual Defendants are "highly placed executives" is insufficient to support scienter, id. at 35; (iii) temporal proximity does not support scienter and is "impermissible fraud-by-hindsight pleading[,]" id.; (iv) Miller's departure was unsurprising and does not support scienter, id. at 36; and (v) the core operations doctrine may not have survived the PSLRA and cannot serve as an independent basis for scienter, id.

Defendants' arguments disregard this Court's obligation to consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, 551 U.S. at 323. Here, taken collectively, plaintiffs' allegations are sufficient to plead a strong inference of scienter. Plaintiffs have pled that defendants had information that undermined the assurances they repeatedly made throughout the Class Period. Further, defendants' statements after the class period ended that they knew of decreased customer demand "a number of quarters ago," AC ¶ 146, and knew, as early as September 2024, that the semiconductor industry was unlikely to recover in 2024, id. ¶ 134, further support a finding of scienter.

### 2. **Motive**

Additionally, while "motive is not required to plead scienter," <u>Freudenberg v. E*Trade Fin. Corp.</u>, 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010), plaintiffs allegations concerning defendants' motives to commit fraud bolster our conclusion.  The sales of ASML stock by Dassen, Fouquet, and additional ASML board members during the class period are particularly salient.  Under plaintiffs' allegations, these individuals sold anywhere from 15-100% of their respective holdings, totaling over €20 million during the class period.  AC ¶ 242.  Taken as true, these alleged sales are more than sufficient to support scienter.  <u>See</u> <u>In re Oxford Health Plans, Inc.</u>, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (sales of 11% to 100% of holdings supported scienter); <u>In re Scholastic Corp. Sec. Litig.</u>, 252 F.3d 63, 74-75 (2d Cir. 2001) (sale of 80% of a defendant's holdings supported scienter inference).  Dassen in particular made a sale approximately six weeks before the truth was allegedly revealed to the market, and in so doing liquidated his entire remaining holdings.  AC ¶ 243.  This fact too supports scienter.  <u>Oxford</u>, 187 F.R.D. at 139 (noting that "[t]rades made a short time before a negative public announcement are suspiciously timed" and finding that stock sales "two months before" the truth was revealed "support[ed] a strong inference of scienter").

Defendants' challenges to the relevance of these sales, including that the trades were made pursuant to the Dutch-equivalent of a 10b5-1 trading plan, Mot. at 31-33, that the sales were made to cover tax liabilities, id., and that plaintiffs have improperly calculated the percentages of holdings that the insiders sold, id. at 32-33, are not issues to be resolved at the pleading stage. See Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc., 2019 WL 2360942, at *6 (S.D.N.Y. Mar. 4, 2019) (at the pleading stage "[t]he existence of a Rule 10b5-1 Trading Plan is an affirmative defense that must be pled and proved."); In re SLM Corp. Sec. Litig., 740 F. Supp. 2d 542, 558 n.6 (S.D.N.Y. 2010) ("To the extent that [defendant] offers explanations for his stock sales . . . those facts remain in dispute . . . [and are] not to be resolved on a Rule12(b)(6) motion."); In re Weight Watchers Int'l Inc. Sec. Litig., 504 F. Supp. 3d 224, 258 (S.D.N.Y 2020) (allegations concerning percentage of holdings sufficient where "[l]ooking only at the [complaint], Plaintiffs allege that [a defendant] sold approximately 60% of his [company] shares" because "at this stage, this Court must confine itself to the pleadings").  Nor are defendants correct that the sales by Schneider-Maunoury and Allan "are irrelevant."  Mot. at 33.  The fact that "several other insiders unloaded" stock may "permit an inference of bad faith and

54

scienter." Stevelman v. Alias Research Inc., 174 F.3d 79, 85 (2d Cir. 1999); accord City of Sterling Heights Police & Fire Ret. Sys. V. Reckitt Benckiser Grp. PLC, 587 F. Supp. 3d 56, 97 (S.D.N.Y. 2022) (Sales by non-defendants can "have some bearing when considering the scienter allegations holistically and collectively.").

Plaintiffs' showing of scienter is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 323 (2007). Defendants argue that the "only rational" understanding of defendants' statements is that they made cautious disclosures "amidst a global industry downturn," "warned of orders delay," "updated [the market]" about "slower-than-anticipated recovery," and ultimately revised their 2025 guidance "[o]nce [they] had enough information[.]" Mot. at 36-37. While, defendants' theory may ultimately prove true, it cannot be said at the motion to dismiss stage, and in the absence of a further developed factual record, that defendants' proffered conclusion is more cogent and compelling than plaintiffs' theory of scienter.

Finally, neither party seriously disputes that corporate scienter in this case is analyzed any differently than the scienter of the individual defendants. Indeed, defendants only argue in a footnote that "[t]here is no corporate scienter without Individual

55

Defendant scienter." Reply at 15 n.31. Accordingly, the Court finds that plaintiffs have sufficiently pled both individual scienter of management-level defendants and, as a result, corporate scienter. Estée Lauder, 2025 WL 965686, at *9 ("Courts in this district generally conclude that the scienter of 'management level' employees can be attributed to the corporation.").

### D. Loss Causation

Defendants briefly argue that plaintiffs' Amended Complaint fails to plead loss causation. Mot. at 37-38. To sufficiently plead loss causation, plaintiffs must allege that "the subject of the fraudulent statement or omission was the cause of the actual loss suffered." Carpenters Pension Trust Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 232 (2d Cir. 2014) (internal quotation marks omitted). Loss causation may be shown by a "corrective disclosure" revealing the fraud or by "materialization of the risk" that was the subject of the fraud. Id. at 233. "Plaintiffs' burden in pleading loss causation is not a heavy one[.]" In re Omega Healthcare Investors, Inc. Sec. Litig., 563 F. Supp. 3d 259, 266 (S.D.N.Y. 2021) (internal quotation marks omitted).

Defendants first argue that plaintiffs have failed to plead loss causation because "the October 2024 disclosure did not 'correct[] or otherwise reveal[]' any 'prior untruth' to cause a

56

stock decline." Mot. at 37 (citing Forth Worth Employers' Ret. Fund v. Biovail Corp., 615 F. Supp. 2d 218, 229 (S.D.N.Y. 2009)). Instead, defendants argue that the disclosures merely "accurately disclosed quarterly results, in line with prior guidance." Id.

Plaintiffs' complaint identifies two corrective events. First, the Company's October 15, 2024 earnings release in which the Company "revealed quarterly bookings of just €2.63 billion" and lowered its 2025 guidance to a range of €30-35 billion. AC ¶ 226. Second, an October 16, 2024 earnings call in which the defendants provided their bases for the revised guidance. Id. 231-33. It may be true that the corrective disclosures "accurately disclosed quarterly results," Mot. at 37, but the fact that the corrective disclosures were accurate does not mean that they cannot support loss causation. When taken in context with plaintiffs' myriad alleged misstatements and misrepresentations prior to these disclosures, including the allegations that defendants repeatedly guided analysts and the market to the upper end of the Company's 2025 revenue prediction despite knowing that they were likely to narrow their guidance to the low end of the range, the disclosure of accurate quarterly results still suffices to satisfy loss causation at the pleading stage. Indeed, a corrective event, by definition, must always be a revelation of accurate facts in the face of prior misstatements.

In the alternative, defendants contend that plaintiff did not "plead that the risk that materialized was previously concealed . . . given Defendants' disclosures."  Mot. at 38.  It cannot seriously be argued that defendants had previously revealed that they would revise their 2025 guidance down to the €30-35 billion range.  Throughout the class period, defendants had maintained their guidance for 2025 revenue in the €30-40 billion range and made statements suggesting that they believed the low end of this range was unlikely to come to fruition and was "too conservative" of an estimate.  See, e.g., AC ¶¶ 216, 220, 222.

Further, and as plaintiffs argue, defendants' argument sounds in a "truth-on-the-market" defense, which the Supreme Court as well as courts in this Circuit have found to be typically inappropriate as a ground for dismissal at the pleadings stage. Amgen Inc. v. Connecticut Retirement Plans & Trust Funds, 568 U.S. 455, 482 n.11 (2013) (when "news of the truth had entered the market and dissipated the effects of prior misstatements is a matter for trial.") (cleaned up); Gimpel v. The Hain Celestial Grp., Inc., 2025 WL 2749562, at *12 (2d Cir. Sep. 29, 2025) ("[T]he truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a §10(b) complaint[.]").

In this context, it is worth repeating that defendants did not challenge plaintiffs' Section 10(b) Claim on the bases that the misstatements were immaterial, the plaintiffs did not suffer economic harm, nor that plaintiffs did not rely on defendants' misstatements.  Thus, to summarize our ruling on plaintiffs' Section 10(b) claims, the Court has found that (i) plaintiffs have alleged several actionable misstatements; (ii) those misstatements are not protected by the PSLRA safe harbor; (iii) plaintiffs have sufficiently alleged scienter; and (iv) plaintiffs have sufficiently alleged loss causation.  Accordingly, plaintiffs' Section 10(b) Claim based on the alleged misstatements found to be actionable above may proceed.

### E. Scheme Liability

In addition to their claims relating to defendants' alleged misstatements, plaintiffs argue that defendants are liable under Rule 10b-5(a) and (c) "for 'disseminating' false and misleading statements and engaging in other deceptive conduct, including by overdelivering to China to sustain the Company's performance during an industry slump and engaging in a 'communication campaign' to get analysts to walk-back guidance expectations."  Opp. at 37 (citations omitted).  Defendants argue that "[t]o the extent Plaintiffs seek to pursue scheme liability under Rule 10b-5(a) or (c)" their claims fail because the complaint "nowhere cites either

59

subsection or identifies what the scheme was, other than making false statements." Mot. at 38.

Subsections (a) and (c) of Rule 10b-5 prohibit "employ[ing] any device, scheme, or artifice to defraud," and "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit" "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. Violation of these subsections does "not require the defendant to make a misstatement or omission; they require only deceptive conduct." Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank, 11 F.4th 90, 105 (2d Cir. 2021). "To maintain a 10b-5(a) or (c) claim, a plaintiff must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." Id. (internal quotation marks omitted). Finally, "[b]ecause scheme claims sound in fraud, they are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)." Id.

The Court agrees with defendants that plaintiffs have not pled the elements of a scheme liability claim under Rules 10b-5(a) or (c). Indeed, the word "scheme" appears only three times in plaintiffs' 115-page complaint in connection with plaintiffs' general claim under Rule 10b-5. AC ¶¶ 297-98. This alone is

60

sufficient grounds to dismiss plaintiffs' purported claim for scheme liability. In re Teva Sec. Litig., 512 F. Supp. 3d 321, 336–37 (D. Conn. 2021) (rejecting an un-pled scheme liability claim because "[c]ourts rightly insist that a plaintiff who intends to bring a Rule 10b-5 claim based on both misstatement and scheme liability must do so clearly and specifically" and noting that "such plaintiffs routinely proceed by alleging Rule 10b-5 claims in two separate counts—one based on misstatements and one based on scheme liability"); see also Clean Coal Technologies, Inc. v. Leidos, Inc., 377 F. Supp. 3d 303, 321 (S.D.N.Y. 2019) ("It is axiomatic that a complaint cannot be amended by the briefs in opposition to a motion to dismiss.").

Accordingly, plaintiffs' purported scheme liability claim is dismissed.

### II. Plaintiffs' Section 20(a) Claims

We turn next to plaintiffs' claims under Section 20(a) of the Exchange Act. AC ¶¶ 300–03. The sole arguments raised by defendants regarding these claims is that the claims must fail absent a predicate Exchange Act Violation, Mot. at 38; Reply at 17, while plaintiffs argue that because they have adequately alleged a violation under Section 10(b), their claims may go forward, Opp. at 37.

As discussed at length above, we have upheld plaintiffs' Section 10(b) Claim, and therefore plaintiffs' claims arising under Section 20(a) may proceed as well.

### III. Plaintiffs' Section 20A Insider Trading Claims

Finally, we address plaintiffs' insider trading claims under Section 20A of the Exchange Act, alleging that plaintiffs were harmed when they purchased ASML ordinary shares contemporaneously with the sales made by defendants Dassen and Fouquet. AC ¶¶ 304–09. Defendants argue that plaintiffs' claims must be dismissed for three reasons: first, there is no predicate Exchange Act violation, Mot. at 38; second, plaintiffs have not pled personal jurisdiction over Dassen and Fouquet, id. at 38-39; and third, plaintiffs cannot satisfy Section 20A's "contemporaneous investor" requirement, id. at 39. Defendants' personal jurisdiction argument is dispositive.

### A. Personal Jurisdiction

Defendants argue that plaintiffs have failed to plead personal jurisdiction over Dassen and Fouquet because they "are foreign defendants not subject to general jurisdiction" and plaintiffs cannot "show that the challenged sales were 'purposefully directed' to the U.S. for specific jurisdiction." Mot. at 38-39. Plaintiffs in turn argue that they have adequately alleged personal jurisdiction for their Section 20A claims because

"Dassen and Fouquet conceded jurisdiction for . . . the predicate violations for the Section 20A claims—which is sufficient." Opp. at 38 (citing In re Aegean Marine Petroleum Network, Inc. Sec. Litig., 529 F. Supp. 3d 111 (S.D.N.Y. 2021)). Defendants counter in reply that In re Aegean is inapposite because there, this Court found that it lacked jurisdiction as it related to the predicate claims but had jurisdiction over one defendant for the Section 20A claim "because it involved a defendant transaction in the U.S[.]" Reply at 17.

It is of course true that "[a] plaintiff must establish the court's jurisdiction with respect to each claim asserted." Sunward Elecs. v. McDonald, 362 F.3d 17, 24 (2d Cir. 2004). Where, as here, defendants reside abroad, "this Circuit relies on the 'effects test' to determine whether it can exercise specific jurisdiction over a defendant whose 'conduct that forms the basis of the controversy occurs entirely out-of-forum,' and whose 'only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." In re Aegean, 529 F. Supp. 3d at 135 (quoting Tarsavage v. Citic Tr. Co., Ltd., 3 F. Supp. 3d 137, 145 (S.D.N.Y. 2014)). Under the effects test, "the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum." Tarsavage, 3 F. Supp. 3d at 145. "[T]he fact that harm

63

in the forum is foreseeable . . . is insufficient for the purpose of establishing specific personal jurisdiction over a defendant." In re Terrorist Attacks on Sep. 11, 2001, 714 F.3d 659, 674 (2d Cir. 2013).

Plaintiffs do little to allege specific personal jurisdiction over Dassen and Fouquet in connection with their Section 20A claim. This deficiency is evidenced by the fact that plaintiffs' only argument in support of personal jurisdiction amounts to one sentence: "Dassen and Fouquet conceded jurisdiction for the section 10(b) and 20(a) claims—the predicate violations for the Section 20A claims—which is sufficient." Opp. at 38 (citing In re Aegean, 529 F. Supp. 3d at 139-40, 176). Put simply, plaintiffs misread In re Aegean. There, this Court found that the plaintiffs had failed to allege "a basis for specific jurisdiction over [the defendant] in connection with the Fraudulent Scheme" alleged, but "[n]evertheless," the Court found that a specific stock repurchase "support[ed] a finding of personal jurisdiction over [the defendant] with respect to the Section 20A insider trading claim." In re Aegean, 529 F. Supp. 3d at 139. "The reason for [that] conclusion [was] that the Repurchase, in the context of the Section 20A claim, was aimed at the United States. Aegean stock traded only on the NYSE and Aegean's transfer agent [was] located in Colorado." Id. Therefore, "[u]nlike [] business transactions

64

that could readily occur entirely overseas, this one could not be effected anywhere other than in the United States.  Facilitating a $100 million stock buyback of shares that trade on the NYSE, constituting over 20% of shares outstanding, created a 'near certainty that United States shareholders . . . would be adversely affected" by the defendant's actions.  Id. (alteration in original).

The Court did not, as plaintiffs suggest, find that jurisdiction was proper over the individual defendant because jurisdiction held in connection with the underlying predicate claims, but rather found that the defendant's transaction was purposely directed at the United States, and thus specific jurisdiction was proper.  Here, on the other hand, Dassen and Fouquet sold their shares on Euronext and not a U.S. market, Mot. at 39, a fact that plaintiffs do not dispute.  ASML shares do not trade exclusively on American markets, and the sales did not amount to a significant percentage of the shares outstanding.  In the absence of such allegations, the Court finds that the sales did not create a "near certainty that United States shareholders would be adversely affected," and cannot find that Dassen and Fouquet "expressly aimed" their conduct at the forum.  Accordingly, plaintiffs have insufficiently pled personal jurisdiction over

Fouquet and Dassen in connection with their Section 20A claim and that claim must be dismissed.

### CONCLUSION[27]

For the foregoing reasons, the Court grants defendants' motion to dismiss in part as to plaintiffs' purported scheme liability claim and Section 20A claim (Count III) and denies defendants' motion as to Counts I and II. The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 92.

**SO ORDERED.**

Dated:    March 27, 2026
          New York, New York

_____
        NAOMI REICE BUCHWALD
     UNITED STATES DISTRICT JUDGE

---

[27]    The Court understands that the parties requested oral argument. However, given the extensive briefing and that our holding is based on clear legal doctrine, the Court determined that oral argument would not be productive.